# EXHIBIT D

Court Reporter's Transcript of
the Termination Hearing

1               DOCKET NO.: 034-LH-01-2016

2 TROUP INDEPENDENT     ) BEFORE CHRISTOPHER D. FREEMAN
  SCHOOL DISTRICT,        )

3                       )
  VS.                 ) CERTIFIED HEARING EXAMINER

4                       )
  DENNIS ALEXANDER,     ) TEXAS EDUCATION AGENCY

5

6

7   ************************************************************

8

9                   REPORTER'S RECORD

              HEARING ON TERMINATION

10                   VOLUME 1 OF 1

11                 FEBRUARY 29, 2016

12

13   ************************************************************

14

15     BE IT REMEMBERED THAT on the 29th day of February,

16   2016, the above styled and numbered cause came on for

17   hearing before the Certified Hearing Examiner, Mr.

18   Christopher D. Freeman, in the Troup Independent School

19   District Administration Building, located at 201

20   Carolina Street, Troup, Texas, before Terri Lynn Smith,

21   CSR in and for the State of Texas, reported by

22   computerized stenotype machine, pursuant to the Texas

23   Rules of Civil Procedure and the provisions stated on

24   the record or attached hereto, and the following

25   proceedings were had, to wit:

1                    A P P E A R A N C E S

2

3    CERTIFIED HEARING EXAMINER

4        MR. CHRISTOPHER D. FREEMAN
         WILLIAM ARNOLD III & ASSOCIATES, P.C.
5        9400 North Central, Suite 605
         Dallas, Texas  75231
6        Telephone:  (214) 393-3840
         Facsimile:  (214) 692-6474
7        cfreeman@awalaw.com

8

9    COUNSEL FOR PETITIONER:  Troup Independent School
                             District
10

11       MR. JOHN C. HARDY
         MR. JOHN M. HARDY
12       HARDY, COOK & HARDY, P.C.
         2080 Three Lakes Parkway
13       Tyler, Texas  75703
         Telephone:  (903) 561-8400
14       Facsimile:  (903) 561-8228
         john@hardylaw.com
15       jmh@hardylaw.com

16

17   COUNSEL FOR RESPONDENT:  Dennis Alexander

18       MR. RON ADKISON
         ADKISON LAW FIRM
19       300 West Main Street
         Henderson, Texas  75652
20       Telephone:  (903) 657-8545
         Facsimile:  (903) 657-6108
21       ron@adkisonlawfirm.com

22

23

24

25

1                            INDEX

2                                            PAGE

3    Appearances...................................1..    2

4    Proceedings.......................................    7

5    Petitioner's Opening Statement By Mr. John C. Hardy    11

6    Respondent's Opening Statement by Mr. Adkison......    12

7    Petitioner's Closing Statement by Mr. John C. Hardy  198

8    Respondent's Closing Statement by Mr. Adkison......  199

9    Petitioner's Rebuttal Closing Statement by
     Mr. John C. Hardy.................................  204
10
     Court Reporter's Certificate......................  210
11

12                   PETITIONER WITNESS INDEX

13   STUART BIRD                                     PAGE

     Direct Examination by Mr. John C. Hardy............   15
14   Cross-Examination by Mr. Adkison...................   37
     Redirect Examination by Mr. John C. Hardy..........   55
15   Recross-Examination by Mr. Adkison.................   56

16

17   COLTON WHITSELL

     Direct Examination by Mr. John C. Hardy............   59
18   Cross-Examination by Mr. Adkison...................   64
     Redirect Examination by Mr. John C. Hardy..........   79
19   Recross-Examination by Mr. Adkison.................   81

20

21   BLAKE ATTAWAY

     Direct Examination by Mr. John C. Hardy............   85
22   Cross-Examination by Mr. Adkison...................   92
     Redirect Examination by Mr. John C. Hardy..........  102

23

24   STEPHANIE "SAM" MCMULLEN HAMILTON

25   Direct Examination by Mr. John C. Hardy............  106

1  ANDY M. GRIFFIN, JR.

2  Direct Examination by Mr. John C. Hardy........... 125
   Cross-Examination by Mr. Adkison.................. 132

3

4  RESPONDENT WITNESS INDEX

5  STUART BIRD

6
7  Direct Examination by Mr. Adkison................. 141
   Cross-Examination by Mr. John C. Hardy............ 160

8  ASTIN GREER

9
10 Direct Examination by Mr. Adkison................. 162
   Cross-Examination by Mr. John C. Hardy............ 169
   Redirect Examination by Mr. Adkison............... 173

11

12 JOEY GRAY

13 Direct Examination by Mr. Adkison................. 181
   Cross-Examination by Mr. John C. Hardy............ 183

14

15 LEONARD CABE

16 Direct Examination by Mr. Adkison................. 186

17

18 MATT ADAMS

   Direct Examination by Mr. Adkison................. 189

19

20 WILLIAM MITCHELL ADAMS

21 Direct Examination by Mr. Adkison................. 191
   Cross-Examination by Mr. John C. Hardy............ 193

22

23 WALKER ADAMS

24 Direct Examination by Mr. Adkison................. 195
   Cross-Examination by Mr. John C. Hardy............ 197

25

1                    EXHIBIT INDEX

2                      PETITIONER

3    NO. DESCRIPTION                                    PAGE

4    1   Dual-Assignment Term Contract..................   18

5    2   Handwritten Statement, Blake Attaway, 10/22/15..  89

6    5   Handwritten Statement, Adam Thomas, 10/21/15....  58

7    6   Handwritten Statement, Sam Hamilton, 10/19/2015. 109

8    10  Troup ISD, Employee Standards of Conduct,
         Reports to State Board for Educator
9        Certification, DHB(Legal)-P....................   18

10   11  Troup ISD, Term Contracts,
         Suspension/Termination During Contract,
11       DFBA(Legal)-P..................................   18

12   12  Agenda of Special Meeting, The Board of Trustees
         Troup ISD, November 3, 2015....................   18
13
     13  October 27, 2015, Letter to Texas Education
14       Agency from Stuart Bird, Superintendent........   18

15   14  Notice of Special Meeting, The Board of Trustees
         Troup ISD, November 3, 2015....................   18
16
     15  Troup ISD Board of Trustees, Special Meeting,
17       November 3, 2015...............................   18

18   16  Notice of Special Meeting, The Board of Trustees
         Troup ISD, December 18, 2015...................   18
19
     17  Troup ISD Board of Trustees, Special Meeting,
20       December 18, 2015..............................   18

21   18  Notice of Proposed Termination of Term Contract,
         December 18, 2015, Dennis Alexander............   18
22
     19  December 18, 2015, Letter to Dennis Alexander
23       from Stuart Bird, Superintendent...............   18

24   20  Troup Independent School District, Coaching
         Staff Evaluation Form, Sam.....................   18
25

1  21  Troup Independent School District, Coaching
       Staff Evaluation Form, Sam McMullen Hamilton....  18
2
   22  Troup Independent School District, Coaching
3      Staff Evaluation Form, Sam Hamilton.............  18

4
                          RESPONDENT
5
   NO. DESCRIPTION                                        PAGE
6
   1   Book, "The Things They Carried" by Tim O'Brien,
7      2009 Edition, ISPN 978-0-618-70641-9...........  144
       (Retained by the Certified Hearing Examiner.)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         PROCEEDINGS

2                 INDEPENDENT HEARING EXAMINER:  Here we'll

3      call Docket No. 034-LH-01-2016.  Parties please state

4      your name and appearances.

5                 MR. JOHN C. HARDY:  John C. Hardy on

6      behalf of Troup Independent School District, attorney.

7      Sitting to my right is Mr. Stuart Bird, superintendent

8      of Troup ISD, and to my left is John M. Hardy, attorney

9      in my office.

10                 MR. ADKISON:  Ron Adkison, your Honor.  I

11      represent Dennis Alexander.  This is Coach Alexander

12      sitting to my right.

13                 INDEPENDENT HEARING EXAMINER:  Okay.  The

14      attorneys have invoked the Rule.  Let me ask everyone

15      who's -- who's sitting in the room, if -- if you know or

16      expect to be called as a witness in this case, will you

17      raise your hand, please?

18                 Okay.  Let me get you guys -- you folks

19      to go ahead and stand up and let me ask counsel if -- if

20      you see -- if either of y'all see anyone in the room who

21      is not standing up who you expect to be witnesses in

22      this matter other than those seated at counsel table.

23                 MR. ADKISON:  I do not.

24                 MR. JOHN C. HARDY:  None from me.

25                 INDEPENDENT HEARING EXAMINER:  Okay.  All

1  of you who are standing up -- first, let me get your

2  names.

3              MR. ADAMS:  Walker Adams.

4              INDEPENDENT HEARING EXAMINER:  Okay.

5              MR. GRAY:  Joey Gray.

6              MR. WILLIAMS:  Kyle Williams.

7              MR. CABE:  Leonard Cabe, C-a-b-e.

8              INDEPENDENT HEARING EXAMINER:  Pink

9  shirt.

10             MR. MITCH ADAMS:  Mitch Adams.

11             MR. MATT ADAMS:  Matt Adams.

12             MR. DAVIS:  Patrick Davis.

13             INDEPENDENT HEARING EXAMINER:  Okay.

14             MR. GREER:  Astin Greer.

15             INDEPENDENT HEARING EXAMINER:  Spell your

16 last name for me.

17             MR. GREER:  Greer, G-r-e-e-r.

18             INDEPENDENT HEARING EXAMINER:  Okay.  For

19 all of you standing, the attorneys have invoked the

20 Rule, which means that in just a minute, I'm going to

21 swear you in as witnesses and then I'm going to ask you

22 to step out, and you will not be permitted to sit in the

23 hearing and listen to other testimony in this case.

24             Okay.  I also need to admonish you that

25 you're not to discuss the case when you're -- when

1 you're out of the hearing room with -- with each other,

2 with anyone else. And after you've testified, you're

3 not to discuss your testimony and the testimony that you

4 gave with anyone else. Does anybody have any questions

5 about that?

6 Okay. We've another one standing. Tell

7 me --

8 MR. ADKISON: Well, there's two others

9 that -- that may be relevant on an issue.

10 INDEPENDENT HEARING EXAMINER: Okay.

11 Tell me your name, ma'am.

12 MS. DARDEN: Frankie Darden.

13 MR. DARDEN: Nelson Darden.

14 INDEPENDENT HEARING EXAMINER: Okay.

15 Going back to what I said, does anybody have any

16 questions about that admonishment that I've given you?

17 We all clear on that? Okay. Let me get all of y'all to

18 raise your right hand.

19 (Witnesses sworn.)

20 INDEPENDENT HEARING EXAMINER: Okay.

21 Thank you. Go ahead and -- Mr. Hardy, do we have a

22 holding room that we can put them in or --

23 MR. JOHN C. HARDY: We do.

24 INDEPENDENT HEARING EXAMINER: If y'all

25 will follow Mr. Bird, he will put y'all in a holding

1 room, and we'll call for you when we need you.

2                    (Witnesses exited the room.)

3                    INDEPENDENT HEARING EXAMINER:  Okay.  The

4 only other two preliminary things that I have, first of

5 all, as I said on the record earlier, there are other

6 people in the hearing room.  By statute, the hearing's

7 closed unless the teacher requests it to be an open

8 hearing.  It's my understanding, Mr. Adkison, that Mr.

9 Alexander has requested an open hearing; is that

10 correct?

11                    MR. ADKISON:  Yes, sir, your Honor.

12 We've done it on every schedule.

13                    INDEPENDENT HEARING EXAMINER:  Okay.  The

14 final thing is I've spoken with the attorneys on this,

15 but I just need to get on the record we are -- if we do

16 not finish today, we are adjourning and by agreement

17 will return on Wednesday.  Wednesday is a holiday, being

18 Texas Independence Day, and the parties have agreed to

19 continue the hearing despite it being a holiday; is that

20 correct?

21                    MR. ADKISON:  Yes, your Honor.

22                    MR. JOHN C. HARDY:  That's correct.

23                    INDEPENDENT HEARING EXAMINER:  All right.

24 Mr. Hardy, you may begin.

25                    MR. JOHN C. HARDY:  Do you prefer that we

1    stand when we address --

2                    INDEPENDENT HEARING EXAMINER:  Whichever

3    is more comfortable and easier for you.  If you need to

4    stretch your legs, you can stand.

5                    MR. JOHN C. HARDY:  I appreciate that,

6    Judge.

7                    PETITIONER'S OPENING STATEMENT

8                    MR. JOHN C. HARDY:  This morning we're

9    here on behalf of the Troup Independent School District

10   regarding the proposed termination of Mr. Dennis

11   Alexander who has served as the athletic director and

12   head football coach at Troup.  The case is actually a

13   very simple case from the district's standpoint.  It is

14   not based upon Coach Alexander's evaluations for the

15   last couple of years.  This situation arose because of

16   inappropriate contact with students.

17                   Specifically we believe that the evidence

18   will clearly show that Coach Alexander hit more than one

19   student on more than one occasion and that his language

20   in addressing the staff and the students does not meet

21   the community standards nor the district standards, as

22   well as failing to get along with his coworkers as

23   required under our policy.

24                   We believe that the evidence will clearly

25   show that Coach Alexander abused his position as head

1   football coach and athletic director and that this is a
2   situation that was not remediable under the Texas laws
3   and that the recommendation from the administration was
4   termination of his contract.
5                   INDEPENDENT HEARING EXAMINER:  Okay.
6   Thank you.
7                   Mr. Adkison, would you like to make your
8   opening statement now or reserve?
9                   MR. ADKISON:  Well, your Honor, have you
10  received a copy of my Notice of Reservation of Federal
11  Questions?
12                  INDEPENDENT HEARING EXAMINER:  No.
13                  MR. ADKISON:  Let the record reflect that
14  I'm serving the parties with a copy of those also,
15  reserving the Fifth Circuit for federal questions for
16  determination by the Federal Court.
17                  RESPONDENT'S OPENING STATEMENT
18                  MR. ADKISON:   Your Honor, I'm not here
19  to make any friends.  I'm not here to be friends -- be
20  friends with anybody but the truth.  The truth is that
21  the won/loss record Coach Alexander had for the past two
22  years was not good, that there was discussion already
23  started among the school board members by
24  dissatisfaction with that, that this was seized upon a
25  as a perfect opportunity.

1          The student involved in this allegation
2   is both the son and the grandson of a school board
3   member.  The evidence is going to show you that this
4   investigation that was done is absolutely inadequate,
5   that it was result oriented, that the result to be
6   obtained was to get Coach Alexander to resign.  The
7   reason for that is because he has a multiyear contract
8   that still has another year remaining on it after this
9   year.
10          As I understand it, at the behest of the
11  current school board president, which Coach Alexander
12  was hired, the current school board president being a
13  former coach, that Coach Alexander's contract does not
14  allow him to be reassigned, so the only option is to
15  fire him.
16          Now, as you look at the Reservation of
17  Federal Questions that I filed in this case, we are
18  expressly reserving those federal questions for
19  determination with the United States District for the
20  Eastern District of Texas.  However, as the reservation
21  points out, those same actions violate the state
22  constitution.  So you may hear evidence in this case
23  about constitutional violations.  Those are expressly
24  referencing the state constitution, not the federal
25  constitution.

1            And I intend by cross-examination to show
2    that this investigation was rigged at the beginning, and
3    when I say that, that's no aspersion on Mr. Hardy.  Mr.
4    Hardy only knows what he's been told by the
5    superintendent.  The school board only knows what they
6    have been told by the superintendent.  And as this
7    investig -- this hearing goes on, I'm going to try to
8    demonstrate for you what really happened.  I'm going to
9    show you that Dennis Alexander's language is not worse
10   than any other coach and that the current president
11   of the school board and I stood right there in that
12   corner at a reception with Coach Alexander when he was
13   hired and laughed about it.  It's not anything that
14   wasn't known to them when they hired him.  And there was
15   an allegation of a racial slur, but that's so hilarious
16   I hadn't heard anything about it this morning.
17            And when we get through, you're the last
18   person that can save this school district from the
19   Whitsells.  Otherwise they're headed to federal court,
20   and if it doesn't do anything but get his year's salary,
21   the last one of those that I saw reported the attorney's
22   fees at $350,000.  So you're their last hope.
23            INDEPENDENT HEARING EXAMINER:  Mr. Hardy,
24   call your first witness.
25            MR. JOHN C. HARDY:  Call Mr. Stuart Bird.

1          INDEPENDENT HEARING EXAMINER:  Mr. Bird,

2   go ahead and spell your first and last name for the

3   court reporter.

4          MR. BIRD:  First name is Stuart,

5   S-t-u-a-r-t.  The last name is Bird, B-i-r-d.

6          INDEPENDENT HEARING EXAMINER:  And I did

7   not swear you in earlier.  Let me get you to go ahead

8   and raise your right hand.

9              STUART BIRD,

10  having been first duly sworn, testified as follows:

11         INDEPENDENT HEARING EXAMINER:  You may

12  proceed.

13             DIRECT EXAMINATION

14  BY MR. JOHN C. HARDY:

15     Q.   Mr. Bird, would you state your name for the

16  record, please, sir?

17     A.   Stuart Bird.

18     Q.   And what position do you hold in employment

19  right now?

20     A.   Superintendent of schools, Troup ISD.

21     Q.   And how long have you held that position?

22     A.   Four years at the end of this year.

23     Q.   Were you a superintendent at Troup ISD at the

24  time Mr. Dennis Alexander was hired?

25     A.   I was not.

1    Q.    Okay.  Who was the superintendent at that time?

2    A.    They were without a superintendent at that

3  time.

4    Q.    Had Mr. Beaty been --

5    A.    Mr. Beaty was the prior superintendent.

6    Q.    And do you recall who the Board president was

7  at the time Mr. Alexander was hired?

8    A.    Yes, sir.  That would be Andy Griffin.

9    Q.    Let's talk a little bit about Mr. Alexander's

10  position with Troup ISD.  What position does he hold?

11    A.    He is the athletic director and head football

12  coach.

13                MR. JOHN C. HARDY:  May I approach the

14  witness?

15                INDEPENDENT HEARING EXAMINER:  Yes.

16                MR. JOHN C. HARDY:  Your Honor, what I've

17  handed the witness is a list of 22 exhibits from the

18  school district's point of view that I'd previously

19  shared with Mr. Ron Adkison, attorney for Mr. Alexander.

20  It's my understanding that -- it was reported to you

21  earlier that there were no objections to those exhibits.

22                MR. ADKISON:  That's not true.  These

23  Exhibits 2, 3, 4, 5, 6, 7, 8, 9 all are hearsay

24  statements through the definition of hearsay.  They're

25  out of court statements made by the witness not here.

1  It's offered for -- to show the truth of the matter

2  asserted therein.  For that reason, I certainly object

3  to those.

4              INDEPENDENT HEARING EXAMINER:  All right.

5  Hold on just a second.

6              MR. ADKISON:  One other point.

7              INDEPENDENT HEARING EXAMINER:  I'm

8  listening.

9              MR. ADKISON:  The introduction of those

10  evidence would deprive my -- this coach of a

11  constitutional right to confront his accusers in the

12  termination hearing.  Violations of his civil liberties

13  have been enough at this point.  This only exacerbates

14  it.

15              INDEPENDENT HEARING EXAMINER:  Let's go

16  through them, Mr. Adkison.  Which ones do you not have

17  objections to?

18              MR. ADKISON:  No. 1 is the contract.  I

19  have no objection to that.  No. 10, the Standards of

20  Conduct, Reports.  No. 11, Termination During Contract.

21  The only objection to those are that they are selective

22  parts of a statute or a -- or a governing enactment, and

23  for optional completeness the entire statute or

24  enactment should be in place.  The agenda of the special

25  board meetings of the Troup ISD, 12, 13, 14, 15, 16, 17,

1   18, I don't object to.  In fact, I welcome them.  They
2   show the constitution violation for failure to give a
3   prompt hearing.  19 I don't object to.  It's a letter
4   sent by the superintendent.  20 appears to be coaching
5   staff evaluation forms for one of the witnesses.  Those
6   were authored by my client, and I don't object to them.
7           MR. JOHN C. HARDY:  Your Honor, while
8   you're going through those documents, the one number
9   that I did not hear, and I may have just missed it, was
10  No. 18.
11          INDEPENDENT HEARING EXAMINER:  I thought
12  that he said that 18 he was fine with.
13          MR. JOHN C. HARDY:  Okay.  Thank you.
14          INDEPENDENT HEARING EXAMINER:  Okay.
15  Petitioner's Exhibit 1 is admitted.  Petitioner's
16  Exhibit 10, I heard your objection, Mr. Adkison.  It's
17  overruled.  10 is admitted.  Okay.  Objection to 11 is
18  overruled.  11 is admitted.  12, 13, 14, 15, 16, 17, 18,
19  19, 20, 21, 22 are all admitted.
20          (Petitioner's Exhibits 1 and 10-22
21          admitted.)
22          INDEPENDENT HEARING EXAMINER:  Now, Mr.
23  Hardy, that leaves us with Exhibits 2 through 9, and
24  we've got a hearsay objection on those.  What's your
25  response?

1        MR. JOHN C. HARDY:  My response to that

2   is that those are documents that were made in the

3   investigation by Mr. Stuart Bird, charged with the

4   investigation regarding the wrongdoings of Dennis

5   Alexander, that those were made contemporaneous to the

6   time of the events.  They were part of the official

7   records of the school district and should be admitted.

8   I can also test -- excuse me.  I can also say for the

9   hearing officer that the witnesses are available, and

10  they will be called to verify those documents.

11        MR. ADKISON:  Such time as they're

12  called, they may become admissible, but in the meantime,

13  the predicate for a business record hadn't been met.

14  It's probably not really a business record, and these --

15  until these witnesses hit the witness stand, these are

16  not admissible.  And there's no harm to them if they're

17  planning on calling them anyway.

18             INDEPENDENT HEARING EXAMINER:  Yeah.

19  I -- I think, Mr. Hardy, you know, without taking the

20  time to read through each one of these, just generally

21  they -- these look like handwritten statements that were

22  made by, I presume, students, but there may be adults in

23  here, too.  I think you can certainly ask him general

24  questions about these, but -- but for now, the objection

25  is sustained.  Obviously, once you bring those students

1  or adults in, then that changes it.

2                    MR. JOHN C. HARDY:  Thank you.  Are we

3  ready to proceed?

4                    INDEPENDENT HEARING EXAMINER:  Yes.

5      Q.   (BY MR. JOHN C. HARDY)  Mr. Bird, if you'll

6  look in front of you, you have a list of exhibits.  Do

7  you see item No. 1?

8      A.   Yes, sir.

9      Q.   Is that the contract that Mr. Alexander serves

10 at this time?

11     A.   It is.

12     Q.   And just for the record, explain to the hearing

13 officer what happened that caused Mr. Alexander's

14 employment status to come into question in your office?

15     A.   What happened was that he -- it was reported to

16 me through a variety of sources that Coach Alexander had

17 slapped a student or students on the football field at

18 practice.

19     Q.   And was that a concern to you?

20     A.   It's always a concern to me when we put our

21 hands on people.

22     Q.   As the chief officer in operating, the person

23 in charge of the district, did you undertake an

24 investigation regarding that situation?

25     A.   Yes, sir, I did.

1    Q.   Who -- who was the first person that reported

2    to you that one or more students had been struck by Mr.

3    Alexander?

4    A.   One of the student's parents.

5    Q.   And what was that parent's name?

6    A.   John Whitsell.

7    Q.   Does he also serve on the school board?

8    A.   He does.

9    Q.   Did that make any difference to you?

10   A.   None.

11   Q.   Are all students treated the same under your

12   eyes?

13   A.   Yes, sir.

14   Q.   When that was reported to you, explain what

15   steps you took in your investigation.

16   A.   I -- from that -- from the time he reported it

17   to me, it was reported to me again the next morning.  I

18   immediately went to the high school and asked that our

19   principal assemble students that were in the proximity

20   of where the student was allegedly slapped and that he

21   assemble as many of those as he could find through the

22   report of adults who were on the field.  He assembled

23   those students.  I asked that they not have time to

24   contact each other.  I wanted them one at a time.

25              I asked each of those students to come in

1  and to -- and just sit down with Mr. Smith and myself

2  and just was investigating an incident that may have

3  happened at football practice the day before or maybe it

4  was even the day before that by this time, by the time I

5  got the information, and was there anything that, you

6  know, that they -- that went on that was unusual.  And

7  if I'm not mistaken, all but one of them said to me, You

8  mean when Coach A slapped Colton?  And I said, That

9  would be the incident I'm in reference to.  And then I

10  said, Tell me what you know about that, and each of them

11  shared with me their information.  I asked that they be

12  carried to a separate room without contact of any of the

13  other people and that they just write a statement as to

14  what they had said, sign it and date it.

15      Q.   Did you also talk with some of the staff at

16  Troup ISD about what had happened?

17      A.   I did.  I talked to our trainer, Sam, and I

18  talked to several coaches.  I had the coaches come in.

19  I asked them the same question.  They all knew what I

20  was in reference to.  All but -- almost none of the

21  coaches actually saw it.  But they heard the kids

22  talking about it.  But they never really -- they didn't

23  actually see what took place.  My trainer, Sam, did see

24  it, and there may have been one other coach that'll have

25  an opportunity to speak, I think, today, that saw

1  something relative to that.

2      Q.   Did you feel that you needed to talk to every

3  single person that was out there on the field that day?

4      A.   I did not.  I thought I had a pretty good

5  sampling of what went on, especially those that were in

6  the closest proximity to the situation, and that was

7  what I was most interested in.  Obviously, as many

8  people as were gathered, there would be people there who

9  could not obviously have seen what went on, may not have

10  been paying attention enough to see what went on, so

11  forth and so on.  So I really thought I had a very good

12  sampling of what I needed.

13      Q.   Did you have more than one student that said

14  that they had been struck?

15                 MR. ADKISON:  Object to leading.

16      A.   Answer it?  Yes.  I did have more than one

17  student.

18                 INDEPENDENT HEARING EXAMINER:  Overruled.

19      A.   I had two student -- two other students that

20  said they'd been struck.

21      Q.   (BY MR. JOHN C. HARDY)  Did that cause you any

22  concern?

23      A.   It always causes me concern when you strike

24  students in -- in education, or any time for that

25  matter.

1     Q.   Did these events take place on or about October
2   the 19th?
3     A.   Yes, sir.
4     Q.   And was your investigation started very quickly
5   after that?
6     A.   Yes, sir.  As soon as I found out the -- as
7   soon as it was reported to me, it started immediately.
8     Q.   Did you offer or request Mr. Alexander to come
9   to your office and visit with you about the situation?
10     A.   I did.
11     Q.   What happened during that first visit?
12     A.   We visited and he came over.  And, in fact, by
13   the time I got back to my office and at the end of the
14   -- of my -- that part of the investigation, I got a text
15   from him that said that he was -- despite reports, he
16   was doing -- alive and well in the field house.  Then I
17   said, Then you need to come and visit with me.  So he
18   came over and we sat down and visited.  And I asked him
19   questions about football practice and, you know, various
20   things like that, and then I finally got down to saying,
21   Did you slap Colton Whitsell?
22               And his response to me was, I didn't slap
23   anybody.
24               I said, Well, tell me what did happen.
25               He said, I don't know what happened, he

1    said, but I didn't slap anybody.

2        Q.    Did he acknowledge striking another student or

3    pushing one down?

4        A.    He acknowledged taking Colton's headband off of

5    his head.  That wasn't at the time of the slap.  I don't

6    know that he acknowledge -- no, sir.  He did not

7    acknowledge that to me.

8        Q.    Did you offer Mr. Alexander an opportunity to

9    tell his side of the story?

10        A.    Yes, sir; more than one time.

11        Q.    Did he tell it?

12        A.    He told me what I said he said, that he didn't

13    slap anybody.  And when I said, Well, then, Dennis, tell

14    me what happened, he said, I don't know.  And we had two

15    other conversations after that.

16        Q.    How did those -- let's talk about those.  How

17    did those con -- did they differ from the first

18    conversation?

19        A.    They differ a little from the first.  In fact,

20    we had -- he and I talked, and I had -- I asked him,

21    Will you sit down with the student's dad and have a

22    conversation with him?

23            You know, let me -- if I may paint this

24    picture.  These are good friends.  These folks get along

25    well.  They go to church together.  I really thought,

1  based on what -- what I knew, that if we could get those

2  guys together, that they might have a conversation and

3  we might resolve that issue.

4          MR. ADKISON:  I'm going to object.  This

5  is nonresponsive to anything he's been asked.

6          INDEPENDENT HEARING EXAMINER:  Sustained.

7      Q.   (BY MR. JOHN C. HARDY)  Tell us what happened

8  in the second conversation with Mr. Alexander.  Was his

9  demeanor the same as it had been in the first?

10     A.   It was.

11     Q.   Describe his demeanor in the first

12  conversation.

13     A.   You know, Dennis and I have been friends a long

14  time, so our friendship runs deep, and we have very good

15  conversations.  It was, at the very least, reserved.

16     Q.   What was his emotional status?

17     A.   Concerned to me.

18     Q.   Did he -- in your opinion, did he have an

19  opportunity to rebut what you were discussing with him?

20     A.   He certainly did, and he had an opportunity to

21  at least tell me what happened so I could kind of wrap

22  my head around it.  I just didn't get that information.

23     Q.   Was it your evaluation after those

24  conversations that he should be suspended?

25     A.   It was for fear that if, in fact, that did

1   happen, that if I put him back out there, then I run the

2   risk of it happening again to someone else, but we

3   already had that information.

4       Q.   Did you direct Mr. Alexander to leave the

5   premises and not return to the Troup facilities?

6       A.   I did.

7       Q.   And did he follow that directive?

8       A.   No, sir.

9       Q.   Did any Board member know a suspension, within

10  your knowledge, a suspension of Mr. Alexander before it

11  took place?

12      A.   No, sir.

13      Q.   If you will turn over in the exhibits that are

14  in front of you, Mr. Bird, and look at Item No. 10,

15  please, sir.  It's been admitted into evidence.  Do you

16  recognize that as a policy of Troup ISD?

17      A.   I do.

18      Q.   Is that reporting requirements regarding an

19  employee's misconduct?

20      A.   Yes, sir.

21      Q.   Is that policy in place here at Troup?

22      A.   It is.

23      Q.   Did you follow that policy?

24      A.   Yes, sir, I did, to the best of my --

25      Q.   What did you do to follow that policy?

1      A.    Primarily stayed in contact with you to be sure

2   we were following the policy, to be sure that we weren't

3   violating the policy.  I kept John in contact the whole

4   time because this was a very serious matter, and that's

5   basically --

6                    MR. ADKISON:  Your Honor, are they

7   intending to waive the attorney-client privilege?

8                    MR. JOHN C. HARDY:  No.

9                    MR. ADKISON:  If he's going to -- if he's

10  going to rely -- if he's going to rely upon

11  conversations with the attorney, then he's waiving it.

12                   INDEPENDENT HEARING EXAMINER:  I don't

13  think he -- I don't think he said anything that the

14  attorney told him or that he told the attorney.  He was

15  just referencing that he had conversations with the

16  attorney.  Continue, Mr. Hardy.

17                   MR. JOHN C. HARDY:  Thank you, sir.

18      Q.    (BY MR. JOHN C. HARDY)  Mr. Bird, did you write

19  a letter to the State Board of Education Certification

20  regarding Dennis Alexander?

21      A.    Yes, sir, I did.

22      Q.    Did you feel it was necessary?

23      A.    Yes, sir, I did.

24      Q.    If you'll look at Item No. 11, Exhibit -- the

25  next one, policy DFBA Legal.

1      A.    Yes, sir.

2      Q.    Is that a policy of the Troup Independent

3   School District?

4      A.    It is.

5      Q.    And did you, to the best of you ability, follow

6   that policy?

7      A.    I did.

8      Q.    Was this the part of the policy that you

9   suspended Mr. Alexander under?

10     A.    Yes, sir.

11     Q.    Was Mr. Alexander suspended with or without

12  pay?

13     A.    With pay.

14     Q.    So Mr. Alexander's been paid since October the

15  19th through today?

16     A.    That's correct.

17     Q.    And did you believe that the safety of the

18  students at Troup ISD were in jeopardy if Mr. Alexander

19  was back on campus?

20     A.    I did.

21     Q.    Is that why he remains suspended?

22     A.    Yes, sir.

23     Q.    Now, during this time of suspension, was Mr. --

24  with Mr. Alexander on suspension, did the Board have

25  several meetings?

1    A.    Yes, sir.

2    Q.    And did you attend those meetings?

3    A.    Yes, sir.

4    Q.    If you'll look at Item No. 12, that is an

5    Agenda, notice of a special board meeting on November 3,

6    2015.  Do you see that?

7    A.    Yes, sir.

8    Q.    Did you attend that meeting?

9    A.    Yes, sir.

10    Q.    Was part of the discussion that night in

11    executive session -- I'm not asking you what was said in

12    executive session.

13    A.    Sure.

14    Q.    But I'm asking was part of that meeting an item

15    listed as discussion of contract of Dennis Alexander?

16    A.    Yes, sir.

17    Q.    Okay.  And then if you'll look at Item No. 13.

18    A.    Okay.

19    Q.    Is that your letter to the Texas Education

20    Agency regarding the allegation of educator misconduct

21    regarding Dennis Alexander?

22    A.    Yes, sir.

23    Q.    Do you have anything in there that you feel is

24    incorrect, untrue, or out of -- out of character with

25    what transpired?

1      A.    No, sir.

2      Q.    I'd ask you to look at Item No. 14, please,

3   sir.

4      A.    Okay.

5      Q.    Can you identify that as the Notice of Special

6   -- Agenda, Notice of Special Meeting of the Board of

7   Trustees that shows that it took place on Friday,

8   October 30th at approximately 9:00 o'clock?

9      A.    Yes, sir.

10     Q.    Again, does it talk about Item No. 6 on that

11  agenda, a possible action on the contract of athletic

12  director --

13     A.    Yes, sir.

14     Q.    -- Dennis Alexander?

15     A.    Yes, sir.

16     Q.    Then on Item No. 15, are those the official

17  minutes in the records of the Troup ISD Board of

18  Trustees?

19     A.    Yes, sir.

20     Q.    And that's regarding a meeting of November the

21  3rd?

22     A.    Uh-huh.

23     Q.    Okay.  If you'll look at Item No. 16, is that

24  the agenda where there was a Notice of Special Meeting

25  of the Board on December 18th --

 1     A.    Yes.

 2     Q.    -- 2015?

 3           Is that part of the official notice?

 4     A.    Yes, sir.

 5     Q.    And then Item No. 17, Mr. Bird, are those

 6  minutes of the board meeting of December 18th?

 7     A.    Yes, sir.

 8     Q.    And under Item No. 7 of the minutes, does it

 9  reflect what action the Board took regarding Dennis

10  Alexander's contract?

11     A.    Yes, sir.

12     Q.    Would you read that for the Court, please?

13     A.    Yes, sir.  It says, Shane Jasper moved to

14  propose termination of Dennis Alexander as athletic

15  director/head football coach and that he provide notice

16  -- that he be provided notice of this proposed

17  termination as soon as possible.  Robbie Switzer

18  seconded that motion.

19     Q.    Okay.  And what was the vote on that motion?

20     A.    4-0.

21     Q.    Okay.  If you'll look back up at the top of

22  those minutes, it shows members that were present, does

23  it not?

24     A.    Yes, sir.

25     Q.    And it shows that Mr. Gene Whitsell and Mr.

1  John Whitsell were -- were present, does it not?

2      A.   Yes, sir.

3      Q.   And do you know for a fact whether or not they

4  participated in any of the discussions or the vote

5  regarding Dennis Alexander?

6      A.   No, sir.  They did not.

7      Q.   If you'll look at Item No. 18, you notice that

8  that's the Notice of Proposed Termination of Term

9  Contract?

10     A.   Yes, sir.

11     Q.   Was that the action that was addressed by the

12  Board directing the board president to give Mr.

13  Alexander notice of proposed termination?

14     A.   Yes, sir.

15     Q.   And was that shared with Mr. Alexander?

16     A.   Yes, sir.

17     Q.   Then if you'll look at No. 19 with me, please,

18  sir.  Is that a letter on Troup ISD letterhead?

19     A.   Yes, sir.

20     Q.   Is it a letter signed by you as Troup

21  Independent School District superintendent?

22     A.   It is.

23     Q.   Is it dated -- what date is it?

24     A.   This is dated December the 18th, 2015.

25     Q.   And did you prepare this letter regarding the

```
 1    Board action on the proposed termination of the contract
 2    of Dennis Alexander?
 3         A.   Yes, sir.
 4         Q.   And does that letter correctly reflect the
 5    persons that you believe will be witnesses at the time
 6    if there is a hearing?
 7         A.   Yes, sir.
 8         Q.   And does it also have a basis under -- on the
 9    second page, a basis for your recommendation for
10    proposed termination?
11         A.   Yes, sir.
12         Q.   And does it list each item?
13         A.   Yes, sir.
14         Q.   Eight items?
15         A.   Yes, sir.  There are eight there.
16         Q.   And you believe that each of those items is a
17    relevant area for the termination of this coach?
18         A.   Yes, sir.
19         Q.   Do you believe that inappropriate contact with
20    students is a good a cause for termination of a coach's
21    contract?
22         A.   Yes, sir.
23         Q.   Do you believe that behavior that presents a
24    danger of physical harm to students is a good cause
25    reason for termination?
```

1      A.    Yes, sir.

2      Q.    Do you believe that abuse of a student is a

3   good cause for termination?

4      A.    Yes, sir.

5      Q.    Do you believe that assault on a student is

6   good cause for termination?

7      A.    Yes, sir.

8      Q.    Item No. 5, use of profanity in the course of

9   performing your duties of employment in the presence of

10  students and staff, as well as the public.  Is that

11  acceptable conduct at Troup ISD?

12     A.    No, sir.

13     Q.    Is that good cause, you believe, for

14  termination of a contract?

15     A.    Certainly.

16     Q.    Did your investigation lead you to believe that

17  these items that we've gone through here, 1 through 5 so

18  far, constituted good cause and based upon your

19  investigation --

20     A.    Yes, sir.

21     Q.    -- was cause for termination?

22     A.    Yes.

23     Q.    No. 6, failure to meet the district's standards

24  of professional conduct.  Do you feel that Mr. Alexander

25  met the standards of professional conduct at Troup ISD?

1    A.    No, sir.

2    Q.    No. 7, the list is failure to maintain an

3    effective working relationship and good rapport with

4    students, staff, and community.  Do you feel that Coach

5    Alexander did that?

6    A.    Yes, sir.

7    Q.    You felt like he had good rapport with the

8    students?

9    A.    No, no.  I'm sorry.  I misunderstood that.  No.

10   He -- with some and some not.

11   Q.    What about the staff?

12   A.    Same thing.

13   Q.    Do you still believe as you're here testifying

14   today that Coach Alexander should be terminated from his

15   position as coach and athletic director at Troup ISD?

16   A.    Yes, sir.

17   Q.    Did your investigation lead you to believe

18   that?

19   A.    Yes, sir.

20   Q.    Did you believe that the students that you

21   talked to were credible?

22   A.    I did.

23   Q.    Did you believe that they were reliable?

24   A.    Yes, sir.

25   Q.    Did they share with you their concern about

1  this coach?

2      A.   Yes, sir.

3      Q.   What about the staff?  Did you talk to some

4  of the staff?

5      A.   I did.

6      Q.   Did the staff provide you with comments that

7  led you to believe that it was inappropriate for him to

8  remain here as coach at Troup ISD?

9      A.   Yes.

10     Q.   Did you, from your investigation, believe that

11 Coach Alexander struck more than one student?

12     A.   Yes, sir.

13     Q.   Did your investigation lead you to believe that

14 inappropriate language was addressed to staff and

15 students by Mr. Alexander?

16     A.   Yes, sir.

17     Q.   Do you believe that Coach Alexander can come

18 back to Troup ISD and be successful as a coach?

19     A.   I do not.

20              MR. JOHN C. HARDY:  Pass the witness.

21                   CROSS-EXAMINATION

22 BY MR. ADKISON:

23     Q.   Well, he sure can't now, can he?  Your

24 investigation took care of that, didn't it?

25     A.   Yes, sir, I suppose.  I don't know whether they

1   did or not.  That's what we're here to decide.

2      Q.   Well, you just testified under oath that you

3   had an opinion about it.

4      A.   Well, I do.

5      Q.   Well, you recognize the two statements you just

6   made about you know and you don't know are entirely

7   contradictory under oath, don't you?

8      A.   You know, maybe, maybe not.

9      Q.   You understand you're under oath just like if

10  you --

11     A.   I understand --

12     Q.   -- were testifying --

13     A.   -- that.

14     Q.   -- in court?

15     A.   I -- I got a handle on it.

16     Q.   All right.  Now, let me ask you this:  The

17  first person to report this to you, this allegation to

18  you was a school board member, correct?

19     A.   That's correct.

20     Q.   And the child that he was making this complaint

21  about is also the grandson of a school board member,

22  correct?

23     A.   That's correct.

24     Q.   Now, when did you receive that complaint?

25     A.   I received that complaint, if I'm not mistaken,

1   on Tuesday.  I think Tuesday afternoon.

2       Q.   What time?

3       A.   You know, I don't really remember what time.

4       Q.   When was the incident supposed to have

5   occurred?

6       A.   Monday.

7       Q.   Okay.  And was the school board member who's

8   the parent, what did he tell you?

9       A.   He called me and he said, There's probably

10  something I need to tell you, and I slept on it

11  overnight.  And he said, But I don't want anything to

12  happen.  And I said, Well, it depends on what you tell

13  me as to what's going to happen because there are some

14  things that I have to follow-up on.  And I had already

15  had a report that --

16      Q.   Okay.  That's -- you've answered my question.

17      A.   Gotcha.

18      Q.   At what point did you start to keep a file?

19      A.   I started keeping a file, I guess when I

20  started the investigation at the high school.  That

21  includes these --

22      Q.   Well, did you make notes on the conversation

23  that you had with the school board member parent and put

24  it in your file?

25      A.   I did not.

1     Q.   Well, I've read a lot of this stuff about

2  people's duties at schools.  One of the things that a

3  superintendent does is keep and maintain adequate

4  records.

5     A.   Yes, sir.

6     Q.   So that's your duty under your contract and

7  under the state law to keep a record of what the school

8  district does, isn't it?

9     A.   That's correct.

10     Q.   And you knowingly failed to make an entry that

11  started this entire investigation?

12     A.   I disagree with you on that.  I -- I'm --

13     Q.   Well, is there a record of it?  Excuse me.  Is

14  there a record of it?

15     A.   There's not a record of that conversation, no.

16           MR. JOHN C. HARDY:  I'm going to object

17  to the arguments.  I mean, he can ask a question.  He

18  can be civil about it.  The witness is willing to answer

19  it.           INDEPENDENT HEARING EXAMINER:  Yeah.

20  Mr. Adkison --

21           MR. ADKISON:  I'll calm down.

22           INDEPENDENT HEARING EXAMINER:  Well, let

23  me finish, first of all.

24           MR. ADKISON:  I'm sorry.

25           INDEPENDENT HEARING EXAMINER:  When you

1  ask the witness a question, let him finish his answer.

2  MR. ADKISON:  May I object to

3  nonresponsive if it's nonresponsive?

4  INDEPENDENT HEARING EXAMINER:  If it's

5  not responsive, you can object.

6  Q.  (BY MR. ADKISON)  Now, when did you start

7  keeping a file?

8  A.  I started keeping a file when we started

9  talking to coaches and children, those that you objected

10 to.

11 MR. ADKISON:  Object to the last part as

12 nonresponsive.  Your Honor?

13 INDEPENDENT HEARING EXAMINER:  Sustained.

14 Q.  (BY MR. ADKISON)  Now -- so if you got the

15 report on Tuesday, when did you first start talking to

16 coaches and children?

17 A.  Probably sometime around 9:00 o'clock on

18 Tuesday morning -- I mean, it would have been Wednesday

19 morning.

20 Q.  So you interviewed nobody on Tuesday?

21 A.  Let me think through that a minute.  Let me

22 think through that for a minute.  I think he called me

23 on Tuesday.  So no, I wouldn't have interviewed anybody

24 'til Wednesday.

25 Q.  So you interviewed nobody Tuesday?

1    A.    Yes.

2    Q.    All right.  Where is the file that you kept?

3    A.    The file that I kept?

4    Q.    Uh-huh.

5    A.    Right here.

6    Q.    So the only file that you have are the exhibits

7    that you have either -- that you've attempted to offer

8    into evidence, correct?

9    A.    That's the only records I have, yes.

10    Q.    Now, when did you suspend Coach Alexander?

11    A.    That would have been Wednesday afternoon.

12    Q.    What was the date?

13    A.    21st.

14    Q.    October 21st?

15    A.    Uh-huh.

16    Q.    What is today?

17    A.    What is today?  I don't know what today -- I

18    don't know what today is.

19    Q.    February 29?

20    A.    Yes, sir.

21    Q.    2016?

22    A.    Yes, sir.

23    Q.    Has Coach Alexander been given an opportunity

24    to have a hearing at any time between October 21st and

25    February the 29th?

1      A.    No, sir.

2      Q.    Whose decision was that?

3      A.    Well, I guess it would have been our decision.

4      Q.    Who's "our"?

5      A.    Well, that would have been John and I and the

6  Board.

7      Q.    Well, you're not saying that Mr. Hardy has any

8  discretionary authority with the school district?

9      A.    He does not.

10     Q.    So if there's any fault later to be laid for

11  delaying the hearing, it's not Mr. Hardy's fault, is it?

12     A.    No, it's not.  It would be myself and the

13  school board.

14     Q.    Now, you made a statement earlier that at the

15  time that you made the decision to suspend Coach

16  Alexander that you had consulted no school board

17  members.  Did I understand that correctly?

18     A.    That is correct.  I had notified my board

19  president as to what was going on, but I did not notify

20  him before I suspended him.

21     Q.    Well, now, that's not true, because you've

22  already told me that you talked to John Whitsell, didn't

23  you?

24     A.    I didn't talk to John Whitsell about suspending

25  him.

1     Q.    Well, you had talked to John Whitsell about the

2   incident.

3     A.    I had talked to him.

4     Q.    Did you talk to Gene Whitsell about the

5   incident?

6     A.    I did not.

7     Q.    How many times did you talk to John Whitsell

8   between the time that he made the report to you and the

9   time that you made the decision to suspend?

10    A.    Twice.

11    Q.    And the first would have been the time that he

12  made the report?

13    A.    Yes, sir.

14    Q.    What was the second?

15    A.    When he and Dennis and I met.

16    Q.    How soon after the meeting with Mr. Whitsell in

17  attendance with Coach Alexander did you make the

18  decision to suspend Coach Alexander?

19    A.    I asked Mr. Whitsell to leave that meeting,

20  which was very brief, and I told Dennis that afternoon

21  I'd have to suspend him.

22    Q.    So do I understand that you called Coach

23  Alexander to a meeting with a school board member whose

24  child was involved in this alleged incident, and

25  immediately after that meeting you asked the school

1  board member to step out while you suspended Coach
2  Alexander?
3      A.   I asked him -- he left.  He didn't just step
4  out.  He left and he was not aware of what was about to
5  take place.  You have to remember --
6      Q.   Excuse me.
7      A.   -- that that meeting was a reconciliation --
8              MR. ADKISON:  Objection -- Excuse me.  I
9  object to nonresponsive.
10             INDEPENDENT HEARING EXAMINER:  Sustained.
11     Q.   (BY MR. ADKISON)  So if we just look at this
12  factually, Coach Alexander is summoned to a meeting at
13  which a school board member whose child is the subject
14  of the investigation is present, that person leaves, and
15  immediately Coach Alexander is suspended.  Is that the
16  chain of facts?
17     A.   More or less.
18     Q.   Now, you've been aware during the course of
19  this pendency of this matter that Mr. Hardy and I have
20  been having conversations about the names of all the
21  persons that were interviewed by you, correct?
22     A.   Correct.
23     Q.   And I want to show you, because I'm sure you
24  were copied on it, a letter that Mr. Hardy sent me that
25  says that the only person interviewed that did not

1  provide a written statement was Colton Whitsell.

2      A.    Uh-huh.

3      Q.    Is that a true statement?

4      A.    You know, I -- I suppose it is.  I don't know

5  whether that is or not.  If we -- there was an intention

6  to get that statement.  We did interview him, but -- and

7  let -- and hear his story, and it was our intention to

8  get a statement from everyone who was interviewed.

9      Q.    Okay.  Let's -- let me break that down just a

10 minute.

11     A.    All right.

12     Q.    First of all, are you telling me that at the

13 time you made your decision to suspend Coach Alexander

14 you had not interviewed Colton Whitsell?

15     A.    That is not at all what I just said.

16     Q.    Okay.  Well, tell me what you just said.

17     A.    What I just said was we had already interviewed

18 Colton.  Colton was the first person we interviewed

19 about that situation, and my intent was that each of

20 those young men were to leave that room and go into the

21 next room and write a statement, and for some reason

22 after he left the room, he didn't write the statement.

23     Q.    Okay.

24     A.    But he was the first person.

25     Q.    So was Colton interviewed in a room with other

1  students?

2      A.    No, sir.

3      Q.    All right.  Now, the second part of that is, is

4  that every person besides Colton Whitsell that you

5  interviewed about this matter, you took a statement

6  from.

7      A.    Say that again.

8      Q.    The other side of that coin would be, then,

9  that every person that you interviewed besides Colton

10 Whitsell you took a statement from.

11     A.    That is a true statement.

12     Q.    And that's your statement under oath, that you

13 provided to Mr. Hardy a statement from every person you

14 interviewed about the allegations about Coach Alexander

15 except Colton Whitsell?

16     A.    Let me back up on that just a minute, and let

17 me just tell you that there may have been people that I

18 interviewed that did not have knowledge of the

19 situation, and if they didn't have any knowledge of the

20 situation and didn't see anything relative to it, I did

21 not take their statement.

22     Q.    So any person who issued -- any person who

23 denied that the incident took place you would have taken

24 a statement from?

25     A.    That is correct.

1     Q.   And that's your testimony under oath?

2     A.   Yes, sir.

3     Q.   Now, do you know what steps either of the Mr.

4 Whitsells took outside your presence that might have

5 influenced your investigation?

6     A.   No, sir.

7     Q.   Now, did Mr. Whitsell, John Whitsell suggest to

8 you names of persons that it might do well for you to

9 interview?

10    A.   I don't remember that at all.

11    Q.   Did you make any notes in the school file?

12    A.   No.  I didn't take notes on that, but I don't

13 remember him suggesting anybody that I interview.  I

14 made those decisions pretty much on my own, if I

15 remember correct.

16    Q.   Well, I thought a minute ago you said that you

17 asked the principal to find out who was closest in

18 proximity.  So did you make the decision, or did the

19 principal make the decision?

20    A.   Well, I made the decision on who and -- and the

21 basis on which were selected.  I asked that my principal

22 select those -- go with Sam to select those people.

23    Q.   Okay.  So now it was Sam, right?

24    A.   Yes.

25    Q.   So now it's not just the principal going to

1    find people to interview.  Now it's Sam, correct?

2        A.    Correct.

3        Q.    Now, Coach Alexander writes Sam's performance

4    review, correct?

5        A.    That is correct.

6        Q.    And Sam was previously on staff with the school

7    where you were formerly, correctly?

8        A.    Yes, sir.

9        Q.    If you had a complaint about a member of the

10   training staff attempting to solicit an improper

11   relationship with a student, what would you do?

12       A.    I'd investigate it.

13       Q.    Have you ever had such a complaint while you

14   were a superintendent?

15       A.    No, sir.

16       Q.    And if it was determined that the head trainer

17   knew of those incidents and failed to report them, what

18   action would be appropriate against the head trainer?

19            MR. HARDY:  I'm going to object.  That's

20   irrelevant and immaterial.

21            INDEPENDENT HEARING EXAMINER:  Sustained.

22       Q.    (BY MR. ADKISON)  Now, when you talked to Mr.

23   Whitsell either time, did he tell you that he was

24   interviewing students himself?

25       A.    No, sir.

1      Q.   If he had told you that, would you have changed

2  your course of conduct?

3                MR. JOHN C. HARDY:  I'm going to object

4  on that question as speculation.

5                INDEPENDENT HEARING EXAMINER:  Go ahead

6  and respond.

7                MR. ADKISON:  This is a unique situation

8  constitutionally where you have a member of what would

9  be the decision-making governing Board actively

10 participating in the investigation of an incident.  The

11 later recusal from decision-making doesn't entirely

12 solve that problem, so it's relevant on state

13 constitutional issues.

14                INDEPENDENT HEARING EXAMINER:  I'm going

15 to sustain that.  I think you're asking him to

16 speculate.  He said that there was no indication that

17 Whitsell was doing his own investigation.

18      Q.   (BY MR. ADKISON)  Well, these statements that

19 Mr. Hardy has offered, I'm assuming that since you --

20 and were you the sole investigator of this suspension

21 investigation?

22      A.   Yes, sir.

23      Q.   So I'm assuming if it -- you were the sole

24 investigator and you were the one making the decision,

25 that you carefully read all of these statements, didn't

1  you?

2      A.   I did at the time, yes, sir.  And I listened to

3  the verbal statements.

4      Q.   So if you look at Exhibit No. 5 --

5              MR. JOHN C. HARDY:  Your Honor, that's a

6  mischaracterization.  He's objected to Exhibit No. 5.

7  We're certainly willing to stipulate.  I thought we had

8  before we started, but if we're going to question him

9  from the exhibits, I think that they ought to be

10  admitted.

11             MR. ADKISON:  I understood your

12  instruction to him to be that he could generally ask

13  questions about them before they were in evidence, and

14  that's all I'm doing.

15             INDEPENDENT HEARING EXAMINER:  I'm going

16  to overrule it at this point because I haven't heard a

17  specific question.

18             MR. ADKISON:  Sure.

19             INDEPENDENT HEARING EXAMINER:  The only

20  thing I've heard is for him to look at Exhibit 5, but...

21      Q.   (BY MR. ADKISON)  Particularly if you look at

22  the second paragraph in Exhibit 5.

23      A.   Yes, sir.  Gotcha.

24      Q.   Did you ever give any instructions to the

25  school board member to not be contacting witnesses?

1    A.    I did not specifically give him that

2  information.  I don't remember specifically doing that.

3  Let's just put it that way.

4    Q.    And you didn't keep a file other than what's

5  here in front of you?

6    A.    That's correct.

7            MR. ADKISON:  Your Honor, if I could have

8  just a second, I may can shorten this up.

9    A.    Thank you.  I would have another comment to

10  that statement.

11    Q.    (BY MR. ADKISON)  I also believe that in your

12  testimony you said that none of the coaches saw the --

13  let me rephrase that.

14            None of the coaches confirmed seeing the

15  incident made the basis of the allegation, correct?

16    A.    I said with the exception of one.

17    Q.    Okay.  Which one?

18    A.    That would have been Tell Ross.

19            INDEPENDENT HEARING EXAMINER:  I'm sorry.

20  What was that name?

21    A.    Tell Ross.

22    Q.    (BY MR. ADKISON)  Now, did you personally

23  interview Tell Ross?

24    A.    Yes, sir.

25    Q.    Was anyone else present when you interviewed

1   Tell Ross?

2       A.   I don't remember.  If it would have been, it

3   would have been David Smith.

4       Q.   Was that the principal?

5       A.   Yes, sir.

6       Q.   Now, why would Mr. Smith have been present?

7       A.   Because the interview took place in his office.

8   Mr. Smith was present for the majority of, if not all,

9   the interviews.

10      Q.   Did he take notes?

11      A.   I can't answer that question.

12      Q.   You said after a certain point you put the

13  students in a separate room to write statements.  Were

14  they all in the same room?

15      A.   They were not at the same time ever in the same

16  room, to my knowledge.

17      Q.   Were any two of them ever in the same room?

18      A.   Not to my knowledge.

19      Q.   Now, see if you can help me with this.  As I

20  understand, another allegation that you have is that

21  Coach Alexander's language was bad.  Did I understand

22  that correctly?

23      A.   That's correct.

24      Q.   And what specific part of the Board policy --

25  well, I think I can cut this even shorter than that.

1          Who was denominated as Coach Alexander's

2    successor as athletic director?  John Eastman?

3        A.    That would be correct.  Thank you.

4        Q.    While Dennis Alexander was on suspension,

5    partly, I suppose, over his language, did John Eastman

6    get ejected from a basketball game?

7        A.    He did.

8        Q.    And he got ejected from a basketball game for

9    the use of profanity, didn't he?

10              MR. JOHN C. HARDY:  Your Honor, I'm going

11   to object.  That's irrelevant and immaterial.

12              MR. ADKISON:  Part of it is whether or

13   not policy is clear under the state constitution to

14   determine whether an action conforms or does not

15   conform.

16              INDEPENDENT HEARING EXAMINER:  I'm going

17   to allow it for now.  Go ahead.

18       Q.    (BY MR. ADKISON)  So Mr. Eastman got ejected

19   from a basketball game for language, didn't he?

20       A.    He did.

21       Q.    Did you initiate a termination proceeding

22   against him?

23       A.    Mr. Eastman called me and told me what --

24              MR. ADKISON:  Excuse me.  I'll object

25   nonresponsive, your Honor.

1      A.    No.

2            MR. ADKISON:  That's all I have at this

3  time, Your Honor.  He's subject to recall.

4            INDEPENDENT HEARING EXAMINER:  Anything

5  further?

6            MR. JOHN C. HARDY:  Just a couple.

7            INDEPENDENT HEARING EXAMINER:  Okay.

8                 REDIRECT EXAMINATION

9  BY MR. JOHN C. HARDY:

10     Q.    Did anyone interfere with your investigation

11 regarding Mr. Alexander?

12     A.    No, sir.

13     Q.    Did you, to the best of your ability and

14 training, perform an investigation that you thought was

15 fair and impartial?

16     A.    Yes, sir.

17     Q.    Did Mr. Whitsell, either John Whitsell, the

18 father, or Gene Whitsell, the grandfather of Colton,

19 ever do anything to influence your decision regarding

20 this matter?

21     A.    They did not.

22     Q.    Would you have treated this student the same as

23 every other student?

24     A.    Yes, sir.

25     Q.    In fact, there are other students that were

1  involved; is that correct?

2      A.   Correct.

3      Q.   And their parents aren't -- grandparents aren't

4  on the school board?

5      A.   No, sir.

6      Q.   Doesn't make any difference to you?

7      A.   Not to me.

8              MR. JOHN C. HARDY:  Nothing further at

9  this time.

10                 RECROSS-EXAMINATION

11 BY MR. ADKISON:

12     Q.   Well, you say that nobody did anything to

13 influence your decision.  Certainly if you influenced

14 witnesses and their testimony and then feed those

15 witnesses to the decision-maker, that's an influence on

16 your decision?

17     A.   I'm not aware that that took place.

18     Q.   I didn't ask you that.

19     A.   Okay.

20     Q.   I asked you if it happened --

21     A.   I guess it would -- I guess it would be if that

22 took place.

23     Q.   And we now know, even though you denied it

24 earlier, that one of the very statements you have

25 indicates that there was contact between Mr. Whitsell

1  and the witness, wasn't there?

2      A.   That's correct.

3      Q.   And you previously denied that, didn't you?

4      A.   Yes, sir.  But there's no indications to when

5  that contact was made, whether -- whether it was before

6  or after I started my investigation, and I firmly

7  believe it was before.

8      Q.   Excuse me.  If you will just let me ask you a

9  question.  It was before because it was before the

10  statement, wasn't it?

11     A.   Yes, sir.

12     Q.   So that -- whatever that answer was you just

13  gave about when, I mean, what we know is it was before

14  the statement, correct?

15     A.   That's correct.

16     Q.   Which means it was before your initial

17  interview with the witness unless you've interviewed

18  them times you haven't told me about.

19     A.   No, I haven't.  You're correct.

20             MR. ADKISON:  That's all I have at this

21  time.

22             MR. JOHN C. HARDY:  Your Honor, the only

23  thing I have at this time is we -- the petitioner would

24  reoffer Exhibit No. 5.  We've done everything but read

25  it into the record on cross-examination.

1          INDEPENDENT HEARING EXAMINER:  5 is
2   admitted.
3          (Petitioner Exhibit 5 is admitted.)
4          MR. JOHN C. HARDY:  Thank you.  Nothing
5   further of this witness, Judge.  The witnesses are down
6   in another room.  May I go get the next witness?
7          INDEPENDENT HEARING EXAMINER:  That's
8   fine.  Who is the next witness?
9          MR. JOHN C. HARDY:  Colton Whitsell.
10          MR. ADKISON:  Your Honor, while he's
11   doing that, may I go get a drink of water?
12          INDEPENDENT HEARING EXAMINER:  Yeah.
13          MR. ADKISON:  I'm dry.
14          MR. JOHN C. HARDY:  Judge, this witness
15   has not been sworn.
16          INDEPENDENT HEARING EXAMINER:  Okay.  Mr.
17   Whitsell, go ahead and spell your first and last name
18   for the court reporter.
19          MR. WHITSELL:  C-o-l-t-o-n,
20   w-h-i-t-s-e-l-l.
21          INDEPENDENT HEARING EXAMINER:  Raise your
22   right hand for me.
23               COLTON WHITSELL,
24   having been first duly sworn, testified as follows:
25          INDEPENDENT HEARING EXAMINER:  And Mr.

1  Whitsell, let me ask you, there's some air conditioning

2  in here, and the court reporter's taking everything

3  down, so please speak up so that all of us can hear you.

4  Okay?

5              THE WITNESS:  Yes, sir.

6              INDEPENDENT HEARING EXAMINER:  Go ahead,

7  Mr. Hardy.

8              MR. JOHN C. HARDY:  Thank you.

9                   DIRECT EXAMINATION

10  BY MR. JOHN C. HARDY:

11      Q.    Colton, would you state your name for the

12  record, please?

13      A.    Colton Whitsell.

14      Q.    And are you a student at Troup ISD?

15      A.    Yes, sir, I am.

16      Q.    What's your -- what grade are you?  What's your

17  classification?

18      A.    I'm a sophomore.

19      Q.    And is your father John Alexander -- excuse me

20  -- John Whitsell?

21      A.    Yes, sir, he is.

22      Q.    Does he serve on the school board?

23      A.    Yes, sir, he does.

24      Q.    Does your -- is your grandfather Gene Whitsell?

25      A.    Yes, sir.

1     Q.   Does he serve on the school board?

2     A.   Yes, sir.

3     Q.   Do you play football for Troup ISD?

4     A.   Yes, sir.

5     Q.   Were you on the football team this past fall?

6     A.   Yes, sir.

7     Q.   Was Coach Alexander your coach?

8     A.   Yes, sir.

9     Q.   Do you recall the date of October the 19th for

10 any reason?

11    A.   Yes, sir, I do.

12    Q.   Would you describe for the judge why you recall

13 October 19th as it relates to your football experience

14 at Troup?

15    A.   That was the day that --

16              MR. ADKISON:  I need to object that it

17 calls for a narrative and so it'll prevent me from

18 interjecting with a later objection of responsiveness if

19 we get too far.

20              INDEPENDENT HEARING EXAMINER:  I'm going

21 to give it a little bit of latitude.  We'll -- we'll cut

22 it off when we need to.  Go ahead, Mr. Hardy.

23    Q.   (BY MR. JOHN C. HARDY)  Colton, what happened

24 to you on October the 19th?

25    A.   That was the day that Coach Alexander struck

1  me.

2      Q.   Was that at school?

3      A.   Yes, sir, it was.  It was during football

4  practice.

5      Q.   During football practice.  What did he strike

6  you with?

7      A.   His hand.

8      Q.   Where did he hit you?

9      A.   Hit me across the face.

10     Q.   Had you been acting out in any way?

11     A.   No, sir.  I was on a knee looking at Coach A.

12     Q.   Was --

13     A.   He was giving us our speech before practice.

14     Q.   Did it surprise you that he hit you?

15     A.   Yes, sir.  It embarrassed me.

16     Q.   Did it hurt?

17     A.   Yes, sir, it did.

18     Q.   Did you feel that it was done in a joking

19  manner?

20     A.   No, sir, I did not.

21     Q.   Did you later talk with your father about that?

22     A.   Yes, sir, I did.  It was the first thing we

23  discussed when I got in the car.

24     Q.   Had the coach ever hit you before?

25     A.   No, sir.  It was the first time.

1    Q.   What about the language of Coach Alexander?

2  Was it an appropriate type of language, or was it

3  profanity at the school?

4    A.   Coach A has one of the foulest mouths I've ever

5  heard, sir.

6    Q.   Did he use "GD," the Lord's name in vain when

7  he was yelling at the kids?

8    A.   It was a minute-by-minute occurrence, sir.

9    Q.   Did you hear him use the F bomb?

10    A.   Yes, sir.

11    Q.   On many occasions?

12    A.   Yes, sir.

13    Q.   Did you hear him addressing the students to get

14  your "F'n A" over here?

15    A.   Yes, sir.

16    Q.   Did you feel that that was appropriate?

17    A.   No, sir, I did not.

18    Q.   Was it a discussion between you and your

19  teammates that felt that Coach Alexander was out of

20  place with his language?

21    A.   Yes, sir.

22    Q.   Did you find him motivating?

23    A.   No, sir, I did not.  I find it degrading, and I

24  don't think it helped our morale.

25    Q.   How would you describe the morale on the team?

1       A.    It was pretty low.  We didn't -- we didn't have

2    a motivating coach.  We had a coach that tried to put us

3    down and make us angry all the time.

4       Q.    Have you known Coach Alexander through family

5    or church relationships?

6       A.    Yes, sir, I did.  We went to church together.

7       Q.    Were you out in any way to get Coach Alexander?

8       A.    No, sir, I wasn't.  I thought we had had a

9    pretty good relationship.

10      Q.    Did you have a relationship where you thought

11   it would be all right for him to strike you?

12      A.    No, sir.

13      Q.    Did you talk with Mr. Stuart Bird about this

14   situation?

15      A.    Yes, sir, I did.

16      Q.    When you talked with Mr. Bird, who was in the

17   room with you?

18      A.    It was Mr. Bird and our principal, Principal

19   David Smith.

20      Q.    Did either one of those gentlemen try in any

21   way, in your opinion, to influence what you were giving

22   in the way of your statement?

23      A.    No, sir.

24      Q.    Do you, to this day, know why Coach Alexander

25   struck you?

1    A.    No, sir.  I have no idea.

2    Q.    Are you afraid of Coach Alexander?

3    A.    No, sir.

4    Q.    Do you think that he treats the team members

5    appropriately?

6    A.    No, sir, I do not.

7    Q.    In your opinion as a team member, if Coach

8    Alexander came back to Troup ISD, could you play for

9    him?

10                  MR. ADKISON:  Objection, non -- that's

11   also speculation.  That's outside the scope of this

12   hearing.

13                  INDEPENDENT HEARING EXAMINER:  Sustained.

14   Q.    (BY MR. JOHN C. HARDY)  Have you had any

15   contact with Coach Alexander since you were struck?

16   A.    No, sir.

17                  MR. JOHN C. HARDY:  Pass the witness.

18                  MR. ADKISON:  Just a second, sir.

19                  CROSS-EXAMINATION

20   BY MR. ADKISON:

21   Q.    Colton, my name's Ron Adkison.  I represent

22   Coach Alexander.  Do you understand who I am and who I

23   represent?

24   A.    Yes, sir.

25   Q.    You understand you're under oath just like you

1    would be testifying in the courtroom?

2        A.    Yes, sir.

3        Q.    You said that in your opinion the team had

4    morale problems.  When did you first notice morale

5    problems on the team?

6        A.    About the first week of school, second week of

7    school.

8        Q.    Okay.  So that's still in scrimmage time,

9    right?

10       A.    No, sir.

11       Q.    First game?  First game, first week of school?

12       A.    Yes, sir.

13       Q.    So week one.  And this incident that you allege

14   occurred in what, week six?

15       A.    Yes, sir.

16       Q.    Now, in between that time, what was the

17   won-loss record?

18       A.    Not very good.

19       Q.    Was it 0-6, 1-5?

20       A.    1-5.

21       Q.    Okay.  So were you concerned about the morale

22   on the team as a player?

23       A.    Yes, sir.

24       Q.    Okay.  And you said you had a discussion

25   between teammates about morale.  Who did you discuss

1 morale with on the team?

2     A.   Shane Thomas.

3     Q.   Anyone else?

4     A.   No, sir.

5     Q.   All right.  So as the record went to 1-5, did

6 you ever have any discussions with your father about the

7 morale on the team?

8     A.   No, sir, I didn't.

9     Q.   None whatsoever?

10     A.   No, sir.

11     Q.   Never asked why are we 1-5?

12     A.   No, sir.

13           MR. JOHN C. HARDY:  Object, asked and

14 answered.

15           INDEPENDENT HEARING EXAMINER:  Sustained.

16     Q.  (BY MR. ADKISON)  So on October 19, 2016 [sic],

17 was this incident that you allege prior to practice?

18     A.   No, sir.  It was during practice.

19     Q.   Okay.  Did you finish the practice session?

20     A.   Yes, sir, I did.

21     Q.   Did you ask to be excused from any drills

22 because of what you alleged to have happened earlier?

23     A.   No, sir.

24     Q.   Did you seek any attention from the training

25 staff --

1      A.   No, sir.

2      Q.   -- for that which you allege to have occurred?

3           All right.  When -- as I understand some

4  of the things I've been provided, this incident was

5  alleged to have occurred at a team meeting prior to the

6  start of actual contact drills?

7      A.   No, sir.

8      Q.   Okay.  Tell me when it started.  Tell me when

9  this talk by the coach was.

10      A.   We go through our warm-ups and we do some light

11  hitting, and then Coach Alexander would call us up and

12  he'd talk to us and give his thoughts, and that's when

13  it happened.

14      Q.   All right.  Now, in relation to the end zone

15  and midfield, where was the team gathered at the time of

16  this?

17      A.   About the 40 yard line.

18      Q.   North or south?  Toward the bus barn or the

19  golf course?

20      A.   Golf course.

21      Q.   So the south 40 yard line.

22      A.   No.  Is that south?

23      Q.   Okay.  So you're -- either way, it's the 40

24  yard line nearest the golf course, right?

25      A.   Yes, sir.

1     Q.    All right.  And who was there?  Varsity?
2  Junior Varsity?  Who?
3     A.    We were all there that day.
4     Q.    Okay.  So it was JV and varsity, correct?
5     A.    Yes, sir.
6     Q.    The coach is on the field?
7     A.    Yes, sir.
8     Q.    Which coaches do you recall being on the field?
9     A.    All of our normal coaches, Coach Leach, Coach
10 Lawson, Coach Ross, Coach Thomas, Coach Eastman, Coach
11 Alexander, Coach Greer.
12    Q.    Coach Greer was there?
13    A.    Yes, sir, he was.
14    Q.    Where was Coach Greer standing in relation to
15 Coach Alexander?
16    A.    I don't recall.
17    Q.    All right.  If you're gathered on the 40 yard
18 line, I take it the team is in front of and to the side
19 of Coach Alexander?
20    A.    Yes, sir.
21    Q.    For instance, were they in a circle around
22 Coach Alexander, or was everybody sort of in a huddle?
23    A.    We were in a semicircle.
24    Q.    Semicircle in front of him?  And which way was
25 Coach Alexander facing?  Was he facing the golf course,

1   facing --

2       A.   He was facing a little to the home --

3   catty-corner to the home stands.

4       Q.   Okay.  The coaches that you knew were there,

5   were they standing behind him, in front of him, to the

6   side of him?  Where were they?

7       A.   Some of them had walked off to go to their

8   stations.  I think some of them were standing behind us.

9       Q.   All right.  And were you on Coach Alexander's

10  left or right?

11      A.   His left.

12      Q.   Who was immediately to his right?

13      A.   I don't remember.

14      Q.   Okay.  What piece of equipment did you have on?

15      A.   I had on my shoulder pads, and that was it.

16      Q.   Did you have on shorts?  Shoes?

17      A.   Yes, sir, I did.

18      Q.   Did you have a headband?

19      A.   Yes, sir.

20      Q.   What kind of headband?

21      A.   It was an Under Armour headband.

22      Q.   Made out of terry cloth and elastic?

23      A.   I don't remember.

24      Q.   Okay.  What color was it?

25      A.   It was a Texas flag.

1     Q.   Let's see.  Your position on the football team

2  was wide out?

3     A.   I have multiple.

4     Q.   Okay.  What were your positions?

5     A.   At one point I played wingback.  At one point I

6  played wide receiver.  I played quarterback for a week.

7  Played tight end.  I played defensive end, defensive

8  tackle.

9     Q.   Okay.  Anyplace else?

10     A.   No, sir.

11     Q.   Were you a starter?

12     A.   Yes, sir, I was.

13     Q.   Okay.  Did you start at each of these

14  positions?

15     A.   No.  I did not start at defensive end,

16  defensive tackle, tight end, and quarterback.

17     Q.   All right.  In the meeting at the 40 yard line

18  on October 19th, did Coach Alexander discuss particular

19  players and their performance the week before?

20     A.   I don't recall.

21     Q.   At the time Coach Alexander began to speak,

22  were you laughing?

23     A.   No, sir, I was not.

24     Q.   Did you ever laugh at any time?

25     A.   No, sir.

```
 1     Q.    Coach Alexander ever remove your headband?
 2     A.    Yes, sir, he did.
 3     Q.    And did he pop you on the head with it?
 4     A.    No, sir, he did not.
 5     Q.    Did he drop the headband?
 6     A.    No, sir.  He put it in his pocket.
 7     Q.    After the meeting was over, did you get the
 8 headband back?
 9     A.    Yes, sir, I did.
10     Q.    At this meeting, was Coach Alexander telling
11 any jokes or anything that would have been funny?
12     A.    I don't remember.
13     Q.    What I'm trying to figure out is if it would
14 have been appropriate in this context for you to have
15 been laughing.
16     A.    No, sir.  I do not believe it would have been.
17     Q.    Now, how long after the incident you alleged
18 did this meeting continue?
19     A.    Two or three minutes.
20     Q.    Who is the next person who either mentioned
21 this to you or that you mentioned it to?
22     A.    I don't understand.
23     Q.    Okay.  The incident you allege occurs, meeting
24 breaks up, you start on practice.  Who's the next person
25 who either mentioned this incident that you allege to
```

1   you or that you mentioned that incident to yourself?

2     A.   Shane Thomas.

3     Q.   Now, that's the same person that you had

4   previously been discussing morale with, correct?

5     A.   Yes, sir.

6     Q.   Okay.  After Shane Thomas, who's the next

7   person that either you mentioned this to or that

8   mentioned it to you?

9     A.   My father.

10     Q.   Okay.  So do you deny under oath that you had a

11  conversation about this with Tray Wade?

12     A.   I don't remember that conversation.

13     Q.   Now, did -- after -- once you alleged it

14  occurred, did you have any visible marks on your face?

15     A.   Yes, sir.  My face was red.

16     Q.   Was that from being called out by a coach, or

17  was that a fingerprint or something?

18     A.   No, sir.  Only one side of my face was red, the

19  side that he hit me on.

20     Q.   Okay.  And did any of the trainers attempt to

21  assist you after that?

22     A.   No, sir.  I just put my helmet on.  They never

23  saw it.

24     Q.   Were they getting the water for the -- that was

25  the day the waterline was broken, wasn't it?

```
 1      A.   Yes, sir.
 2      Q.   So were they -- the trainers all down getting
 3  the water?
 4      A.   Yes, sir.
 5      Q.   Every one of them?
 6      A.   Only -- I believe Sam McMullen was on the
 7  field.
 8               THE REPORTER:  I'm sorry.  Who?
 9      A.   Sam McMullen Hamilton.
10      Q.   (BY MR. ADKISON)   Now, have you talked to Sam
11  Hamilton about this incident?
12      A.   Yes, sir, I have.
13      Q.   When did you first talk to her?
14      A.   The day after it happened.
15      Q.   And did you initiate that conversation or did
16  she?
17      A.   No, sir.  She did.
18      Q.   Did she tell you that she had talked to your
19  father?
20      A.   No, sir.
21      Q.   All right.  When did -- where did the
22  conversation with Ms. Hamilton take place?
23      A.   In the hallway outside of her classroom.
24      Q.   Where is her classroom?
25      A.   It is in the -- it's by Ms. Agnew's classroom.
```

1    There are only two classrooms down there.

2        Q.   Ms. Agnew teaches what?

3        A.   Cooking, culinary.

4            INDEPENDENT HEARING EXAMINER:  I'm sorry.

5    Ms. who?

6            MR. ADKISON:  Agnew.

7        Q.   (BY MR. ADKISON)  Okay.  Did you understand

8    that she'd had conversations with Ms. Agnew about this

9    alleged incident?

10       A.   No, sir.  That wasn't discussed.

11       Q.   Who brought the subject up?  You or Ms.

12   Hamilton?

13       A.   She called me out into the hallway.

14       Q.   Okay.  And so what time of day would this have

15   been?

16       A.   This was at the beginning of our class period,

17   so 12:23.

18       Q.   On Wednesday?

19       A.   Yes.

20       Q.   Now, while you were at -- on Tuesday night,

21   which would have been the night, I believe, of October

22   19th, did your father take any actions after you and he

23   talked about this?

24       A.   No, sir.

25       Q.   When you got home, did he bring it -- or when

1    you got in the car, did he bring it up or did you bring

2    it up?

3         A.    I brought it up.

4         Q.    Now, did you hear your father make any phone

5    calls to any other students?

6         A.    No, sir.

7         Q.    Did you know that he did?

8         A.    No, sir, I did not.

9         Q.    Now, were you interviewed by the

10   superintendent?

11        A.    Yes, sir, I was.

12        Q.    What date?

13        A.    The day immediately following the incident.

14        Q.    So on Wednesday?

15        A.    Yes, sir.

16        Q.    What time of day?

17        A.    I believe I was called out of Spanish class, so

18   anywhere from 11:27 to 12:19.

19        Q.    And who brought the subject of this incident up

20   in that meeting?

21        A.    The superintendent.

22        Q.    And was anybody present besides you and the

23   superintendent during that meeting?

24        A.    David Smith.

25        Q.    Is that the high school principal?

```
 1      A.   Yes, sir, he is.
 2      Q.   All right.  And did you give them a statement
 3 at that time?
 4      A.   Yes, sir, I did.
 5      Q.   Did you write a statement at that time?
 6      A.   No, sir, I didn't.
 7      Q.   When were you first asked to write a statement?
 8      A.   When I met with Mr. Hardy.
 9      Q.   And when would that have been?
10      A.   I don't remember the exact date.
11      Q.   Did you write a statement that day?
12      A.   I don't remember.
13      Q.   Well, you didn't write a statement until after
14 you met John Hardy, correct?
15      A.   Possibly.  I don't --
16      Q.   Did you write one before?
17      A.   I don't remember, sir.  I don't remember.
18      Q.   Did you talk to anybody about this incident
19 between -- let's see.  We'll go at it this way.  Make it
20 easier for you.
21           About this incident that you allege, you
22 talked to your dad, you've talked to Sam Hamilton, and
23 you've talked in the presence of David Smith, and later
24 you talked to Mr. Hardy.  You with me?
25      A.   Yes, sir.
```

1   Q.   Have you talked to anybody else?

2   A.   I talked to my godmother.

3   Q.   Who is?

4   A.   Ms. Agnew.

5   Q.   Ms. Agnew?

6   A.   Yes, sir.

7   Q.   And that's the lady who Sam Hamilton, they're

8   the only two teachers in that building, correct?

9   A.   They're the only two teachers in that section

10  of the building, yes.

11  Q.   Okay.  So when did you talk to Ms. Agnew?

12  A.   About a week after.

13  Q.   Who brought the subject up in that

14  conversation?  You or Ms. Agnew?

15  A.   Ms. Agnew.

16  Q.   How did Ms. Agnew know about this?

17  A.   I don't know.  That wasn't discussed.

18  Q.   Did she know about the allegations?

19  A.   Yes, sir, she did.

20  Q.   Who's currently the athletic director?

21  A.   Coach John Eastman.

22  Q.   Does Coach Eastman have a son about your age?

23  A.   Yes, sir.

24  Q.   Are y'all friends?

25  A.   I wouldn't say we're friends necessarily.

1    We're not in the same grade.  We don't talk much.

2        Q.    Are you in any other sports --

3        A.    I play basketball and baseball.

4        Q.    Let me finish.  With Coach Eastman's son.

5        A.    I played basketball with him.

6        Q.    Now, coaches are -- have not only the right,

7    but probably the duty to instill discipline on their

8    team, correct?

9        A.    Yes, sir.

10       Q.    And now many years have you played varsity?

11       A.    Just one.

12       Q.    This is your first varsity experience?

13       A.    It was my first varsity football experience.  I

14   played varsity baseball as a freshman.

15       Q.    Let me ask you this:  If a student is

16   disruptive in a class, is the teacher allowed to

17   discipline the student?

18       A.    Yes, sir, she is.

19       Q.    And the Troup Independent School District

20   policy actually allows corporal punishment, correct?

21       A.    I don't know.

22       Q.    Well, have you seen people to be taken out to

23   be given licks or given licks or --

24       A.    No, sir.

25            MR. ADKISON:  That's all I have at this

1  time.

2          MR. JOHN C. HARDY:  A couple more

3  questions.  Thank you, Judge.

4                  REDIRECT EXAMINATION

5  BY MR. JOHN C. HARDY:

6      Q.   Colton, the headband incident that Mr. Adkison

7  asked you about, was that before or after you were hit?

8      A.   That was before.

9      Q.   Okay.  And what would you say was the length of

10 time between the headband incident removal and the time

11 you were struck by Coach Alexander?

12     A.   Two and a half to five minutes.

13     Q.   You were asked were you laughing or something.

14 Was there something funny about being hit?

15     A.   No, sir.  There was nothing funny.

16     Q.   Was Tray Wade close by to you?

17     A.   Yes, sir.  He was directly to my right.

18     Q.   Did you see Coach Alexander strike him?

19     A.   Yes, sir, I did.

20     Q.   There was -- gave testimony about who brought

21 up the situation, whether it was you to your father or

22 Ms. Agnew to you or whatever.  Would it be a fair

23 statement that this was a good bit of talk about what

24 was going on around school about the kids and being

25 hit?

1    A.    Yes, sir, it was.

2    Q.    So it wasn't unusual for this to be a

3    discussion or a topic that Coach Alexander had struck

4    more than one student that day?

5    A.    No, sir, it was not.

6    Q.    Do you know Blake Attaway?

7    A.    Yes, sir, I do.

8    Q.    Was he another student that was hit that day?

9    A.    Yes, sir, he was.

10   Q.    Do you know where he was hit?

11   A.    He was hit on the back of the head.

12   Q.    Who hit him?

13   A.    Coach Alexander.

14          MR. ADKISON:  Object to hearsay.

15          INDEPENDENT HEARING EXAMINER:  Sustained.

16   Q.    (BY MR. JOHN C. HARDY)  Did you see Coach

17   Alexander hit him?

18   A.    Yes, sir, I did.

19   Q.    With your own eyes?

20   A.    Yes, sir, I did.

21   Q.    Was there any doubt what you saw?

22   A.    No, sir, there was not.

23   Q.    Did Coach Alexander strike him?

24   A.    Yes, sir, he did.

25   Q.    Do you know of any faculty members, coaches

1  anybody on staff at Troup ISD besides Coach Alexander
2  who goes around slapping kids?
3      A.   No, sir.  It was a very isolated incident.
4      Q.   Do you believe that it would be -- ever be
5  correct for discipline or any reason for one of your
6  teachers or coaches to slap you?
7                MR. ADKISON:  I object.  Speculation.
8  Qualification.
9                MR. JOHN C. HARDY:  I think he can answer
10 what he thinks --
11               INDEPENDENT HEARING EXAMINER:  I think
12 you opened the door on that by asking him earlier about
13 teacher discipline in the classroom.  Go ahead.
14               MR. JOHN C. HARDY:  Thank you.
15     A.   No, sir.  I believe it's unethical, immoral,
16 and illegal in any setting.
17               MR. JOHN C. HARDY:  Pass the witness.
18                    RECROSS-EXAMINATION
19 BY MR. ADKISON:
20     Q.   Well, it's not illegal to strike a student if
21 it's -- if the disciplinary code allows corporal
22 punishment, is it?  Are you saying that TISD School
23 Board policy is illegal, immoral, and unethical --
24               MR. HARDY:  Your Honor, I'm going --
25     Q.   (BY MR. ADKISON)  -- in regards to corporal

1    punishment.

2              MR. HARDY:  Your Honor, I'm going to

3    object.  That's a mischaracterization of what the policy

4    would be on corporal punishment.

5              INDEPENDENT HEARING EXAMINER:  Sustained.

6    Q.   (BY MR. ADKISON)  So, I mean, you made the

7    blanket statement under oath that it's always, in every

8    situation, immoral, illegal, and unethical?

9              MR. JOHN C. HARDY:  Your Honor, I'm going

10   to object again to a mischaracterization question.  The

11   question is whether or not it was ever appropriate to

12   slap a student, not use corporal punishment.  That would

13   be under the school district disciplinary policy.

14             MR. ADKISON:  It's not the question.  It

15   was the answer.

16             INDEPENDENT HEARING EXAMINER:  Well, but

17   his answer was to that question.  Rephrase your

18   question.

19   Q.   (BY MR. ADKISON)  You don't even know whether

20   or not Troup ISD allows its students to be hit with a

21   board under certain circumstances, do you?

22   A.   Sir, I try not to associate myself with people

23   that would be in that situation, so I don't have any

24   experience with it.

25             MR. ADKISON:  Well, I appreciate that,

1    and I'll object to it as nonresponsive.

2                    INDEPENDENT HEARING EXAMINER:  Sustained.

3        Q.    (BY MR. ADKISON)  You've testified under oath

4    in this case and you don't even know if it's within the

5    policies of the Troup Independent School District for a

6    teacher to hit a student with a board, do you?

7        A.    Sir, I've never seen a teacher hit someone with

8    a board, so I wouldn't know.

9        Q.    So is the simple answer to my question, no, I

10   don't know?

11       A.    Yes, sir.

12                   MR. ADKISON:  That's all I have.  Thank

13   you very much.

14                   MR. JOHN C. HARDY:  Nothing further of

15   this witness.

16                   INDEPENDENT HEARING EXAMINER: Okay.  You

17   may step down.  Let me -- you weren't in here earlier, I

18   don't think, so let me tell you, you -- you may not

19   discuss your testimony with anyone else today, any other

20   students, any other adults.  Just keep it -- just keep

21   it to yourself.  Once -- once the hearing is completely

22   concluded, either today or Wednesday, then at that point

23   you're -- you're free to discuss it.  But at this point,

24   don't have any conversations with anyone about what you

25   were asked or the answers that you were giving.  Okay?

```
 1                    THE WITNESS:  Yes, sir.
 2                    INDEPENDENT HEARING EXAMINER:  Thank you.
 3                    MR. JOHN C. HARDY:  Ready for the next
 4    witness?
 5                    INDEPENDENT HEARING EXAMINER:  Yeah.
 6    Let's --
 7                    MR. JOHN C. HARDY:  Take a break?
 8                    INDEPENDENT HEARING EXAMINER:  Yeah.
 9    Let's go off the record and take a five- or ten-minute
10    morning break.
11                    MR. JOHN C. HARDY:  Thank you.
12                    (Recess taken.)
13                    INDEPENDENT HEARING EXAMINER:  Back on
14    the record.
15                    MR. JOHN C. HARDY:  He has not been
16    sworn.
17                    INDEPENDENT HEARING OFFICER:  He has not?
18                    MR. JOHN C. HARDY:  No, sir.
19                    INDEPENDENT HEARING OFFICER:  Okay.
20    Please raise your right hand.
21                        BLAKE ATTAWAY,
22    having been first duly sworn, testified as follows:
23                    INDEPENDENT HEARING EXAMINER:  Okay.
24    Give me your name.
25                    THE WITNESS:  Blake Attaway.
```

1          INDEPENDENT HEARING EXAMINER:  Spell your
2     last name for the court reporter.
3          THE WITNESS:  A-t-t-a-w-a-y.
4          INDEPENDENT HEARING EXAMINER:  All right.
5     Mr. Hardy, go ahead.
6          MR. JOHN C. HARDY:  Thank you.
7              DIRECT EXAMINATION
8     BY MR. JOHN C. HARDY:
9          Q.   Blake, would you state your name for the
10    record, please?
11         A.   Blake Attaway.
12         Q.   And are you a student at Troup ISD?
13         A.   Yes, sir.
14         Q.   And what is your grade or classification?
15         A.   I am in the 12th grade.
16         Q.   Finishing up this year?
17         A.   Yes, sir.
18         Q.   Do you play sports at Troup ISD?
19         A.   Yes, sir, I do.
20         Q.   Do you play football?
21         A.   Yes, sir.
22         Q.   Do you -- did you play this year?
23         A.   Yes, sir.
24         Q.   And were you at practice on October the 19th of
25    this year?

1    A.    Yes, sir.

2    Q.    I guess actually it'd be 2015.

3    A.    Yes, sir.

4    Q.    During that practice, did anything take place
5    that was unusual and inappropriate in your opinion?

6    A.    Yes, sir.

7    Q.    And were you hit or struck by a Coach
8    Alexander?

9    A.    Yes, sir.

10   Q.    Were you doing anything to offend him that you
11   know of?

12   A.    No, sir.

13   Q.    Where did he hit you?

14   A.    In the back of the head.

15   Q.    What did he hit you with?

16   A.    His hand.

17   Q.    Was it surprising to you?

18   A.    Yes, sir.

19   Q.    Did it hurt?

20   A.    A little bit.

21   Q.    Was it an embarrassment?

22   A.    Yes, sir.

23   Q.    Did you see Coach Alexander that day strike any
24   other student?

25   A.    Yes, sir.

1     Q.   And who?

2     A.   Colton Whitsell.

3     Q.   And how did Coach Alexander hit Colton

4 Whitsell?

5     A.   With his hand.

6     Q.   Where did he strike him?

7     A.   On the head.

8     Q.   And would you describe that as a slap?

9     A.   Yes, sir.

10     Q.   Did you see Coach Alexander push down Tray?

11     A.   Yes, sir.

12     Q.   Were those strikes, touches done in a

13 disciplinary way, in your opinion?

14     A.   No, sir.

15     Q.   Did you find it offensive?

16     A.   Yes, sir.

17     Q.   Did you think they were appropriate in any

18 way?

19     A.   No, sir. I did not think they were

20 appropriate.

21     Q.   Did you have an opportunity to give a written

22 statement about what happened on that day?

23     A.   Yes, sir, I did.

24           MR. JOHN C. HARDY: May I approach?

25           INDEPENDENT HEARING EXAMINER: Yes.

```
 1              MR. JOHN C. HARDY:  I don't know what
 2    happened to all of our exhibits that were --
 3              INDEPENDENT HEARING EXAMINER:  I think
 4    they're right here.
 5              MR. JOHN C. HARDY:  I got it.
 6              INDEPENDENT HEARING EXAMINER:  Okay.
 7         Q.   (BY MR. JOHN C. HARDY)  I'm going to hand you
 8    what's been marked as Petitioner's Exhibit No. 2.  Do
 9    you recognize that?
10         A.   Yes, sir.
11         Q.   Is that an exhibit that you prepared at the
12    direction of Mr. Stuart Bird, superintendent?
13         A.   Yes, sir, it is.
14         Q.   Does it set forth what took place in your
15    opinion and in your own handwriting on that date of
16    October the 19th?
17         A.   Yes, sir.
18         Q.   Would you read that statement for the record,
19    please?
20         A.   All right.  On --
21         Q.   Actually -- excuse me.  Actually, at this
22    point, I would like to offer that exhibit.
23              INDEPENDENT HEARING EXAMINER:  Any
24    objections?
25              MR. ADKISON:  Rather than have him read
```

 1    it, I'll just let them admit it.

 2              MR. JOHN C. HARDY:  I understand, but I'm

 3    asking the witness to read that statement.

 4              INDEPENDENT HEARING EXAMINER:  Exhibit 2

 5    is admitted.

 6              (Petitioner Exhibit 2 is admitted.)

 7       Q.   (BY MR. JOHN C. HARDY)  You now -- Blake, if

 8    you would read that statement for the record, please.

 9       A.   All right.

10              MR. ADKISON:  Your Honor, I'm going to

11    object.  The exhibit is in evidence, and the reading

12    from it aloud is cumulative and not -- I mean, it's

13    duplicative of a matter already in evidence.

14              MR. JOHN C. HARDY:  I think that he can

15    be allowed to give his statement and talk about the

16    investigation that was -- he was involved in.

17              MR. ADKISON:  It's all in the statement.

18    It's inclusive of the statement, reading a piece of

19    paper that's in evidence.

20              INDEPENDENT HEARING EXAMINER:  It's not a

21    jury trial, so the fact that it's cumulative doesn't

22    matter.  If -- if you don't want him to read it, that's

23    fine.  We'll take time and I'll read it, and then -- and

24    then it'll be in.  But either way the exhibit is

25    admitted.

 1              MR. ADKISON:  Sure.  And that's what I'm
 2    saying.  It's not a jury trial, and I think you can read
 3    it as well as he can read it out loud to you.
 4              INDEPENDENT HEARING EXAMINER:  Then give
 5    me a minute, Mr. -- Mr. Hardy, and I will read it.
 6              MR. JOHN C. HARDY:  Thank you, Judge.
 7    Thank you.
 8              INDEPENDENT HEARING EXAMINER:  And now
 9    that I've read it, I have a couple of questions that
10    need to be clarified, so I'll just ask the question.
11              Mr. Attaway, if you'll look about halfway
12    down on the statement, there's a -- there's a sentence
13    that starts, "Then there was also."  Do you see that?
14    The line begins "any water," and then it says --
15              THE WITNESS:  "There was also a halftime
16    speech at Frankston"?
17              INDEPENDENT HEARING EXAMINER:  Yes.  Go
18    ahead and read -- read that sentence for me.
19              THE WITNESS:  All right.  (Reading.)
20    There was also a halftime speech at Frankston that was
21    very uncalled for.  He went on to say that we were
22    gutless and pathetic and other things when the score was
23    only 14-10.
24              INDEPENDENT HEARING EXAMINER:  Okay.
25    Thank you.

1     Q.   (BY MR. JOHN C. HARDY)  Blake, your statement

2  in the first four or five lines, it talks about what you

3  observed.  A moment ago you stated that you saw Coach

4  Alexander strike Colton in the head.  Your state -- your

5  statement says face.

6     A.   Yes, sir.

7     Q.   Was it above the shoulders?

8     A.   Yes, sir.

9     Q.   Okay.  Did you observe Colton laughing or doing

10  something inappropriate before he was struck?

11     A.   No, sir, I did not.

12     Q.   Did you see Coach Alexander remove a headband

13  from Colton Whitsell?

14     A.   Yes, sir, I did.

15     Q.   Is this slap in the face or hit to the head the

16  same incident as removing the headband?

17     A.   Yes, sir.  I believe so.

18     Q.   Did you talk with Colton about this situation?

19     A.   No, sir, I did not.

20     Q.   Was it a situation where the student body, in

21  particular the football team, was talking about Coach

22  Alexander's behavior?

23              MR. ADKISON:  Object to hearsay.

24              INDEPENDENT HEARING EXAMINER:  Sustained.

25  Rephrase.

1      Q.   (BY MR. JOHN C. HARDY)  Did you participate in
2  any conversations or did you personally hear
3  conversations and discussions about Coach Alexander's
4  behavior?
5      A.   No, sir.  I haven't heard personally from any
6  player.  I just kind of keep to myself.
7      Q.   Okay.  Did you observe Coach Alexander using
8  derogatory comments or curse words?
9      A.   Yes, sir.
10      Q.   Was that a frequent occurrence?
11      A.   Yes, sir.
12      Q.   In your own mind, was it an opinion -- in your
13  own opinion, was it a motivator for you?
14      A.   No, sir.
15      Q.   Did you find it offensive?
16      A.   Sometimes, yes.
17             MR. JOHN C. HARDY:  That's all I have of
18  this witness at this time.
19                    CROSS-EXAMINATION
20  BY MR. ADKISON:
21      Q.   Blake, I'm Ron Adkison.  I'm Coach Alexander's
22  lawyer.  Do you understand who I am and who I represent?
23      A.   Yes.
24      Q.   You understand that you're testifying under
25  oath here just like you would be in a courtroom?

1     A.   Yes.

2     Q.   Did you take freshman Pre-AP English?

3     A.   I'm not sure.  Probably, yes, sir.

4     Q.   Do you recall a book that you were required to

5 read called "What they Carry"?

6     A.   No, sir.

7     Q.   Where -- we've had some testimony already, so

8 I'll try to cut to the chase, but if I say something

9 that's wrong, correct me.  Having a team meeting

10 somewhere on the 40 yard land toward the country club.

11 Everybody's in circle -- semicircle around Coach

12 Alexander.  He's facing catty-corner toward the --

13 probably at the pro shop of the golf course as opposed

14 to the No. 1 tee and --

15     A.   I think he was -- he was facing more towards

16 the press box.

17     Q.   The home field press box?

18     A.   Yes, sir.

19     Q.   Okay.  Which would have him sitting backward?

20     A.   He'd be facing the golf course, or not facing,

21 but his back would be to the golf course.

22     Q.   Okay.  Now, in that time frame, you saw him --

23 he was talking, and you say that he hit you on the back

24 of the head?

25     A.   Yes, sir.

1    Q.   And I think you said -- you said that he hit
2    Colton Whitsell on the head?
3    A.   Uh-huh.
4    Q.   And that you would term that as a slap?
5    A.   Yes, sir.
6    Q.   The contact with the back of your head, was
7    that a slap or --
8    A.   Yes, sir, it was.
9    Q.   Okay.  Now, have you ever heard the expression
10   "slap somebody on the back"?
11   A.   Not really.
12   Q.   Okay.  But you didn't talk to Colton about
13   this?
14   A.   No, sir.  I have not talked to Colton about
15   this incident.
16   Q.   Okay.  And did you -- did you ever talk to Trey
17   about this?
18   A.   No, sir.  I have not talked to Trey about this.
19   Q.   Do you know whether or not Trey talked to
20   Colton about this?
21   A.   No, sir, I do not.
22   Q.   Okay.  Now, when is the first time that you
23   engaged in a conversation with anybody about what went
24   on on the field on October the 19th?
25   A.   Probably after practice with my friends.

1    Q.    Who?

2    A.    Lane Smith.

3    Q.    Lance Smith?

4    A.    Lane Smith.

5    Q.    Oh, Lane Smith.  Is Lane Smith on the football

6    team?

7    A.    Yes, sir.

8    Q.    Okay.  And where did this conversation take

9    place?

10   A.    Probably at my -- probably just outside the

11   field house or back at my house once we got home from

12   practice.

13   Q.    So he came over to your house maybe when

14   practice was over?

15   A.    Yes, sir.

16   Q.    What position do you play?

17   A.    I played fullback and outside line backer.

18   Q.    After Lane Smith, who's the next person you

19   talked to?

20   A.    Probably my dad.

21   Q.    Did your dad advise you to take any action, or

22   did he call anybody?

23   A.    No, sir, he did not.

24   Q.    Was your dad a football player?

25   A.    Sir?

1      Q.    Did your dad play ball when he was in school?

2      A.    I think he did freshman year, but after that I

3  don't think he ever played football again.

4      Q.    Did he play football, basketball, baseball or

5  anything?

6      A.    He played golf.

7      Q.    After your dad, who's the next person you

8  talked to or that talked to you, either one?

9      A.    Probably just my brother, Bryce.

10      Q.    After that?

11      A.    That's probably about it.

12      Q.    Okay.  Well, at some point in time you gave a

13  statement.

14      A.    Yes, sir.

15      Q.    Okay.  So after Bryce, you had to have talked

16  to somebody else.

17      A.    I talked to Mr. Smith and Mr. Bird in

18  Mr. Smith's office.

19      Q.    Was anybody else present while you were talking

20  to them?

21      A.    No, sir.

22      Q.    All right.  What -- when would that have been?

23      A.    That was the -- it was either Tuesday or

24  Wednesday after that Monday practice.

25      Q.    Do you remember which one?

1      A.    No, sir, I do not.

2      Q.    Morning or afternoon?

3      A.    It was morning.

4      Q.    And is that the time in which you gave a

5  statement?

6      A.    Yes, sir, it was.

7      Q.    Okay.  So if your statement's dated 10/22/15,

8  that would be the date that you first talked to anybody

9  in administration?

10     A.    Yes, sir, it would be.

11     Q.    And so the 19th was on Monday?

12     A.    I'm not too -- not too sure on the date.

13     Q.    Okay.  Let's look.  Okay.

14           MR. ADKISON:  May I approach just so I

15  can show him the calendar?

16           INDEPENDENT HEARING EXAMINER:  (Moving

17  head up and down.)

18     Q.    (BY MR. ADKISON)  Here's mine.  It shows the

19  19th being a Monday and the 22nd being a Thursday.

20     A.    Okay.

21     Q.    Does that sound right?

22     A.    Yes, sir.

23     Q.    So do you know what date Coach Alexander was

24  suspended on?

25     A.    I believe it was the very next day, so it would

1    have been the 20th.

2        Q.    He was suspended the day after it happened?

3        A.    Either the day after or either the Tuesday or

4    Wednesday.

5        Q.    So if he was suspended on Tuesday or Wednesday,

6    then your intimation on the 22nd couldn't have been any

7    sort of a factor or even considered in the decision to

8    suspend him, could it?

9        A.    (No verbal response.)

10        Q.    Easy question.

11        A.    Guess not.

12        Q.    Tuesday and Wednesday comes before Thursday,

13    right?

14        A.    Yes, sir.

15        Q.    So it automatically falls from that, then, that

16    your statement on October the 22nd could not have been

17    even considered if the suspension had already occurred

18    at the time it was given, could it?

19        A.    I don't think so.

20        Q.    Now, had you heard any dissatisfaction before

21    this accident about the won-loss record for Troup for

22    this year?

23        A.    No, sir.

24        Q.    I got a question about your statement.  If

25    you'll look --

1    A.   Okay.

2    Q.   What's that word?

3    A.   Vividly.

4    Q.   Now, did I understand that that example about

5    the water break --

6    A.   Uh-huh.

7    Q.   -- is supposed to be an example of a racial

8    statement?

9    A.   Yes, sir.

10   Q.   And the statement is, somebody wants to take a

11   water break and Coach A says, We're going back to the

12   old days where you don't get a break for any water.

13   A.   Uh-huh.

14   Q.   That's the only statement, correct?

15   A.   Right.

16   Q.   Before you gave this statement as a basis for

17   termination of Coach Alexander, did anybody ever talk to

18   you about how we used to practice back in the day with

19   one water break every two hours?

20   A.   No, sir.

21   Q.   I mean, that statement doesn't have a single

22   word in it.  It doesn't have a derogatory racial

23   reference.  All it says is we're going to go back to old

24   days when we didn't take a break for getting water,

25   right?

1    A.    Correct.

2    Q.    And this -- this is all asked of you after

3  Coach Alexander's already been suspended, correct?

4    A.    Yes, sir.

5    Q.    Now, have you ever had any training in

6  psychology?

7    A.    No, sir.

8    Q.    You ever had any training in -- let's see.

9  When I took it, it was called Theory of Coaching

10  Football.

11    A.    Huh-uh.

12    Q.    So you're not familiar with whether or not

13  coaches are even taught at times to use negative

14  reinforcement?

15    A.    No, sir.

16    Q.    The remainder of this statement talks about --

17  he said we were gutless and pathetic, was only 14-10.

18  How did that game wind up?

19    A.    I believe the final score was 35-17.

20    Q.    Okay.

21    A.    Not too sure.

22    Q.    And then the Arp game is a rivalry game,

23  correct?

24    A.    Yes, sir.

25    Q.    Seven miles apart, right?

1    A.   Yes, sir.

2    Q.   Just like Garrison and Timpson.  Big deal.  And

3    what he was telling y'all was y'all are going to lose to

4    Arp?

5    A.   Yes, sir.

6    Q.   And you just thought that was a bad idea?

7    A.   Yes, sir.

8    Q.   Didn't motivate you at all?

9    A.   No, sir, not at all.

10   Q.   It didn't appeal to your pride in playing and

11   your pride of not getting beat?

12   A.   No, sir.

13   Q.   It didn't appeal to any sense of community or

14   rivalry or self-esteem that you might have?

15   A.   No, sir.

16   Q.   And y'all were 1-5?

17   A.   Yes, sir.

18   Q.   Now, the other thing is, is that in this

19   meeting, as I understand it for maybe the first time,

20   Coach Alexander started the meeting by pointing out

21   individual players and their failures to do their

22   assignments in the previous game; is that correct?

23   A.   That I do not remember.

24   Q.   Give me a second.  And you told me everyone

25   that you've discussed this matter with, correct?

1     A.   Yes, sir, I have.

2     Q.   Did you ever discuss the matter with Mr. Hardy?

3     A.   Yes, sir, I did.

4     Q.   On how many occasions?

5     A.   Twice or -- once or twice.

6     Q.   Okay.  Did you give a statement as soon as you

7  were contacted about being interviewed?

8     A.   No, sir.

9     Q.   Huh?

10    A.   No, sir.

11    Q.   Okay.  Well, obviously you wouldn't have.

12 That's probably a bad question.

13         MR. ADKISON:  That's all I have for now,

14 your Honor.

15         MR. JOHN C. HARDY:  A couple, Judge.

16              REDIRECT EXAMINATION

17 BY MR. JOHN C. HARDY:

18    Q.   Blake, do you testify under oath very often?

19    A.   No, sir, I have not.

20    Q.   A little bit nervous?

21    A.   A little bit.

22    Q.   You talked about some dates here on when Coach

23 A might have been suspended.

24    A.   Yes, sir.

25    Q.   And Mr. Adkison asked you about your statement

1    given on the 22nd of October.  Would you argue with me

2    if I told you that the Coach Alexander was suspended on

3    Friday, the 23rd of October?

4         A.   No, sir.

5         Q.   You --

6         A.   Yes, sir.  I --

7         Q.   You just don't remember the dates, do you?

8              MR. ADKISON:  Excuse me.  Could he

9    answer, your Honor?

10        A.   I just know he was --

11             INDEPENDENT HEARING EXAMINER:  Yeah.  Let

12   him --

13        A.   -- suspended --

14             INDEPENDENT HEARING EXAMINER:  Hang on.

15   Hang on.  Hang on.  Hang on.

16        A.   Yes, sir.

17             INDEPENDENT HEARING EXAMINER:  Let him

18   finish his answer.  Now you can answer.

19        A.   Okay.  I just know he was suspended before I

20   wrote this statement.

21        Q.   (BY MR. JOHN C. HARDY)  Before you read it or

22   wrote it?

23        A.   Wrote it.

24        Q.   Okay.  Had you talked with Mr. Bird and

25   Mr. Smith about the actions of Coach Alexander?

1     A.    I did the day I wrote this.

2     Q.    Okay.

3     A.    It was right after I talked to them.

4           MR. JOHN C. HARDY:  Okay.  I believe

5     that's all that I have.

6           MR. ADKISON:  I have nothing further,

7     your Honor, at this time.

8           INDEPENDENT HEARING EXAMINER:  Okay.

9     Mr. Attaway, you can return to class, is what we said,

10    right?

11          MR. JOHN C. HARDY:  Afraid so.

12          INDEPENDENT HEARING EXAMINER:  Let me

13    admonish you, though.  You weren't in here earlier.  You

14    are not to discuss your testimony with anyone.

15          THE WITNESS:  Yes, sir.

16          INDEPENDENT HEARING EXAMINER:  Okay.

17    You're not to discuss questions that you were asked.

18    You're not to discuss the answers that you gave.  Once

19    this hearing is finished, either today or Wednesday,

20    then at that point you're free to discuss it.

21          THE WITNESS:  Yes, sir.

22          INDEPENDENT HEARING EXAMINER:  But for

23    today and through Wednesday, don't discuss it with

24    anyone.  If anyone asks, you can say that you testified,

25    but you can't say anything beyond that.

1                    THE WITNESS:  Yes, sir.

2                    INDEPENDENT HEARING EXAMINER:  Okay.  And

3    -- and at this point I would say that that includes your

4    parents.  Okay?

5                    THE WITNESS:  Yes, sir.

6                    INDEPENDENT HEARING EXAMINER:  You can

7    tell them that -- that you testified, but tell them that

8    you're under orders from me not to discuss what was said

9    until after Wednesday.  Okay?

10                   THE WITNESS:  Yes, sir.

11                   INDEPENDENT HEARING EXAMINER:  Thank you.

12                   THE WITNESS:  Thank you.

13                   MR. JOHN C. HARDY:  May I get my next

14   witness?

15                   INDEPENDENT HEARING EXAMINER:  Yes.  Who

16   is your next witness?

17                   MR. JOHN C. HARDY:  Ms. Hamilton.

18                   INDEPENDENT HEARING EXAMINER:  Let's go

19   off the record for a second.

20                   (Recess.)

21                   INDEPENDENT HEARING EXAMINER:  Back on

22   the record.  Let me get your -- your full name, please.

23                   MS. HAMILTON:  Stephanie McMullen

24   Hamilton.

25                   INDEPENDENT HEARING EXAMINER:  Now, Ms.

1  Hamilton, just for my -- for my own purposes, because
2  I'm trying to keep everybody straight, do you --
3              MS. HAMILTON:  I go by Sam.
4              INDEPENDENT HEARING EXAMINER:  Sam.
5  Okay.  Perfect.  Let me get you to raise your right
6  hand.
7              STEPHANIE MCMULLEN HAMILTON,
8  having been first duly sworn, testified as follows:
9              INDEPENDENT HEARING EXAMINER:  Go ahead,
10  Mr. Hardy.
11             MR. JOHN C. HARDY.  Thank you, sir.
12                  DIRECT EXAMINATION
13  BY MR. JOHN C. HARDY:
14      Q.   Ms. Hamilton, for the record and the court
15  reporter, would you state your full name?
16      A.   Stephanie McMullen Hamilton.  I go by Sam.
17      Q.   Thank you, ma'am.  How are you employed?
18      A.   I am the head athletic trainer for the district
19  at Troup Independent School District.
20      Q.   And how long have you worked at Troup ISD as
21  the athletic director?
22      A.   This is my sixth year.
23      Q.   And misspoke.  Athletic trainer.
24      A.   Athletic trainer.
25      Q.   Were you working for Troup ISD on the 19th of

1   October, 2015?

2       A.   Yes.

3       Q.   Do you remember that day for any reason?

4       A.   Yes, sir.

5       Q.   Did you observe Coach Alexander strike any

6   students?

7       A.   Yes, sir.

8       Q.   Did you observe Coach Alexander strike Colton

9   Whitsell?

10      A.   Yes, sir, I did.

11      Q.   Would you describe what you saw when he struck

12  Colton?

13      A.   We were in our prepractice meeting.  The boys

14  were taking a knee on the field, and the coaches and

15  myself were standing around the outside of the huddle,

16  and Coach Alexander was talking to the players about the

17  game the week prior against Arp, and sort of out of

18  nowhere he hit -- he slapped Colton across the face.

19      Q.   Would you -- were you able to hear the slap?

20      A.   Yes, sir, I was.

21      Q.   How far away from the incident were you?

22      A.   No more than ten yards, probably closer to --

23  between five and ten.

24      Q.   But it was a pop that you heard?

25      A.   Yes, sir.

1    Q.   And not only did you hear it, but you saw it?

2    A.   Yes, sir.

3    Q.   Was Colton Whitsell acting out in any way that

4    you saw before he was struck?

5    A.   No, sir.

6    Q.   Did you observe him to be laughing?

7    A.   Not -- no, sir.

8         MR. JOHN C. HARDY:  If I might approach

9    the witness.

10        INDEPENDENT HEARING EXAMINER:  Yes.

11   Q.   (BY MR. JOHN C. HARDY)  Ms. Hamilton, I'm going

12   to show you what's been marked Petitioner's Exhibit No.

13   6.  Can you identify that document?

14   A.   Yes, sir.  This is the statement that I wrote

15   on the 19th.

16   Q.   Did you write it on the 19th, or is it --

17   that's the date that --

18   A.   Oh, the date that it happened, yes, sir.  I'm

19   sorry.  I -- I wrote it on the 22nd.

20   Q.   Of October?

21   A.   Yes, sir.

22   Q.   So about three days after the event?

23   A.   Yes, sir.

24   Q.   What caused you to write that statement?

25   A.   The next day after practice I contacted Mr.

1   Bird, the superintendent, and told him that I needed to

2   speak with him because I wasn't comfortable with the

3   situation that had happened.  So I contacted him, and he

4   had me write my statement for him at that time.

5        Q.   Was this before Coach Alexander was suspended?

6        A.   Yes, sir.

7        Q.   Do you recall what day of the week that Coach

8   Alexander was suspended?

9        A.   He wasn't at practice on Wednesday.

10       Q.   Okay.  Did he ever come back to practice after

11  that?

12       A.   No, sir.  I never saw him after that.

13            MR. JOHN C. HARDY:  At this time, Judge,

14  we would offer Exhibit No. 6.

15            INDEPENDENT HEARING EXAMINER:  Exhibit 6

16  is admitted.

17            (Petitioner Exhibit 6 admitted.)

18            MR. JOHN C. HARDY:  Thank you.

19       Q.   (BY MR. JOHN C. HARDY)  Ms. Hamilton, did you

20  believe that the situation was serious?

21       A.   Yes, sir, I did.

22       Q.   Did you believe it was serious enough to report

23  it to CPS?

24       A.   Yes, sir, I did.  I called and filed a report

25  with CPS.

1                MR. ADKISON:  Object to hearsay --

2     Q.  (BY MR. JOHN C. HARDY)  Did you --

3                MR. ADKISON:  -- evidence.

4                INDEPENDENT HEARING EXAMINER:  Overruled.

5     Q.  (BY MR. JOHN C. HARDY)  What did you report to

6 CPS?

7     A.   I reported the -- the situation that during

8 practice Monday morning -- or Monday afternoon, I

9 apologize, Monday afternoon before practice that Coach

10 Alexander slapped Colton Whitsell and shoved another

11 player.

12    Q.   Had you and Coach Alexander gotten along

13 reasonably well as employees of Troup ISD?

14    A.   Yes, sir.

15    Q.   Had you ever had any disagreements?

16    A.   Yes, sir.

17    Q.   Employees have disagreements?

18    A.   Yes, sir.

19    Q.   Did you -- do you recall an incident about

20 lightning and lightning strikes?

21    A.   Yes, sir.  We had a situation at a softball

22 playoff game that was off site at Whitehouse --

23              MR. ADKISON:  Excuse me.  This is not --

24 this isn't relevant to any issue that's been framed by

25 the notice letter, and I object to it.

1          MR. JOHN C. HARDY:  I'll withdraw my

2    question if that'll make it easy.  Thank you, Judge.

3          Q.   (BY MR. JOHN C. HARDY)  Did you also, on the

4    19th, see Coach Alexander strike any other student or

5    push a student around?

6          A.   I saw him push Demontrae Wade over --

7          Q.   And --

8          A.   -- from a kneeling position.

9          Q.   Was that done, from what you saw, in a playful

10   or joking manner?

11         A.   It didn't seem so to me, no, sir.  He seemed

12   upset.

13              MR. JOHN C. HARDY:  May I approach, your

14   Honor?

15              INDEPENDENT HEARING EXAMINER:  Yes.

16         Q.   (BY MR. JOHN C. HARDY)  Ma'am, I've put in

17   front of you three evaluation documents.  Do you

18   recognize those?

19         A.   Yes, sir, I do.  They're my evaluations from

20   the last three seasons.

21         Q.   Who prepared those documents?

22         A.   The one that's labeled 20 and 21 were done by

23   Coach Alexander.  The one that was -- is labeled 22 I

24   filled out and Coach Alexander signed.

25         Q.   Are those records of your evaluations at Troup

1  ISD while employed under the directorship of Coach
2  Alexander?
3       A.   Yes, sir.
4            MR. JOHN C. HARDY:  We would offer at
5  this time, your Honor, 20, 21, and 22.
6            INDEPENDENT HEARING EXAMINER:  They've
7  already been admitted.
8            MR. JOHN C. HARDY:  Thank you.
9       Q.   (BY MR. JOHN C. HARDY)  What would you describe
10 as your relationship with Coach Alexander?
11      A.   I mean, we had a relationship, a working
12 relationship.  I enjoyed working for him for the most
13 part.  We had disagreements on basically one point and
14 that was it.  He -- just like any other employee, he
15 would get upset with me same as I would get upset with
16 situations, but it wasn't adversarial at all.
17      Q.   Did you -- do you have any reason to want to
18 see Coach Alexander removed from his position as
19 athletic director at Troup ISD?
20      A.   I don't have anything against Coach Alexander
21 personally.  No, sir.
22      Q.   During the time that you were a trainer and
23 working under Alexander's leadership, did you observe
24 him addressing any of the students or the team
25 inappropriately?

1    A.    He used foul language on a regular basis.

2    Q.    Did he use the "GD" when we was addressing the

3  kids?

4    A.    Yes, sir.

5    Q.    Did that happen on a regular basis?

6    A.    Yes, sir.

7    Q.    Did he drop the F bomb when he was yelling at

8  the kids?

9    A.    Yes, sir.

10   Q.    Did that happen on a regular basis?

11   A.    Yes, sir.

12   Q.    Did he address some of the other coaches and

13  you that way at times?

14   A.    Yes, sir.

15   Q.    Did you find that demeaning?

16   A.    I didn't like it, no, sir.

17   Q.    Did you feel it was inappropriate?

18   A.    Yes, sir.

19   Q.    Did you feel it was inappropriate to address

20  the students in that manner?

21   A.    Yes, sir.

22              MR. JOHN C. HARDY:  I pass this witness.

23                   CROSS-EXAMINATION

24  BY MR. ADKISON:

25   Q.    Ms. Hamilton, my name's Ron Adkison.  I'm Coach

1     Alexander's attorney.  Do you understand who I am and
2     who I represent?
3          A.   Yes, sir.
4          Q.   You understand you're testifying under oath
5     here?
6          A.   Yes, sir.
7          Q.   You said that the game a week before was the
8     Arp game?
9          A.   From my memory, yes, sir.  I could be wrong.
10          Q.   All right.  After you observed what you say you
11     observed, did you go to Colton Whitsell?
12          A.   Not that afternoon, no.
13          Q.   Well, did you go to him and see if he needed
14     any sort of medical attention?
15          A.   He got slapped in the face.  I didn't really
16     find that it needed medical attention.
17          Q.   Well, you -- you contacted CPS.  Did you
18     photograph his face to show it to CPS?
19          A.   No, sir.
20          Q.   That's one thing that's really handy in a CPS
21     allegation is -- is for photographs, aren't they?
22          A.   I don't work for CPS.  I don't know.
23          Q.   Have you ever made a report to CPS before?
24          A.   Yes, sir.
25          Q.   How many times previously have you made a

1  report to CPS?

2     A.   This was the second.

3     Q.   Okay.  So when did you contact CPS?

4     A.   The following day.

5     Q.   And would it surprise you that CPS has taken

6  absolutely no action about that?

7           MR. JOHN C. HARDY:  I object to that.  It

8  calls for a conclusion by Ms. --

9           INDEPENDENT HEARING EXAMINER:  Sustained.

10     Q.   (BY MR. ADKISON)  But you're telling this

11  investigator that you made a report specifically to CPS,

12  giving the specific name of a child, specific name of

13  the adult, and the specific circumstances under which it

14  happened?

15     A.   Yes, sir.

16     Q.   And that would have been four months ago?

17     A.   Yes, sir.

18     Q.   Okay.  Did you seek to offer any assistance to

19  Trey?

20     A.   No, sir.

21     Q.   Now, I believe you said Coach Alexander did not

22  make the Wednesday practice; is that correct?

23     A.   Yes, sir.

24     Q.   So did he coach Tuesday but not Wednesday?

25     A.   Yes, sir.

1    Q.    Okay.  And what's the date of your statement?

2    A.    The 22nd.

3    Q.    Now, when did you first have a conversation

4    with Mr. Bird?

5    A.    I spoke to him on the telephone the next

6    morning, on Tuesday, and we met on Wednesday.  He wasn't

7    in the office on Tuesday.

8    Q.    Okay.  Did you not give a statement on the day

9    that you talked to him in the office?

10    A.    I wrote it the next day, I believe, from the

11    date.  It's dated the 22nd.

12    Q.    So you weren't asked to give a statement on the

13    day that you spoke to Mr. Bird?

14    A.    Not written.  I spoke to him one-on-one in his

15    office.

16    Q.    You and Mr. Bird have previously worked at

17    schools together other than Troup, correct?

18    A.    Yes, sir.

19    Q.    Where?

20    A.    Jacksonville.

21    Q.    And what was his position at Jacksonville?

22    A.    When I was hired, he was the principal, and he

23    transitioned into the superintendent position when he

24    was hired.

25    Q.    And then how did the trajectory of your being

1   in Jacksonville a little after he was superintendent?

2       A.   He left as superintendent.  I was in

3   Jacksonville for eight years.

4       Q.   Okay.  In what capacity?

5       A.   I was the athletic trainer.  I was the

6   assistant athletic trainer for seven years and the head

7   athletic trainer for one year.

8       Q.   Now, I believe in answer to -- Mr. Hardy made a

9   statement that employees have disagreements.

10      A.   Yes, sir.

11      Q.   And you believe that, don't you?

12      A.   Yes, sir.

13      Q.   Is there anybody that you have worked with as

14  an athletic trainer where your official duties required

15  that, that you haven't had some disagreement with at

16  some time or the other?

17      A.   Specifically athletic directors that I haven't

18  disagreed with?

19      Q.   ADs, assistant coaches, other teachers.

20      A.   I have worked with a few athletic directors

21  that I didn't have disagreements with, yes, sir.

22      Q.   All right.  But by and large, you agreed with

23  what Mr. Hardy said, the employees have disagreements?

24      A.   Yes, sir.

25      Q.   And an athletic director is a supervisor?

1    A.   Yes, sir.

2    Q.   And obviously, a supervisor's job is not to

3 just roll over and agree with what everybody acting

4 under his supervision decides they want to do, is it?

5    A.   No, sir.

6    Q.   Do you have job duties at Troup Independent

7 School District other than athletic trainer?

8    A.   Yes, sir.

9    Q.   What?

10   A.   I teach classes.

11   Q.   Which classes do you teach?

12   A.   I teach sixth grade PE at the middle school and

13 a seventh grade elective class at the middle school.

14 And I teach a high school sports medicine class.

15   Q.   Do you actually teach the sports medicine

16 class?

17   A.   Yes, sir.

18   Q.   Okay.  At what time of day do you teach the

19 high school class?

20   A.   My class starts at about 12:19 and goes to

21 1:11.

22   Q.   Okay.  What time do you teach the 7th grade

23 class?

24   A.   My class goes from 10:00 -- no.  I'm sorry.

25 Probably 10:45 'til -- it includes the lunch period, so

1    11:42, I believe is when it ends.

2         Q.    And then your sixth grade class?

3         A.    Right before that.

4         Q.    Okay.  Now, the day of this incident that you

5    reported to the superintendent, was that the day that

6    the water mains in Troup were down?

7         A.    I believe so.  They happen -- it happens kind

8    of regularly, so I don't know specifically.

9         Q.    Well, isn't it true that Troup ISD dismissed

10   classes at noon that day?

11        A.    That could have been one of the day -- I'm

12   sorry.  I don't know specifically.  That could have been

13   one of the days.

14        Q.    So your responsibility as an athletic trainer

15   is, is one thing that we know is that athletes need to

16   be hydrated?

17        A.    Yes, sir.

18        Q.    Unlike the Neanderthal days when I played and

19   you got like one water break every two hours or

20   something, I mean athletes need to be hydrated.

21        A.    Yes, sir.

22        Q.    And if the water mains in Troup were broke,

23   then it's your job as the athletic trainer to make sure

24   that there's sufficient water for them to be hydrated.

25        A.    Yes, sir.

1    Q.    Okay.  And what time did practice start that

2  day?

3    A.    If we got out of 12:00, then we probably

4  started shortly after that.

5    Q.    And you had duties up until that time, correct?

6    A.    Yes, sir.

7    Q.    Matter of fact, all morning your morning would

8  have been taken up with your other duties, correct?

9    A.    Yes, sir.

10    Q.    Now, did you personally see to it that the team

11  had sufficient water for a practice session?

12    A.    David Lamotte brought bottles of water.

13    Q.    Uh-huh.

14    A.    He's our transportation director.

15    Q.    Uh-huh.

16    A.    And we made sure that we had plenty of bottles

17  of water that day, but I didn't have to actually fetch

18  them myself.

19    Q.    No.  I didn't mean you had to fetch them.

20    A.    They were brought to us.

21    Q.    Where did you bring them though?

22    A.    To the field house.  We loaded them up on the

23  Gator in the trailer.

24    Q.    But you're not practicing in the field house,

25  are you?

1     A.   No, sir.

2     Q.   Practice is going to take place on the field,

3 and that is over 100 yards from the field house?

4     A.   Yes, sir, about.

5     Q.   And this incident that you have described was

6 during a prepractice meeting --

7     A.   Yes, sir.

8     Q.   -- correct?

9           Now, where was the team at the time that

10 you said this occurred?

11     A.   Kneeling on the field closest -- the end

12 closest to the golf course.  I don't know if it's north

13 or south.

14     Q.   What yard line?

15     A.   Near the goal line.

16     Q.   Not near the 40?

17     A.   No, sir.

18     Q.   Okay.  Was Coach Alexander facing the golf

19 course or the bus barn?

20     A.   The bus barn, home stands direction.  The team

21 was facing the -- the golf course.

22     Q.   Okay.  And to get to the field from the field

23 house, you can't go through the center of the stands,

24 can you?

25     A.   There's a gate on the bus barn end.  I don't

1  know north and south.  I apologize.  But on the bus barn

2  end that we come through between the main stands on the

3  home side and the band stands.

4      Q.  I appreciate that.  But my simple question is

5  you can't come through -- there's no opening in the

6  center of the stands to give that training staff access

7  to the field, correct?

8      A.  No, sir.

9      Q.  And you anticipated where I was going next.

10 The one gate that allows you to get in there with the

11 Gator carrying the water is to the bus barn side,

12 correct?

13     A.  Yes, sir.

14     Q.  Which is on the opposite end from the goal line

15 by the golf course, correct?

16     A.  Yes, sir.

17     Q.  Do y'all also have a watering device?  I don't

18 know what you call them, but it had coolers.

19     A.  Cow.

20     Q.  Yeah.  That has multiple --

21     A.  We call it a cow.

22     Q.  -- outlets for water?

23     A.  Yes, sir.

24     Q.  And was that device available that day for

25 water?

1     A.   Yes, sir.  We set it at the 50 yard line where

2  the water hose is.

3     Q.   And that means that that device had to be

4  loaded, that that wasn't just hauling a bottle up there,

5  correct?

6     A.   Yes, sir.  My student trainers helped me load

7  that onto the Gator.

8     Q.   So in addition to hauling bottled water at the

9  conclusion of your day in the classrooms, you were on --

10  going in and out of the north side entrance onto the

11  field not only hauling bottled water, but setting up a

12  water device, correct?

13     A.   Yes, sir.  We had all that done before --

14     Q.   And --

15     A.   --- Coach Alexander --

16     Q.   And --

17     A.   -- met.

18     Q.   And overseeing that process during that period

19  -- prior to the start of the practice, correct?

20     A.   Yes, sir.  It was finished.

21     Q.   Was any of that still going on at the time that

22  the prepractice meeting started?

23     A.   No, sir.  We were done and set up.

24     Q.   So you deny that under oath?

25     A.   That the water was set up?

1    Q.   It was completely set up.

2    A.   My student trainers might have been filling up

3    bottles at the time, but I was there, and that part was

4    finished.  Yes, sir.

5    Q.   Okay.  And where was the, as you call it, cow

6    set up?

7    A.   On the 50 yard line.

8    Q.   Okay.  So 50 yards away from where Coach

9    Alexander's meeting with the team?

10    A.   Yes, sir, roughly.

11              MR. ADKISON:  I pass the witness.

12              MR. JOHN C. HARDY:  Nothing further of

13    this witness at this time.

14              INDEPENDENT HEARING EXAMINER:  Okay.  Ms.

15    Hamilton, you're excused.  Let me admonish you because

16    you weren't in here earlier.  You're not permitted to

17    discuss your testimony today with anyone.  You're not --

18              THE WITNESS:  Yes, sir.

19              INDEPENDENT HEARING EXAMINER:  -- allowed

20    to discuss the questions that were asked of you.  You're

21    not allowed to discuss the answers that you gave until

22    such time as the hearing is concluded either today or

23    Wednesday.  If anyone asks, you can say I was called to

24    testify.  You can't say anything beyond that.  Okay?

25              THE WITNESS:  Okay.

1              INDEPENDENT HEARING EXAMINER:  You're
2    excused.
3              THE WITNESS:  Thank you.
4              MR. JOHN C. HARDY.  My next witness is
5    Mr. Griffin.
6              INDEPENDENT HEARING EXAMINER:  Okay.
7              MR. ADKISON:  May I take a short break?
8              INDEPENDENT HEARING EXAMINER:  We'll go
9    off the record.
10             (Recess.)
11             INDEPENDENT HEARING EXAMINER:  Back on
12   the record.  And Mr. Hardy, this witness has not been
13   sworn in, correct?
14             MR. JOHN C. HARDY:  You are correct.
15             INDEPENDENT HEARING EXAMINER:  Can you
16   give me your full name?
17             MR. GRIFFIN:  Andy M. Griffin, Jr.
18             INDEPENDENT HEARING EXAMINER:  Raise your
19   right hand.
20                  ANDY M. GRIFFIN, JR.,
21   having been first duly sworn, testified as follows:
22             INDEPENDENT HEARING EXAMINER:  Go ahead
23             MR. JOHN C. HARDY:  Thank you.
24                       EXAMINATION
25   BY MR. JOHN C. HARDY:

1     Q.    Would you state your name for the record,

2 please?

3     A.    Andy M. Griffin, Jr.

4     Q.    And where do you reside?

5     A.    In Troup, at 605 East McKay.

6     Q.    And what is your position or relationship with

7 Troup ISD at this time?

8     A.    I serve on the school board.

9     Q.    Do you serve as an officer of the school board?

10     A.    Yes.

11     Q.    What office do you hold at this time?

12     A.    President.

13     Q.    Have you held that position for a period of

14 time?

15     A.    I think about three years, but I'm not

16 positive.

17     Q.    Were you present at the Troup ISD School Board

18 when Coach Dennis Alexander was hired?

19     A.    I believe I was.

20     Q.    During this -- this current school year

21 beginning in the fall, did you have occasion to visit

22 with Mr. Stuart Bird, the superintendent, about the

23 employment of Coach Alexander?

24     A.    Mr. Bird called me in to discuss the issue,

25 yes.

1      Q.    And what was the issue that you were
2  discussing?
3      A.    At -- at that time there was alleged slapping
4  of a player, and they were taking some statements on it,
5  that kind of thing.
6      Q.    After that initial discussion with Mr. Bird,
7  did you participate in board meetings where Mr.
8  Alexander's contract was under discussion?
9      A.    Only at the last one.  There was some
10 discussion of -- I don't know the exact wording,
11 termination request or -- I don't know the exact
12 wording.
13     Q.    Under the proposed termination?
14     A.    Proposed.  That's...
15     Q.    Mr. Griffin, do you recall -- and it's in the
16 record and I can get them for you.  Exhibit No. 14 deals
17 with a board meeting on November the 3rd of 2015.  Would
18 you have been -- it shows that you were present at that
19 meeting.  Were you -- do you recall that meeting?
20     A.    Yes.  Vaguely, yes.
21     Q.    That's okay.
22     A.    Details I would have a hard time.
23     Q.    Well, certainly.
24               MR. ADKISON:  He's talking about that one
25 right up here.

1          MR. JOHN C. HARDY:  Thank you, Mr.
2     Adkison.
3          MR. ADKISON:  You're welcome.
4     Q.   (BY MR. JOHN C. HARDY)  I'm just trying to lay
5     with you, Mr. Griffin, that there were several board
6     meetings where Coach Alexander's contract was under
7     discussion; is that correct?  I'm not asking you to talk
8     about executive session, but that the minutes and the
9     agenda show --
10         A.   Right, right.
11         Q.   And then on December the 18th is the meeting
12    that we're talking about, and that's Exhibit No. 17 in
13    front of you, that deals with the agenda item No. 7
14    where there was a proposal to meet the termination of
15    Dennis Alexander as athletic director and head football
16    coach.  Do you recall that?
17         A.   Yes.
18         Q.   Now, during that meeting there -- that vote
19    shows what?  4-0?
20         A.   Yes.
21         Q.   Why were there only four votes?  There's six of
22    you that --
23         A.   There were two --
24         Q.   -- serve on this --
25         A.   -- in -- on the Board that were personally

1    involved with some of the people that were involved in
2    this incident, so they recused themselves.  John
3    Whitsell and Gene Whitsell.
4        Q.    And they did not participate in either the
5    discussions or the vote; is that correct?
6        A.    No.
7        Q.    Is that correct?
8        A.    Yes.
9        Q.    After the board meeting and the motion by Shane
10   Jasper to terminate or propose termination of Dennis
11   Alexander and then Mr. Switzer seconded that motion,
12   that's what the minutes show.  Do you have any objection
13   to that?
14       A.    No, I don't.
15       Q.    And then did you give notice in writing to
16   Coach Alexander on December -- dated December the 18th
17   that the Board had voted to propose his termination?
18   That's Exhibit No. 18.
19       A.    Yes.
20       Q.    And that's your signature on that, is it not,
21   sir?
22       A.    Yes.
23       Q.    And that was the action of the Board?
24       A.    Yes.
25       Q.    Did you as the board president and the Board

1  direct the superintendent, Mr. Stuart Bird, to prepare

2  and forward a letter to Mr. Dennis Alexander setting

3  forth the recommendation to propose termination?

4      A.   Yes.

5      Q.   And did that letter set forth who the witnesses

6  and the general testimony would be, as well as the eight

7  reasons for recommending proposal of termination of

8  Coach Alexander?

9      A.   Yes.

10     Q.   Let's go -- let's talk just a minute about your

11  background, Mr. Griffin.  In your working -- are you

12  retired?

13     A.   Yes.

14     Q.   In your working career, what did you do?

15     A.   I was a football coach.

16     Q.   High school?

17     A.   Yes, sir.

18     Q.   During the time that you were a high school

19  football coach, did you ever slap or strike a student?

20     A.   No.  I, you know, being a coach all my life, I

21  believe a coach has a responsibility to be a role model

22  and to set an example for kids on how to act, how to

23  talk, how to treat others, how to be fair, how to

24  conduct themselves in all situations.  So that -- that

25  would be the -- what I would rely on is my ability to do

that.

Q.   Did you cuss the students that you were coaching?

A.   No.

Q.   Do you believe that would be appropriate?

A.   Well, again, you know, agreements -- when you have team meetings and meetings with coaches, you go over the fact that you've got to stay away from all forms of disrespectful conduct, verbal abuse, physical abuse, taunting, trash talking, that kind of thing because we're interested in the bottom line, the emotional health and well-being of our players.

Q.   Are you fairly familiar with the corporal punishment policies at school districts?

A.   No, I'm not.

Q.   Okay.  Fair enough.  Do you believe based on what you have heard and reviewing the statements and what you have seen that Coach Alexander ought to be employed as the athletic director and head coach at Troup ISD?

A.   No, I do not.  I had not talked to anybody, but I have read the statements.

Q.   Do you believe from what you have read and reviewed and discussed with Mr. Bird that he is the role model that you would want for the Troup athletes?

1     A.    No.

2     Q.    Do you believe based upon what you have read,

3  seen, and visited with Mr. Bird about in the

4  investigation that he should be brought back to Troup

5  ISD?

6     A.    No.

7                 MR. JOHN C. HARDY:  Pass the witness.

8                 CROSS-EXAMINATION

9  BY MR. ADKISON:

10    Q.    Mr. Griffin, my name is Ron Adkison.  I

11 represent Coach Alexander.  You understand who I am and

12 who I represent?

13    A.    Yes.

14    Q.    Do you recall ever meeting me before?

15    A.    Meeting you?

16    Q.    Yes.

17    A.    No, sir.

18    Q.    Do you recall the reception that was given for

19 Coach Alexander when he was hired?

20    A.    Vaguely, yes.

21    Q.    And it was in this very room?

22    A.    Yes.

23    Q.    Now, at the time that Coach Alexander was

24 hired, Troup did not have a superintendent, correct?

25    A.    I believe we were close to, but I'm not sure we

1  did.

2      Q.   That's all right.  And how long have you known

3  Coach Alexander?

4      A.   Well, we have never been close friends, but we

5  have been acquaintances through many years.

6      Q.   How many?

7      A.   I would say since 1969 or '70, somewhere in

8  that area.  When we -- he was at Hughes Springs, we

9  played each other and got to know each other, but it was

10 a casual acquaintance.

11     Q.   Sure.  What about when he was at Daingerfield?

12     A.   We played in the playoffs there once, yes.

13     Q.   All right.  And so since 1969 or 1970, you've

14 known Coach Alexander, you've known his coaching

15 methods.

16     A.   I wouldn't put it that way.

17     Q.   Well, okay.  Coaching -- you've known Coach

18 Alexander and you know his personality, correct?

19     A.   I did not know him personally, on a personal

20 relationship basis.  We had -- we met at games and we

21 talked at games and we had meetings about games that

22 were going to happen.  That's the extent of our --

23     Q.   What about coaching clinics?

24     A.   I don't recall ever seeing him.

25     Q.   You're not trying to tell the jury under oath

1   that one coach in the district does not know the
2   reputation of another coach in the district, do you?
3       A.   That one coach in the district?
4       Q.   Let me start over.  Let me slow down a bit.
5   You're not here under oath to tell the hearing officer
6   that a coach in a district doesn't know the reputation
7   of another coach in the district, are you?
8       A.   I know of things that they've -- been said
9   about them, but as far as personally knowing, no.
10      Q.   Okay.  Now, back to the reception, do you
11  recall you and I and Coach Alexander being in this
12  corner back here laughing about his reputation for using
13  profanity?
14      A.   No, sir, I don't.
15      Q.   Do you deny that?
16      A.   I don't remember it.  I sure don't.
17      Q.   Now, also at the time that Coach Alexander was
18  hired, did you and he go to see Mr. Hardy, the school's
19  lawyer, together about his contract?
20      A.   Yes, sir.  Sure did.
21      Q.   And that was at your instance, was it not?
22      A.   Yes, sir; to make sure he was protected in
23  every way that he could be protected by a contract.
24      Q.   Including his contract contained a provision
25  that he could not be reassigned?

1  A.  Correct.

2  Q.  And as a former coach, you are sensitive to

3  protecting coaches?

4  A.  I sure am.

5  Q.  Because if the won-loss record gets a little

6  bad, then all of a sudden the knives are out and

7  everybody's looking for a reason to fire him, aren't

8  they?

9  A.  Right.  And it doesn't always have to be --

10  it's just if you do the wrong thing at the wrong time to

11  the wrong person.

12  Q.  Wrong thing, wrong time, wrong person.  All

13  right.  I'm going to come back to that.

14          But what I was going to say is the

15  won-loss record gets bad, and Dennis's has been bad for

16  a couple of years, hasn't it, right?

17  A.  Yes, sir.  We all experience that.

18  Q.  Sure.  And, I mean, did you ever know Jim Hess?

19  He was a coach --

20  A.  Yes, sir.

21  Q.  -- at Angelo?

22  A.  Yes, sir.

23  Q.  Mr. Hess told me one time on the sideline at

24  New Mexico State, if you can't run and jump, you can't

25  play this game, right?

1      A.   (Moving head up and down.)

2      Q.   Do you agree with that?

3      A.   I -- I would agree if you can't run it, you

4  sure can't.

5      Q.   Yeah.  If you can't run and jump, you can't

6  play this game.  So anyway, back to what I was saying.

7  The won-loss record starts getting bad, then everybody

8  gets their knives out, and any old excuse will do,

9  correct?

10     A.   Sometimes.

11     Q.   Yeah.  And your entire source of information

12  about what really did or didn't go on as regards to

13  Coach Alexander hitting a player came from Stuart Bird,

14  didn't it?

15     A.   No.  It came from me reading the statements.

16     Q.   Oh, okay.  I'm sorry.  That was a bad question.

17  Let me start over.

18               You have not independently made any

19  verification of the matters contained in the statements,

20  have you?

21     A.   What -- explain what you mean --

22     Q.   Yeah.

23     A.   -- by that.

24     Q.   I mean you didn't go out and interview anybody

25  --

1      A.   Oh, no.

2      Q.   -- who gave a statement --

3      A.   No.

4      Q.   -- right?

5      A.   No, no.

6      Q.   And you didn't conduct any investigation to see

7  if there might be other motives behind any of the

8  statements that you read, right?

9      A.   No, I did not.

10     Q.   Okay.

11     A.   That would be out of place for me.

12     Q.   Sure.  And you -- so what I was getting at

13 before is by necessity, your opinions that you've

14 expressed about Coach Alexander are based on this

15 investigation, correct?

16     A.   Yes, sir.

17     Q.   And would depend upon the truth and veracity

18 and the thoroughness of the investigation, correct?

19     A.   Yes, sir.

20     Q.   For instance, if there are other players and

21 other coaches who were on that field at the time who

22 were looking right at Coach Alexander and who say what

23 they're saying happened just didn't happen, that would

24 change your mind, wouldn't it?

25     A.   Not -- because the statements I saw --

1    Q.   I know.

2    A.   -- were -- were all in contrast to that.

3    Q.   Sure.

4    A.   And as far as I know, everybody that has seen

5    the incident was interviewed.

6    Q.   And that's what was told to you, wasn't it?

7    A.   Yes, sir.

8    Q.   Now, if that turns out to be wrong and if there

9    were people who were interviewed who said that didn't

10   happen, that starts to make you question the extent

11   of the the investigation?

12   A.   No, sir.  The people that -- they were positive

13   of what they stated as I read it.

14   Q.   Okay.

15   A.   And they were positive about what they had seen

16   happen.

17   Q.   What about John Eastman?  Did John Eastman see

18   it?

19   A.   I don't know.

20   Q.   Well, I thought you read the statements.

21   A.   I believe -- let me refresh.  I don't think he

22   saw it.  I don't -- I don't recall reading that.

23   Q.   Okay.  Now -- so there's absolutely nothing

24   that could be produced or introduced that would change

25   your mind in any way whatsoever, correct?

1     A.   That was a thorough investigation, as I

2  understand it.

3     Q.   But -- I appreciate that.  I just need you to

4  answer my specific question.  Okay?

5          So as a result of this investigation,

6  there is nothing that would change your mind about Coach

7  Alexander's status with Troup Independent School

8  District; is that correct?

9     A.   That's correct.

10         MR. ADKISON:  That's all I have, your

11  Honor, at this time.

12         INDEPENDENT HEARING EXAMINER:  Okay.

13         MR. JOHN C. HARDY:  Nothing further of

14  this witness at this time.  Thank you.

15         INDEPENDENT HEARING EXAMINER:  Okay.

16  Mr. Griffin, let me admonish you.  You can go ahead and

17  stand up.  You don't have to sit back down.  Let me

18  admonish you, you're not to discuss your testimony here

19  today with anyone until the hearing is concluded,

20  probably on Wednesday.  Don't discuss the questions that

21  you were asked.  Don't discuss the answers that you

22  gave.  The only thing that you're permitted to say is

23  that -- is that you did testify.  Is that clear?

24         THE WITNESS:  Yes, sir.

25         INDEPENDENT HEARING EXAMINER:  Thank you.

1                    THE WITNESS:  Thank you.

2                    INDEPENDENT HEARING EXAMINER:  Okay.  Now

3    let's take a lunch break.  Now, you guys tell me because

4    I don't know Troup.

5                    UNIDENTIFIED AUDIENCE MEMBER:  Don't get

6    caught by the train.

7                    MR. ADKISON:  Depends on which side of

8    the train track you're on.

9                    INDEPENDENT HEARING EXAMINER:  Are --

10   what -- how much time do we need for lunch?  Let's go at

11   it that way.

12                   MR. ADKISON:  Seriously about the train

13   track, I'm going to say -- you better say an hour,

14   because if you get on the other side of that, that thing

15   --

16                   MR. JOHN C. HARDY:  An hour is fine.

17                   INDEPENDENT HEARING EXAMINER:  All right.

18   Then we'll adjourn until 1:10 and be ready to go when we

19   get back.  Off the record.

20                   (Lunch recess.)

21                   INDEPENDENT HEARING EXAMINER:  Let's go

22   back on the record.

23                   All right.  Mr. Hardy, you can call your

24   next witness.

25                   MR. JOHN C. HARDY:  At this time the

1    petitioner rests.

2                        INDEPENDENT HEARING EXAMINER:  Okay.  Mr.

3    Adkison?

4                        MR. ADKISON:  I'll briefly recall the

5    superintendent.

6                        INDEPENDENT HEARING EXAMINER:  And Mr.

7    Bird, you're still under oath.  I'll just remind you.

8                        MR. BIRD:  Yes, sir.

9                        INDEPENDENT HEARING EXAMINER:  Okay.  Go

10   ahead.

11                       STUART BIRD,

12   having been previously duly sworn, testified as follows:

13                       DIRECT EXAMINATION

14   BY MR. ADKISON:

15       Q.   Mr. Bird, as superintendent of schools, it's my

16   understanding that you're -- part of your

17   responsibilities is overseeing the curriculum.

18       A.   Yes, sir.

19       Q.   And you're familiar with a class that Troup ISD

20   has that's Pre-AP English?

21       A.   Yes, sir.

22       Q.   And who teaches that class?

23       A.   Jennifer Minnix teaches that class.  I had to

24   think.

25       Q.   Now, do you recall having a discussion with one

1    of the player's mothers, Ms. Cabe, about that

2    curriculum?

3        A.   I do.

4        Q.   And her complaint centered around a book that

5    is required reading under the curriculum of the Troup

6    Independent School District, is it not?

7        A.   Yes, sir.  It would be included -- that's --

8    it's actually a state assigned book.

9                MR. ADKISON:  I appreciate that.  I'll

10   object to it as non -- nonresponsive.

11       Q.   (BY MR. ADKISON)  The Troup Independent School

12   District requires students in Pre-AP to read this book,

13   correct?

14       A.   They did this year.

15       Q.   Okay.  And as I understand the allegation, it

16   is that the language that Coach Alexander is accused of

17   using is inappropriate; is that correct?

18       A.   Yes, sir.

19       Q.   And that that language is inappropriate in all

20   settings, correct?

21       A.   Yes, sir.

22       Q.   Hand you Plaintiff's Exhibit 1.  Do you

23   recognize the book?

24       A.   I do.

25       Q.   "The Things They Carried."  That's the book

1    we're discussing, correct?

2        A.    Yes, sir.

3        Q.    And this book that the students are required to

4    read has the F bomb in it continuously, doesn't it?

5        A.    Yes, sir, it does.

6        Q.    It has derogatory language towards women,

7    doesn't it?

8        A.    It does.

9        Q.    It has the "GD" word throughout it, doesn't it?

10       A.    It does.

11       Q.    It has derogatory descriptions of female

12   anatomy in it?

13       A.    It does.

14       Q.    It has graphic descriptions of the male anatomy

15   in it?

16       A.    It does.

17                    MR. ADKISON:  I offer Exhibit --

18   Respondent's Exhibit 1.

19                    MR. JOHN C. HARDY:  No objection.

20                    INDEPENDENT HEARING EXAMINER:

21   Plaintiff's Exhibit 1 is admitted.  I'm sorry.  I said

22   Plaintiff's Exhibit 1.

23                    MR. ADKISON:  Respondent.

24                    INDEPENDENT HEARING EXAMINER:

25   Respondent's Exhibit 1 is admitted.

1          (Respondent Exhibit 1 admitted.)

2          MR. ADKISON:  And your Honor, in my

3     confusion I had to mark out -- because the only exhibits

4     I had, had plaintiff's on them.

5          INDEPENDENT HEARING EXAMINER:  Yeah.  I

6     -- I think that's what it was, but we're clear.

7     Q.    (BY MR. ADKISON)  Now, as I -- the Troup

8     Independent School District is a governmental

9     subdivision, is it not?

10    A.    Correct.

11    Q.    And you were carrying out as regards to Coach

12    Alexander an investigation by such subdivision of the

13    state, were you not?

14    A.    Yes, sir.

15    Q.    And I asked you briefly earlier, part of your

16    responsibility as regards to your role in this

17    investigation would have been recordkeeping?

18    A.    Yes, sir.

19    Q.    You would be the custodian of those records,

20    correct?

21    A.    Correct.

22    Q.    And you would also be the person who would

23    choose what information would be recorded in those

24    records, correct?

25    A.    Ask me that question again.

1     Q.   You would also be the person as the

2  investigator who would be in charge of putting

3  information into records, would you not?

4     A.   I suppose so.  In this -- in this case I was

5  not.

6     Q.   Who was?

7     A.   The witnesses.  That's the only records we

8  kept.

9     Q.   Well, I understand that the witnesses would

10  create a record, but it was your responsibility as the

11  person charged by law to maintain records of the

12  investigation, correct?

13     A.   That's correct.

14     Q.   Are you familiar with Article 37 of the Texas

15  Penal Code?

16     A.   No, sir.

17     Q.   Are you familiar with Section 36 of the Texas

18  Penal Code?

19     A.   No, sir.

20     Q.   Now, so that we will be perfectly clear on this

21  matter, did you ever interview Coach Greer?

22     A.   I don't think so, but I don't remember.  I

23  don't think I did.  On this matter?

24     Q.   Yes.

25     A.   I don't think so.

1    Q.   Did you not interview him on Tuesday?

2    A.   Of this week?

3    Q.   No.  Tuesday following the Monday.

4    A.   Maybe we did.

5    Q.   Is there somebody in the audience that can tell

6    you if you did --

7    A.   Yeah.  That --

8    Q.   -- or not?

9    A.   That would be my high school principal.  I was

10   looking at him for a little bit of memory on that.  We

11   interviewed quite a few people, and I don't remember --

12   if -- let me -- can I say something?

13   Q.   Well, you can answer my question.  Did you

14   interview him or not interview him?

15   A.   I don't remember.

16   Q.   Now, if you're not familiar with it, I won't

17   bore you with the Penal Code sections.  But did you make

18   any notes of the persons that you interviewed for this

19   official investigation of a governmental body that are

20   not found in the documents that you've introduced here

21   before the hearing examiner?

22   A.   I did not.

23   Q.   Why not?

24   A.   I didn't see the need for it.

25   Q.   Well, let's get away from the Penal Code for a

1    section [sic] and get to practicalities of it.  Was your

2    investigation an impartial investigation or was it a

3    result oriented investigation?

4         A.    It was an impartial investigation.

5         Q.    And in an impartial investigation, you would

6    record all the information that supported your decision

7    or did not support your decision, wouldn't you?

8         A.    As I stated earlier, the people who had known

9    -- the only people I interviewed that had -- they had no

10   knowledge of what went on.  I did not record any of that

11   information.  They didn't see it.  They didn't hear it.

12   They had no knowledge.

13        Q.    Did anybody ever describe to you exactly what

14   they saw that was not in keeping with what you later

15   reported to the school board?

16        A.    Ask it again, Ron.  Make sure I understand what

17   you're asking me.

18        Q.    Let me just be blunt.

19        A.    Okay.

20        Q.    Did anybody tell you that they saw what

21   happened of what you were being told happened was not

22   what happened?

23        A.    Yes, sir.  One person did.

24        Q.    Who?

25        A.    That would have been Tell Ross.

1    Q.   What about Coach Greer?

2    A.   I don't recall Coach Greer telling me anything

3 like that.

4    Q.   So at the time that you -- now, did Coach Ross

5 give you his information that says what you were being

6 told simply wasn't true before or after you suspended

7 Coach Alexander?

8    A.   It would have been after.

9    Q.   Now, the only statement that I see from a coach

10 is from Coach Eastman, correct?

11    A.   I don't think so.  Do we not have other

12 coaches' statements?

13    Q.   I'm just asking.  I mean, let me -- let's be

14 clear about something.  You made a decision to suspend

15 an educational professional.

16    A.   Correct.

17    Q.   And so did you pay attention to what you were

18 reading and hearing before you made that decision?

19    A.   I paid very close attention to what I was

20 reading and hearing.

21    Q.   Okay.  So --

22    A.   But that's been some months ago at this point.

23    Q.   All right.  Well, did you have meetings prior

24 to the start of this hearing to refresh your memory

25 about what the course of the investigation was?

1    A.    We did do some of that, yes, sir.

2    Q.    How many hours did you spend reviewing the

3 material before today to get ready for today?

4    A.    Not many.

5    Q.    Well, you realize that today is the day that

6 somebody has to decide whether or not to follow your

7 recommendation, correct?

8    A.    Yes, sir.

9    Q.    So you're not aware of any coaches -- can you

10 point me to any particular coach's statement that was in

11 your investigation other than Coach Eastman?

12    A.    No, sir, I can't.

13    Q.    And what Coach Eastman said was that he did not

14 see Dennis Alexander strike a player, didn't he?

15    A.    Exactly.

16    Q.    Well, but didn't you just tell me that the

17 reason you didn't write some of this stuff down was

18 because these people said they didn't see it?  Do you

19 remember telling me that just a minute ago?

20    A.    I did.  And I told you that because really and

21 truly, the --

22              MR. ADKISON:  Excuse me, your Honor.

23 It's nonresponsive.  I object to it.

24    A.    Okay.

25              INDEPENDENT HEARING EXAMINER:  Sustained.

1          Q.    (BY MR. ADKISON)   And Coach Eastman just

2    happens to be the person who now has the job of athletic

3    director and head football coach, correct?

4          A.    That's correct.

5          Q.    Now, did Coach Eastman previously occupy the

6    position of head football coach?

7          A.    He did.

8          Q.    When?

9          A.    Before I got here.  I'm not sure when.

10         Q.    And he has a child who is playing on that very

11   team, correct?

12         A.    That's correct.

13         Q.    Who is friends with some of these students that

14   you interviewed, correct?

15         A.    Yes, sir.  I suppose.  I don't know that.

16         Q.    Now, I noticed that a great many of these

17   statements are written, correct?

18         A.    Yes, sir.

19         Q.    Coach Ross's statement is typed, isn't it?

20         A.    Yes, sir, if I remember that correctly.

21         Q.    And that was because Coach Ross -- did Coach

22   Ross type his own statement?

23         A.    I have no idea who typed that statement.

24         Q.    So particularly, at what point in time did you

25   decide to suspend Dennis Alexander?

1     A.   I decided to suspend Dennis Alexander when I

2   had all the statements from the youngsters and some

3   coaches who knew something about that, actually saw it,

4   were witnesses to it, were close to it, after I'd had a

5   conversation with Coach Alexander about it, after I'd

6   had a conversation with Coach Alexander and the dad in

7   my office.

8     Q.   And so that coach did not attend the Wednesday

9   practice, correct?

10     A.   That's correct.

11     Q.   Which was the 21st?

12     A.   No.  That's not true.  He did attend that

13   Wednesday practice.  In fact, if I'm not mistaken, I

14   sent him on to practice pending the conversation with

15   the dad, he, and I that afternoon.

16     Q.   Which way is it?  I've heard it two different

17   ways now.  Which way is it?

18     A.   Okay.  We have -- I sent him on to practice

19   that afternoon.

20     Q.   Which afternoon?

21     A.   On Wednesday afternoon.

22     Q.   Okay.

23     A.   Okay.  Pending my conversation with he and John

24   at 5:00 or 5:30 that same afternoon.

25     Q.   It was your -- was there anything else pending

1  besides his conversation with you and Mr. Whitsell that
2  afternoon?
3      A.   Not on the suspension, no.
4      Q.   So had you already decided to suspend him?
5      A.   I had not decided to suspend.  I wanted to have
6  that conversation before I made that decision.
7      Q.   Okay.  But my question is, was there anything
8  -- so there's nothing pending other than the
9  conversation between Coach Alexander and Mr. Whitsell?
10     A.   That's correct.
11     Q.   All right.  So at what time on -- so are you
12 saying that you suspended him on the afternoon of the
13 21st?
14     A.   If that's Wednesday afternoon, yes, sir.
15     Q.   All right.  And so that's -- you didn't have
16 Blake Attaway's statement then, did you?
17     A.   I did have Blake Attaway's statement then.
18     Q.   Well, it's dated 10/22.
19     A.   He's got -- he's got the wrong date on it.
20     Q.   Okay.  Well, what time of day did you take the
21 statements from the players?  Was that in the morning
22 of the 21st?
23     A.   It probably would have been late morning of the
24 21st, maybe to early afternoon.
25     Q.   All right.

1        MR. ADKISON:  Just a second, your Honor.

2        INDEPENDENT HEARING EXAMINER:  Yes.

3    Q.   (BY MR. ADKISON)  Now, at what point in time

4    did you issue a written notice of suspension to Coach

5    Alexander?

6    A.   You're asking about the date?

7    Q.   Yes, sir.

8    A.   I don't remember.

9    Q.   Did you -- at the time that you suspended him,

10   did you give him that written notification or did you

11   oral -- did you verbally suspend him?

12   A.   Verbally suspended him.

13   Q.   All right.  How long after that -- when's the

14   first time that he received a written notice of any

15   suspension of his duties?

16   A.   I don't remember.

17   Q.   Well, as I understood you to say this morning,

18   the exhibits that you -- Exhibit No. 1 was your complete

19   file regarding Coach Alexander's suspension; is that

20   correct?

21   A.   Yes, sir.  You're talking about the --

22   Q.   I'm talking -- this Exhibit No. 1 that you

23   testified under oath this morning was the complete file

24   that you had of this investigation and suspension.

25   A.   Yes, sir.

1    Q.    Is that testimony still true?

2    A.    It is.

3    Q.    So look through there and show me where the

4    first time Coach Alexander got a written notice of

5    suspension was.

6              MR. JOHN C. HARDY:  Your Honor, while the

7    witness is looking for that answer, I would object to

8    mischaracterization in the question.  Exhibit No. 1 is

9    the contract of Coach Alexander.

10             INDEPENDENT HEARING EXAMINER:  Okay.

11   Sustained.

12             MR. ADKISON:  Oh, I'm sorry.

13             INDEPENDENT HEARING EXAMINER:  Just --

14   and I was going to just jump in and say the same thing,

15   Mr. Adkison.  The -- the various documents were all

16   separate exhibits.

17             MR. ADKISON:  Oh, I'm sorry.

18             INDEPENDENT HEARING EXAMINER:  Those are

19   the ones that have been admitted.  Here are the ones

20   that have not been admitted.

21   Q.    (BY MR. ADKISON)  Let me give you the exhibits

22   that are currently in evidence, although I think mine's

23   got the same -- got the same the document.  All these

24   statements.

25   A.    December the 18th, 2015.

1    Q.   And you're referring to Exhibit No. 18?

2    A.   Yes.

3    Q.   So you verbally suspended him on October the

4    20th -- afternoon of October the 21st?

5    A.   I believe that's correct, if that's the

6    Wednesday.

7    Q.   But did not serve him a written notice of

8    suspension until December the 18th?

9    A.   That's correct.

10   Q.   All right.

11   A.   Actually that's the notice of hearing, isn't

12   it?

13   Q.   Yes, sir.  So is that a written notice of

14   suspension?

15   A.   No.

16   Q.   Okay.  As of December the 18th, he still

17   doesn't have a written notice of suspension, correct?

18   A.   Yes, sir.

19   Q.   Well, continue to look through all those

20   exhibits and see when there's the first time he has a

21   written notice of suspension.

22   A.   December the 18th, in this letter right here.

23   Q.   Okay.  In a letter from you?

24   A.   Yes, sir.

25   Q.   Now, from the time that you verbally suspended

1    Coach Alexander on October the 20th -- on the afternoon

2    of October 21st until December the 18th, did you

3    continue to interview potential witnesses as regards to

4    Coach Alexander's suspension?

5        A.    There was one day that I did interview some

6    people at the middle school.

7        Q.    Who did you interview?

8        A.    Interviewed Coach Davis.

9        Q.    All right.

10       A.    Donnie Leach.  I'm trying to remember who the

11   other one was.

12                   AUDIENCE MEMBER:  Lawson and Cole.

13                   INDEPENDENT HEARING EXAMINER:  Ma'am,

14   please don't speak.

15                   AUDIENCE MEMBER:  Oh, I'm sorry.

16                   MR. ADKISON:  Can we identify who that

17   speaker is?

18                   INDEPENDENT HEARING EXAMINER:  Yeah.  Can

19   you -- now that -- now that you've spoken, give me your

20   name.

21                   MS. JOHNSON:  I'm Ava Johnson.

22       A.    She's the principal at the middle school.

23       Q.    (BY MR. ADKISON)  Did you take any written

24   statements from those people that you subsequently

25   interviewed?

1    A.   I did not.

2    Q.   So you still maintain that your investigation

3  was impartial?

4    A.   I do believe it was impartial.

5    Q.   And yet even after you had verbally suspended

6  him, you continued interviewing witnesses, correct?

7    A.   That's correct.

8    Q.   Now, in this Petitioner's Exhibit 19, is there

9  any allegation made against Coach Alexander of the use

10 of racial slurs?

11   A.   I know that there are.

12   Q.   Please show them to me.

13   A.   I'm trying to find them.  Yes, sir.  No. 4,

14 right here in this statement.

15   Q.   Okay.  And Blake Attaway's statement is the

16 statement that says that the racial slur that he's

17 talking about is the statement, quote, We're  going back

18 to the old days where you don't get a break or any

19 water?

20   A.   That's correct.

21   Q.   And he didn't tell you anything other than

22 that, did he?

23   A.   No; other than it was directed to a person of

24 color.

25   Q.   Okay.  Now, your background prior to being an

1  administrator was a band director?

2      A.   Yes, sir.

3      Q.   And in what years was that?

4      A.   I have to think back.  That would have been

5  about 1968 through -- on and -- I guess on and off

6  around through maybe '90.  Yes.  I became a principal in

7  '90.

8      Q.   As a band director, did your band take water

9  breaks?

10     A.   You bet.

11     Q.   Were you aware of what the culture for football

12 teams was, particularly during conditioning during that

13 period of time?

14     A.   Yes, sir.

15     Q.   And at that point in time, water breaks were

16 scheduled?

17     A.   At that point in time they were not scheduled.

18     Q.   Well, did they occur or not occur?

19     A.   They occurred, but they weren't scheduled.  It

20 was when the coach thought they needed a break or when I

21 thought they needed one.

22     Q.   Okay.  And so depending on who your coach or

23 your band director was, we might take a water break now

24 or we might take one in two hours or we might take one

25 some other time?

1    A.    That's correct.

2    Q.    I mean, the stories are legendary about Bear

3  Bryant down in Crimson.  You don't get any water, right?

4    A.    Uh-huh.

5    Q.    Is that correct?

6    A.    That's correct.

7    Q.    And Bear Bryant had a lily white football team,

8  didn't he?

9    A.    Yes, sir, he did.

10   Q.    And so not taking breaks and not drinking water

11  certainly wasn't racial according to the graduating

12  class of 1957 at Texas A&M, was it?

13   A.    No, sir.

14   Q.    Okay.  But you decided that this statement,

15  that we're going back to the old days when you don't get

16  a break for any water is somehow racial?

17   A.    I didn't make that decision.  Blake made that

18  decision with his explanation.

19   Q.    Well, you repeated it, didn't you?  Who's the

20  adult?  You or Blake?

21   A.    Well, you know I'm the adult, but I believe

22  what Blake told me.  He told me who it was directed to,

23  and that was a person of color, so he took it racially.

24  I didn't.

25   Q.    Knowing what you know now, are you telling this

1   hearing examiner that that's a racial slur or not?

2     A.   I think that -- do I think that?

3     Q.   Yes.

4     A.   I don't know.

5     Q.   Okay.

6     A.   But I do think --

7     Q.   Excuse me.

8     A.   Okay. Gotcha.

9           MR. ADKISON: I pass the witness.

10               CROSS-EXAMINATION

11  BY MR. JOHN C. HARDY:

12     Q.   Mr. Bird, just so I can be a historian also

13  like Mr. Adkison, do you know that in 1957 that there

14  were no blacks at A&M?

15     A.   I did not know that for sure.

16     Q.   The -- do you believe as an educator and

17  administrator that there's a difference between

18  literature and the language used in literature and the

19  language directed at a student?

20     A.   There is no question. There is a huge

21  difference in the two.

22     Q.   And the books that are read by the Pre-AP, AP

23  English classes or whatever, are those books from the

24  state mandated, state approved list of literature books?

25     A.   Those books are on that list, yes, sir.

1    Q.   Does a student have the right to opt out of a

2  class if there is something that's being taught that is

3  against their religious beliefs or their moral beliefs?

4    A.   Yes, sir.  They would have that opportunity.

5    Q.   Was that requested in this situation?

6    A.   It was -- it was after the fact, yes, sir.  We

7  eliminated it from our process.

8    Q.   Thank you.  Talking about Coach Eastman being

9  the athletic director.  Who recommended to you that he

10  be appointed athletic director?

11    A.   Coach Alexander, in our conversation, which I

12  asked him who should step up, Coach Eastman.  And he

13  said yes.

14           MR. JOHN C. HARDY:  Okay.  That's all I

15  have at this time of this witness.

16           MR. ADKISON:  I have nothing further at

17  this time.

18           INDEPENDENT HEARING EXAMINER:  Okay.

19   You may step down.

20           MR. ADKISON:  I need to go get my next

21  witness.  It's going to be Coach Greer.

22           INDEPENDENT HEARING EXAMINER:  Go off the

23  record for a second.

24           (Recess taken.)

25           INDEPENDENT HEARING EXAMINER:  Back on

1    the record.

2                    Mr. Greer, I swore you in earlier,

3    correct?

4                    MR. GREER:  Yes, you did.

5                    INDEPENDENT HEARING OFFICER:  Okay.  Go

6    ahead.

7                            ASTIN GREER,

8    having been previously duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. ADKISON:

11       Q.    Would you state your name, please, sir?

12       A.    Astin Greer.

13       Q.    Coach Greer, how are you employed?

14       A.    Excuse me?

15       Q.    How are you employed?

16       A.    Where I'm -- was I employed?

17       Q.    No.  The question, how -- what job do you

18   currently hold?

19       A.    Oh, I'm sorry.  I'm the head boys basketball

20   coach and the head track coach and assistant football

21   coach.

22       Q.    What position do you coach in football?

23       A.    I coach a little bit of everything.

24   Defensively I coach -- I have the secondary cornerbacks

25   and safeties, and offensively I help with the receivers.

1      Q.    Do you recall being summoned to speak to the
2  superintendent and high school principal?
3      A.    Yes, I do.
4      Q.    And were -- if the incident that's the subject
5  of this inquiry was October the 19th, a Monday, when
6  would you have been questioned?
7      A.    I believe it was a Tuesday, I think.
8      Q.    Was that the day after the allegation of the
9  incident?
10     A.    The allegation of the inc -- the actual
11 incident that was alleged was on a Monday.  I believe
12 it was on a Tuesday.
13     Q.    The next day?
14     A.    Yes.  I think so.
15     Q.    And who interviewed you?
16     A.    Mr. Bird and Mr. Smith, the principal.
17     Q.    Where did that interview take place?
18     A.    In Mr. Smith's office.
19     Q.    And were you asked about seeing Coach Alexander
20 strike a player?
21     A.    Yes, I was.
22     Q.    And what did you reply?
23     A.    I told him he didn't.  I hadn't seen him do it.
24 I told him the scenario of what was going on when it was
25 supposed to have happened, and I told them I didn't see

1   him slap him, and I was right there.

2       Q.   All right.  Now, there's been -- there's been

3   some discussion of Coach Alexander's players are

4   laughing right behind him.  Coach Alexander reaches down

5   and takes a headband off, pops him on the head with a

6   headband.  Was that discussed?  The head -- what I call

7   the headband part.

8       A.   The headband never came up.  I was just asked

9   did he slap a player.

10       Q.   And did you see him remove a headband?

11       A.   I saw him take the headband off a kid because

12   he was talking.  They were all talking and giggling, and

13   Coach -- Coach A kind -- Coach Alexander laughed with

14   him, and he snatched the headband off just being funny,

15   laughing with them, and popped him twice with it on the

16   head.

17       Q.   Is that it?

18       A.   Yes, sir.  That's all he did to that player.

19       Q.   Did -- if you were -- you've indicated a motion

20   with your hand.

21       A.   Uh-huh.

22       Q.   If you were standing 50 yards away as opposed

23   to where you were standing, would you be able to tell

24   any difference between that or be able to tell whether

25   or not he actually hit him with his hand?

1    A.    I mean, I think if you're standing where I was

2    or 50, 75 yards away, it'd still look the same.

3    Q.    Okay.  Now, you said that the Coach was trying

4    to talk and the kids were laughing and talking.  Do you

5    remember anything about the identity of those players

6    who were laughing and talking while Coach was trying to

7    talk?

8    A.    I know one was Colton Whitsell.  I don't really

9    remember everybody who was -- I know Blake Attaway was

10   near, and I know Demontrae Wade was near as well.

11   Q.    Okay.

12   A.    But we didn't have a very big team.

13   Q.    Sure.

14   A.    So, I mean, when I say I near, that's about --

15        MR. JOHN C. HARDY:  I'll object as

16   nonresponsive.  There's not even a question asked.

17        INDEPENDENT HEARING EXAMINER:  Sustained.

18        MR. ADKISON:  Okay.  That's all right.

19   Q.    (BY MR. ADKISON)  Colton Whitsell was the child

20   with the headband, correct?  Player with --

21   A.    Yes, sir.

22   Q.    -- the headband.

23   A.    It was an American flag headband.

24   Q.    Now, Blake Attaway.  Did you ever see Coach

25   Alexander take any action with Blake Attaway?

1      A.    Well, they were all laughing and talking.  I

2    saw him hit Blake twice on the back of the head, but it

3    was nothing malicious that was, you know, harmful.

4      Q.    And when you say he hit him, I mean, did he

5    swing at him hard or was it --

6      A.    No.

7      Q.    -- just tapping on the back --

8      A.    He didn't bring his hand back.  He tapped him

9    on the head twice.

10     Q.    So he's got his hand right here right behind

11   his head and he taps him on the back of the head?

12     A.    Yes, sir.

13     Q.    Twice?

14     A.    Yes, sir.  I believe.

15     Q.    That's it?

16     A.    That's all that happened with Blake.

17     Q.    All right.  Now, there's been some other

18   statements entered about Trey.

19     A.    Uh-huh.

20     Q.    Now, were the players on a knee?

21     A.    Everybody was on a knee, yes, sir.

22     Q.    All right.

23     A.    All the players were on their knee.

24     Q.    So tell me, did you see any -- any interaction

25   between Coach Alexander and Trey?

1    A.   Well, it was -- like I said, that was around

2    the time when all the players were laughing, and Coach A

3    went up to Trey and grabbed him on the shoulders, and if

4    you're on one knee and somebody grabs you, you're going

5    to fall, and Trey fell onto the ground.  He caught

6    hisself and set himself back up.  He didn't push him to

7    the ground or anything.

8    Q.   Okay.  Was -- what was Coach's demeanor at that

9    time?  I mean, was he screaming at them, was he

10   laughing?  What was he doing?

11   A.   Well, he was laughing with the rest of the

12   kids.

13   Q.   Now, except for the part about the headband --

14   A.   Uh-huh.

15   Q.   -- being questioned by the superintendent and

16   the principal, did you relay the substance of what

17   you've relayed to us here today?  I know the headband

18   didn't come up, but did you relay the substance of what

19   you relayed here today in that meeting?

20   A.   Well, I told them, I said I didn't see anything

21   like that.  I told them exactly what happened, and they

22   asked me did I see anything else?  They asked me had I

23   seen -- or they asked had he been cussing at me -- or

24   cussing -- they asked did he cuss in general, and you

25   know, my comments were he -- nothing -- nothing

1    abnormal.  I said it wasn't -- I said it was probably a
2    little bit more than what I'm used to but nothing
3    abnormal.
4        Q.   Well, here's what I'm getting at.  When you say
5    you told them what you -- you didn't see him slap or hit
6    anybody, but you told them what you saw, that's what I'm
7    talking about.  Did you relay to them --
8        A.   Yes, I did.
9        Q.   -- basically what you've told us here today?
10       A.   I told them what I saw, and I told them what
11   they asked.  You know, they --
12       Q.   Now, at that point, were -- was the
13   superintendent satisfied with what you told him about
14   these allegations?
15       A.   I mean, I think --
16                MR. JOHN C. HARDY:  I object.  That's
17   rank speculation.
18                MR. ADKISON:  Okay.  Let me rephrase it.
19       Q.   (BY MR. ADKISON)  Was anything said to you
20   after you relayed to them what you relayed here?  Were
21   you encouraged to say more?  Were you given any
22   instructions or assurances or --
23       A.   I was told that, you know, I was told -- I was
24   told -- and I forget by who, but I was told you don't
25   have to worry about it.  Coach A's not going to know you

1  told us anything.  Or no.  Excuse me.  You're not

2  telling us anything that we don't already know, is what

3  I was told.

4      Q.   Were you asked to write a statement?

5      A.   No, I was not.

6                MR. ADKISON:  Pass the witness.

7                CROSS-EXAMINATION

8  BY MR. JOHN C. HARDY:

9      Q.   Coach Greer, are you sure about the headband

10  incident?

11     A.   Yes, sir.

12     Q.   You were an eyewitness to that, right?

13     A.   Yes, sir, I was.

14     Q.   And you know the headband he was wearing?

15     A.   Yes, sir.  I believe it was an American flag

16  headband.

17     Q.   You said that's all that he did to that player.

18  Did you see something else that he did to another

19  player?

20     A.   Yes.  I told you what he did to Blake Attaway.

21  He tapped him on the back of the head twice, and he --

22  he grabbed Trey by the shoulders while he was on a knee

23  which caused him to fall.

24     Q.   Did you overhear the kids talking about anybody

25  getting hit?

1     A.   No. I didn't hear any -- we split up into

2 position. Well, after that we stretched the kids, and

3 nobody at my station where the kids were, which were the

4 running backs and quarterbacks, none of them had said

5 anything about it, so I didn't hear anything about that.

6     Q.   None of the coaches don't hang around when the

7 head coach is talking to the boys. You go to your

8 stations where the kids are coming to, don't you?

9     A.   No. We didn't go to our stations that day

10 because that was our early practice. I think the power

11 was out at the school or the water had shut off, so we

12 got out of school early. So it was a early practice.

13 We were starting about 1:30, I think. I'm not sure

14 completely, but we were starting earlier than normal

15 because we got out of school earlier. So we were just

16 standing around. It was a longer speech than what he

17 normally gave. It was a pretty long speech that day, so

18 we were just standing around the huddle. I was probably

19 15 to 20 yards away from him with the two coaches I was

20 standing with.

21     Q.   You said the language used was nothing that you

22 weren't used to or not out of the ordinary?

23     A.   Right. When I was asked about the language,

24 his language, I told him it wasn't anything, you know,

25 that I hadn't heard before.

1      Q.   Did you think the language was appropriate to
2  address to the students that way?
3      A.   I mean, what -- he wasn't talking bad to them
4  right then.  He wasn't saying anything -- he wasn't
5  using bad language at that time.
6      Q.   What about the other times?
7      A.   What other time?  I mean, what are you --
8      Q.   When he -- generally.  Every day at practice.
9      A.   I mean, it just depends.  I've heard some cuss
10 words before on every coaching staff I've been on.
11     Q.   But I'm asking about Coach Alexander.  Did you
12 hear him tell the kids to get their "F'n A" over here?
13     A.   I've never heard that from Coach Alexander.
14     Q.   You never heard him use the "GD"?
15     A.   I've heard him say damn it, not Goddamn it.
16     Q.   But that's okay with you and the kids?
17     A.   It doesn't bother me.  I just got done with
18 basketball season.  I cussed a little bit, too.
19     Q.   At the kids?
20     A.   Sometimes.  I tell them, Get your ass in gear.
21 Let's go.
22     Q.   Okay.  Thank you.  You believe it's okay to hit
23 the students?
24     A.   No, sir.  It's not okay for anyone to hit a
25 student.

1    Q.    Would you describe yourself as a very sensitive

2  person when it comes to your feelings or your emotions

3  about what's said to you?

4    A.    What do you mean?  Could you elaborate?

5    Q.    Would you be offended if somebody addressed you

6  or your child -- with your child, do you have any

7  problem if somebody addresses your -- your child with

8  this kind of language?

9    A.    I'm the guardian of a student that goes to

10 school here and plays football with Coach A, and he

11 addressed him just like he addressed everybody else, and

12 I never had a problem with it.

13   Q.    Never had a problem with Coach Alexander?

14   A.    No.

15   Q.    No problems?

16   A.    (Moving head side to side.)

17   Q.    Why don't you tell the hearing officer why you

18 had your student that you're a guardian of clean out his

19 locker and he wasn't going to play for Coach A anymore?

20   A.    Because there was a kid that came into the

21 locker room and he said, I kill niggers for fun.  And I

22 reported it to Coach A, but before he could handle it,

23 he got called down here and got suspended.  He was in

24 the process of handling it, but he got a phone call --

25   Q.    Your testimony now is he was in the process of

1   handling it?

2       A.   Yes.  He was handling that situation, and I

3   didn't say I'm pulling him off because Coach A's not

4   handling it.  I was pulling him off because I said he's

5   not going to play on a team with kids that could do

6   that, because there was also a kid that you'll see later

7   that came to school with a fake Klan mask on and it was

8   the same situation.  And I said I didn't feel

9   comfortable with him being a young African-American

10  student in that dressing room, because I felt like it

11  was kind of acceptable.

12      Q.   You were mad at the coach, and you came to the

13  administration and you said, I'm having my kid clean out

14  his locker.  I don't want him to play for Coach A.

15      A.   I came to which administration?

16      Q.   Troup ISD.

17      A.   I didn't go to any administrator and say that.

18  I went to Coach Eastman.

19              MR. JOHN C. HARDY:  Okay.  That's all I

20  have of this witness.

21                  REDIRECT EXAMINATION

22  BY MR. ADKISON:

23      Q.   Is there any doubt in your mind that if Coach

24  Alexander had not been suspended at the time that he

25  was, that he would have handled this problem that made

1  you uncomfortable with your child?

2              MR. JOHN C. HARDY:  I'm going to object

3  to the question.  I'm going to object to the question as

4  speculation.

5              INDEPENDENT HEARING EXAMINER:  Sustained.

6      Q.   (BY MR. ADKISON)  Let me ask you this:  Did

7  Trey play on your basketball team?

8      A.   Yes, he did.

9      Q.   Prior to coming here, where was Trey in school,

10  Trey Wade?

11     A.   Prior to -- excuse me.  What was that?

12     Q.   Prior -- prior to coming to Troup ISD, where

13  was Trey Wade enrolled?

14     A.   He was enrolled here at Troup, I believe.

15     Q.   But prior to that.

16     A.   Prior to that, from my understanding from other

17  coaches he was at Arp.

18              MR. JOHN C. HARDY:  I'm going to object

19  as to hearsay.  The witness has clearly shown he doesn't

20  know.

21              INDEPENDENT HEARING EXAMINER:  Overruled.

22     Q.   (BY MR. ADKISON)  Was he suspended from the Arp

23  athletic program?

24     A.   I don't have any idea what he did.

25     Q.   Did he finish the season as a basketball player

for you?

A.    No, sir.  He did not.

Q.    Did you dismiss him from the basketball team?

A.    Yes, I did.

Q.    And what was the reason for his dismissal from your program, which was basketball?

MR. JOHN C. HARDY:  At this point I'm going to object, Judge, that it's irrelevant and immaterial to the facts at hand.

INDEPENDENT HEARING EXAMINER:  Well, I'm -- despite the objection, I'm going to shut that down because that gets into student privacy issues that -- that we're not going to discuss.

Q.    (BY MR. ADKISON)  So you found it necessary in your program that you were running and in the best interest of the other athletes on that program to suspend him from that program?

A.    Yes, sir.  He was --

MR. ADKISON:  Pass the witness.

MR. JOHN C. HARDY:  No more questions of this witness at this time.

INDEPENDENT HEARING EXAMINER:  Okay.  Mr. Greer, you can be excused.  Just the same thing that I said earlier today, you're not to discuss your testimony with anyone, not to discuss the questions that you were

1   asked or the answers that you were given.

2           THE WITNESS:  Yes, sir.

3           INDEPENDENT HEARING EXAMINER:  Do you

4   understand that?

5           THE WITNESS:  Yes, sir.

6           INDEPENDENT HEARING EXAMINER:  Okay.

7   Call your next witness.

8           MR. ADKISON:  Your Honor, I may can

9   shorten this up if you'll indulge me with about a

10  ten-minute break.

11          INDEPENDENT HEARING EXAMINER:  Let's go

12  off the record and reconvene at 2:15.

13          (Recess.)

14          INDEPENDENT HEARING EXAMINER:  On the

15  record.

16          MR. ADKISON:  First of all, it's my

17  understanding that in the offer of the selected portions

18  of the Board policy that -- on my objection about it's

19  not the entire policy, can we consider that the Board

20  policy in its entirety is in evidence?

21          INDEPENDENT HEARING EXAMINER:  Yes.

22          MR. ADKISON:  Okay.

23          INDEPENDENT HEARING EXAMINER:  Yeah.  And

24  just -- just to clarify -- just to clarify my ruling,

25  the -- I think the two exhibits that were offered are

1    those specific Board policies that he -- that he

2    offered.  The Board policy as a whole encompasses all

3    kinds of -- all kinds of policies.  But I think the

4    two -- the two exhibits that were offered are the

5    complete -- the complete policy on that policy.  In

6    other words, if it's a four-page policy, he wasn't only

7    offering two of the pages.  So that's why I said that I

8    believe it was complete.

9                MR. ADKISON:  Then my proposal at this

10   point in time is to offer, although I don't have it

11   downloaded with an exhibit sticker, the Board policy

12   of the TISD district for you to take notice of, not to

13   read from, not to cover.  But for purposes of my record,

14   then I would need you to take notice of the entire Board

15   policy, not just the selected portions that have been

16   offered.

17               And what I'm dealing with, John, all of

18   that's not going to go.  But without going -- but

19   without going through personnel matters, personnel

20   disciplinary matters, those such things.

21               MR. JOHN C. HARDY:  It does not offend

22   me.  If you're going to introduce all of the Troup ISD,

23   that's up to the Hearing Officer.

24               INDEPENDENT HEARING EXAMINER:  Here's --

25   here's my issue with it.  I mean, you know, if you're

1  offering it and he's not objecting, I'll admit it, but,

2  you know, when we're all said and done, whether that's

3  today or Wednesday, you both expect me to write my

4  recommendation, and without -- without pointing me at

5  the specific provisions of the Board policies that you

6  want me to review, it's going to be difficult for me to

7  pick those out on my own.

8           MR. JOHN C. HARDY:  And without question

9  I agree with that.  And one of the things I don't want

10  to waive on behalf of Troup ISD is if this goes to the

11  commissioner, I don't want to have 1,000 pages that I'm

12  paying for --

13           INDEPENDENT HEARING EXAMINER:  Right.

14           MR. JOHN C. HARDY:  -- to go up.

15           INDEPENDENT HEARING EXAMINER:  Go ahead.

16       MR. ADKISON:  Let me just kind of tell you

17  where I was coming from.  In an effort to move this

18  along, what I had envisioned was, this was set to take

19  testimony, not only today, but Wednesday, that if we did

20  that, then I am assuming that you're going to want to

21  hear some further submission or see some further

22  submission from us, and that at that point in time, as

23  opposed to bringing the principal back, going over

24  specific policies with him that -- of course, all he can

25  do is say what it is, is to point those out in a written

1   statement or written argument to the Court so that we're
2   not burdened with the whole thing.  That's kind -- I'm
3   just trying to figure out a way to move this along.
4                    INDEPENDENT HEARING EXAMINER:  Let me --
5   let me go at it this way.  Okay.  The -- the precedent
6   is clear that the school board gets to interpret their
7   own policy.  Whether -- whether you agree with it,
8   whether I agree with it, whether Mr. Hardy agrees with
9   it, it's the school board's policy, and they get to
10  interpret it and not us.
11                   The second thing that's clear is that --
12  that the Board's policy is what it is, and we can all go
13  out and find those policies.  So I will -- I will take
14  notice that those policies are out there, and you are
15  correct.  Whenever we finish, I'm going to ask y'all to
16  submit your proposed findings of fact and conclusions of
17  law to me, and if there is a specific Board provision
18  that you would like me to review that's not already in
19  front of me, then I will go pull that provision and look
20  at it knowing that it's going -- it says what it says.
21                   MR. ADKISON:  Right.
22                   INDEPENDENT HEARING EXAMINER:  But I -- I
23  am not going to include in the record 1,000 pages that
24  deal with purchasing and donations and everything else.
25  So if you -- if you want it included, you need -- you

1  need to point it out.

2                    MR. ADKISON:  Sure.  And -- and I -- in

3  trying to speed up, I sort of left that part out, but

4  that was my assumption.

5                    INDEPENDENT HEARING EXAMINER:  Okay.

6                    MR. ADKISON:  With that understanding, I

7  don't have any problem.  I'm good with that.

8                    INDEPENDENT HEARING EXAMINER:  Are you

9  okay with that Mr. Hardy?

10                    MR. JOHN C. HARDY:  I am.  I am.  Thank

11  you, sir.

12                    INDEPENDENT HEARING EXAMINER:  Okay.

13                    MR. ADKISON:  Let's see. I have a couple

14  housekeeping matters.  I may have one other witness,

15  your Honor.

16                    INDEPENDENT HEARING EXAMINER:  Okay.

17                    MR. ADKISON:  I have Joey Gray, your

18  Honor.

19                    INDEPENDENT HEARING EXAMINER:  Mr. Gray,

20  I swore you in earlier, correct?

21                    MR. GRAY:  Yes, sir.

22                    INDEPENDENT HEARING EXAMINER:  Okay.  Go

23  ahead, Mr. Adkison.

24                    JOEY GRAY,

25  having been previously duly sworn, testified as follows:

                    DIRECT EXAMINATION
BY MR. ADKISON:
    Q.   Would you state your name?
    A.   Joey Gray.
    Q.   Joey, are you in school at Troup?
    A.   Yes, sir.
    Q.   What year are you in?
    A.   2016, senior.
    Q.   Okay.  And did you play football in the 2015
season?
    A.   Yes, sir.
    Q.   You became aware at some point in time that
Coach Alexander had been suspended?
    A.   Yes, sir.
    Q.   Do you recall the day of October the 19th of
that year?
    A.   I don't remember the exact date.
    Q.   I'd be shocked.  Do you recall the practice
where the water mains had been out and you practiced
earlier?
    A.   Yes, sir.  I remember that.
    Q.   And do you remember the Monday before you found
out later that -- later in the week that Coach Alexander
was suspended?
    A.   Yes, vaguely.

1      Q.   Okay.  And were you present on the field on
2   that Monday?
3      A.   Yes, sir.
4      Q.   And did you see Coach Alexander on the field
5   with Colton Whitsell that day?
6      A.   I saw him with him, yes, sir.
7      Q.   And did -- tell us whether or not Colton had on
8   a headband at that time.
9      A.   Yes, sir.
10     Q.   Was Coach Alexander trying to talk?
11     A.   Yes, sir.
12     Q.   Was Colton -- what was Colton doing while Coach
13  Alexander was initially trying to talk?
14     A.   Talking and goofing around.
15     Q.   Did you see Coach Alexander take off Colton's
16  headband?
17     A.   Yes, sir.
18     Q.   What did he do with it when he took it off?
19     A.   He just popped him on the head with it, just
20  joking around with him, not being -- not doing anything
21  to hurt anybody.
22     Q.   What -- did he say anything when he took it off
23  of him and popped him with it?
24     A.   He said something like y'all stop goofing
25  around or stop talking or something like that.

1    Q.    Okay.  Did you see anything in that that was
2  malicious or harmful or caused any injury or anything to
3  Colton?
4    A.    No, sir, not at all.
5    Q.    Did you -- from the time that he took that
6  headband off or the whole time, did you watch Coach
7  Alexander?
8    A.    Yes, sir, just about.  Just about the whole
9  time.
10    Q.    I mean, if you're a player and the coach is
11  trying to talk to you, I mean, you're expected to look
12  at him, correct?
13    A.    Yes, sir.
14    Q.    Did you ever see Coach Alexander slap any
15  player?
16    A.    No, sir.  I never saw Coach slap any player.
17    Q.    Other than popping him on the headband and
18  telling him to listen up to whatever he said, did you
19  see him have any other physical contact with Colton that
20  day?
21    A.    No, sir.
22              MR. ADKISON:  All right.  I pass the
23  witness.
24                    CROSS-EXAMINATION
25  BY MR. JOHN C. HARDY:

1     Q.   Joey, did you ever hear Coach A cuss the boys,

2 players?

3     A.   Like cuss at them?

4     Q.   Yes.

5     A.   Every now and then.  Nothing that was really

6 bad.

7     Q.   Did he use the "F" word?

8     A.   Not that I remember.

9     Q.   Use "GD"?

10    A.   One or two times.

11    Q.   Never heard him telling any of the students to

12 get your "F'n A" over here or anything like that?

13    A.   No, nothing like that.

14    Q.   You didn't see him strike Blake or Colton?

15    A.   No, sir.

16    Q.   But you didn't watch them the whole time, did

17 you?

18    A.   There was maybe two or three seconds that I

19 wasn't -- didn't have my eyes on him because, like,

20 another coach would be talking.

21    Q.   So you were watching him specifically except

22 for two or three seconds --

23    A.   Yes, sir.

24    Q.   -- Colton and Blake?

25    A.   Yes, sir.

1     Q.    Any particular reason you singled them out to

2   watch?

3     A.    Sir?

4     Q.    Any particular reason you singled them out to

5   watch?

6     A.    Well, I didn't really single them out.  They

7   were just -- I was standing up in the group, and

8   everybody else was kneeling down.  We were all kneeled

9   down around him, and they were just, like, they were

10   right there in front in my plain sight.

11              MR. JOHN C. HARDY:  Pass the witness.

12              MR. ADKISON:  Nothing further.

13              INDEPENDENT HEARING EXAMINER:  All right.

14   You can be excused.  Remember what I told you earlier.

15   Even though you're excused, you're not allowed to

16   discuss your testimony here today.  You can't talk about

17   any of the questions that were asked of you or any

18   of the answers that you gave.

19              THE WITNESS:  Yes, sir.

20              INDEPENDENT HEARING EXAMINER:  Do you

21   understand that?

22              THE WITNESS:  Yes, sir.

23              INDEPENDENT HEARING EXAMINER:  Okay.

24              MR. ADKISON:  Leonard Cabe, Your Honor.

25   Just sit right there at that chair.

1    INDEPENDENT HEARING EXAMINER:  And your
2  full name again?
3    MR. CABE:  Leonard Cabe, sir.
4    INDEPENDENT HEARING EXAMINER:  How do you
5  spell your last name?
6    MR. CABE:  C-a-b-e.
7    INDEPENDENT HEARING EXAMINER:  And I
8  previously swore you in.  You remember that, right?
9    MR. CABE:  Yes, sir.
10    INDEPENDENT HEARING EXAMINER:  Go ahead.
11    LEONARD CABE,
12  having been previously duly sworn, testified as follows:
13    DIRECT EXAMINATION
14  BY MR. ADKISON:
15    Q.    Leonard, do you go to school at Troup?
16    A.    Yes, sir.
17    Q.    You were on the football team in 2015?
18    A.    Yes, sir.
19    Q.    What grade classification are you?
20    A.    Ninth grade.
21    Q.    And did you become aware at some point in time
22  that Coach Alexander had been suspended from coaching?
23    A.    Yes, sir.
24    Q.    And were you at the practice on the Monday
25  prior to his suspension?

1    A.    Yes, sir.

2    Q.    And at that point in time did you see him take

3    any action as regards to any players on the team?

4    A.    Yes, sir.

5    Q.    Who?

6    A.    It was Colton.

7    Q.    Colton Whitsell?

8    A.    Yes, sir, Colton Whitsell.

9    Q.    And did Colton Whitsell have on a headband?

10   A.    Yes, sir.

11   Q.    And what was -- when Coach started trying to

12   talk to the team, what was Colton doing?

13   A.    I'm not exactly sure, sir, because I was paying

14   attention to Coach Alexander.

15   Q.    And that's admiral.

16   A.    Yes, sir.

17   Q.    Did you see Coach Alexander remove Colton's

18   headband?

19   A.    No, sir.

20   Q.    Okay.  Did you see him at any time strike him,

21   hit him with his hand or --

22   A.    No, sir.

23   Q.    Did you see him strike any other player with

24   his hand?

25   A.    No, sir.

1          MR. ADKISON:  That's all I have.  Wait.
2     He may have some questions.
3          MR. JOHN C. HARDY:  I have nothing of
4     this witness.
5          INDEPENDENT HEARING EXAMINER:  Okay.  You
6     can be excused.  Remember what I told you earlier, not
7     to discuss your testimony with anybody, not to discuss
8     the questions that were asked of you or the answers that
9     you gave.  You understand that?
10         THE WITNESS:  Yes, sir.
11         INDEPENDENT HEARING EXAMINER:  Okay.
12    Thank you.
13         MR. ADKISON:  Can we -- John, can we
14    approach?
15         INDEPENDENT HEARING EXAMINER:  Do you
16    want to go off the record?  Let's go off the record.
17         (Bench conference, off the record.)
18         INDEPENDENT HEARING EXAMINER:  Back on
19    the record.
20         MR. ADKISON:  Judge, I'm sorry.  I got
21    asked a question in the hall.  The students, as they've
22    testified, are they released?
23         MR. JOHN C. HARDY:  Certainly as far as
24    we're concerned.
25         INDEPENDENT HEARING EXAMINER:  Yeah.  I

1   mean, that's -- that's y'all's call, but you --

2               MR. JOHN C. HARDY:  You can tell them to

3   go back to class if they're released.

4               INDEPENDENT HEARING EXAMINER:  Tell me

5   your name.

6               MR. MATT ADAMS:  Matt Adams.

7               INDEPENDENT HEARING EXAMINER:  Mr. Adams,

8   I swore you in this morning, so you're still under oath.

9   Do you understand that?

10              MR. MATT ADAMS:  Yes, sir.

11              INDEPENDENT HEARING EXAMINER:  All right.

12  Go ahead, Mr. Adkison.

13                      MATT ADAMS,

14  having been previously duly sworn, testified as follows:

15                  DIRECT EXAMINATION

16  BY MR. ADKISON:

17      Q.   Matt, your name's Matt Adams?

18      A.   Yes, sir.

19      Q.   You are a freshman at Troup ISD?

20      A.   Yes, sir.

21      Q.   And you played football last year?

22      A.   Yes, sir.

23      Q.   You -- there came a time when you became aware

24  that Coach Alexander had been suspended?

25      A.   Yes, sir.

1    Q.   Going back to the Monday practice before that,
2  do you recall that practice?
3    A.   A little bit.
4    Q.   Okay.  Do you remember in the team meeting
5  before that -- well, kind of after warm-ups and that
6  practice, Coach Alexander having some interaction with
7  Colton Whitsell?
8    A.   He took his hair band away because he was
9  playing with it.
10   Q.   And did you ever see him at any time, other
11 than maybe pop him on the head with a sweatband, did you
12 ever see him at any time hit him with his hand or shove
13 him or push him or --
14   A.   No, sir.
15   Q.   Did you ever see him shove or push any players?
16   A.   No, sir.
17        MR. ADKISON:  Okay.  That's all I have.
18        MR. JOHN C. HARDY:  Nothing of this
19 witness.
20        INDEPENDENT HEARING EXAMINER:  Okay.  You
21 can be excused.  Remember what I said this morning.
22 You're not to discuss your testimony with anyone.  Don't
23 tell anyone the questions that you were asked.  Don't
24 tell anyone the answers that you gave.  Do you
25 understand that?

1            THE WITNESS:  Yes, sir.

2            INDEPENDENT HEARING EXAMINER:  Okay.  You

3    may go back to class.

4            Tell me your name.

5            MR. WILLIAM ADAMS:  William Adams.  It's

6    Mitch on there.

7            INDEPENDENT HEARING EXAMINER:  Go ahead

8    -- go ahead and give us your full name.

9            MR. WILLIAM ADAMS:  William Mitchell

10   Adams.

11           INDEPENDENT HEARING EXAMINER:  Okay.  And

12   you remember that I swore you in this morning, correct?

13           MR. WILLIAM ADAMS:  Yes, sir.

14           INDEPENDENT HEARING EXAMINER:  You're

15   still under oath.

16           Mr. Adkison, go ahead.

17            WILLIAM MITCHELL ADAMS,

18   having been previously duly sworn, testified as follows:

19                DIRECT EXAMINATION

20   BY MR. ADKISON:

21       Q.   Mitch, you are a student at Troup Independent

22   School District?

23       A.   Yes, sir.

24       Q.   You're a football player?

25       A.   Yes, sir.

1      Q.   Do you recall a time during the last year when

2   Coach Alexander was suspended?

3      A.   Yes.

4      Q.   Do you recall the practice on the Monday before

5   that?

6      A.   Yes, sir.

7      Q.   And do you recall some interaction between

8   Coach Alexander and Colton?

9      A.   Yes, sir.

10     Q.   And did Colton -- what was -- as Coach

11  Alexander was trying to talk, what was Colton doing?

12     A.   Laughing and just joking around.

13     Q.   And did Coach Alexander take off his sweatband

14  -- headband?

15     A.   Yes.

16     Q.   Did he ever strike him with his hand?

17     A.   No, sir.

18     Q.   Did he ever shove him?

19     A.   No, sir.

20     Q.   Now, in these meetings -- and the last couple

21  guys have been in a hurry.  But I mean, as a player,

22  your attention is focused on the coach --

23     A.   Yes, sir.

24     Q.   -- correct?

25          And seeing Coach Alexander, did he do

1  anything offensive to anybody?  Did he shove anybody?

2  Did he hit anybody, anything like that?

3      A.    No.

4      Q.    Did he tell Colton he needed to be quiet?

5      A.    Yes, sir.

6      Q.    Multiple times?

7      A.    Yeah.

8                MR. ADKISON:  I pass the witness.

9                     CROSS-EXAMINATION

10 BY MR. JOHN C. HARDY:

11     Q.    Mitch, did -- just because you didn't see Coach

12 A hit somebody doesn't mean that it didn't happen, does

13 it?

14     A.    No.  I was watching him the whole time, but I

15 guess so.

16     Q.    You watched Coach A the whole -- the whole

17 practice with --

18     A.    While he was --

19     Q.    -- with --

20     A.    -- while he was talking to us.

21     Q.    As far as you're concerned, nothing happened?

22     A.    Yes, sir.

23     Q.    He use any inappropriate language?

24     A.    Not at that time.

25     Q.    You've heard him use inappropriate language?

1    A.    Yes.  But he never used it toward a player.

2    Q.    He what?

3    A.    Never used it towards a player.

4    Q.    Oh.  So he just gets out there and talks that

5    way?

6    A.    Towards other coaches, just playing around.

7    Q.    I see.

8              MR. JOHN C. HARDY:  Nothing further of

9    this witness.

10              MR. ADKISON:  I have nothing further.

11              INDEPENDENT HEARING EXAMINER:  You can be

12    excused and go back to class.  Remember what I told you

13    this morning.  You're not to discuss your testimony here

14    today.  Don't discuss the questions that were asked of

15    you or the answers that you gave in response to those

16    questions.

17              THE WITNESS:  Yes, sir.

18              INDEPENDENT HEARING EXAMINER:  Do you

19    understand that?

20              THE WITNESS:  Yes, sir.

21              INDEPENDENT HEARING EXAMINER:  Thank you.

22              MR. ADKISON:  That's enough exemplar of

23    those.

24              INDEPENDENT HEARING EXAMINER:  Okay.

25              MR. ADKISON:  Can I go out and tell them

1  they can go back to class?

2                    MR. JOHN C. HARDY:  No objection.

3                    INDEPENDENT HEARING EXAMINER:  Okay.

4  Then they're all excused.  No.  It's fine.

5                    MR. ADKISON:  Let me tell them.

6                    INDEPENDENT HEARING EXAMINER:  All right.

7  Tell me your name.

8                    MR. WALKER ADAMS:  Walker Adams.

9                    INDEPENDENT HEARING EXAMINER:  All right.

10  Mr. Adams remember that I swore you in this morning, so

11  you're still under oath?

12                    MR. WALKER ADAMS:  Yes, sir.

13                    INDEPENDENT HEARING EXAMINER:  You may

14  proceed.

15                         WALKER ADAMS,

16  having been previously duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18  BY MR. ADKISON:

19       Q.    State your name.

20       A.    Walker Harris Adams.

21       Q.    And what year in school are you at Troup?

22       A.    What year?  Like, what grade?

23       Q.    Freshman, sophomore --

24       A.    Freshman.

25       Q.    Freshman?

1    A.    Yes, sir.

2    Q.    And you played football in the '15 season?

3    A.    Yes, sir.

4    Q.    And you became aware at some point in time that

5  Coach Alexander was suspended?

6    A.    Yes, sir.

7    Q.    And that would have been, like, on -- didn't

8  show up for practice on Wednesday or Thursday, but going

9  back to the Monday before that?

10    A.    Yes, sir.

11    Q.    Did you observe Coach Alexander's interactions

12  with any of the players, Colton Whitsell, Trey, anybody

13  else?

14    A.    Colton.

15    Q.    Okay.

16    A.    I didn't see Trey's.

17    Q.    And did Coach Alexander ever hit Colton

18  Whitsell or slap him with his hand?

19    A.    I wouldn't call it a hit at all.

20    Q.    What was it?

21    A.    Just a tap, friendly tap.

22    Q.    Friendly tap.  It's been described by another

23  witness as like you have your hand sitting right here

24  and close your finger --

25    A.    Something like it.  Was nothing big at all.

1          MR. ADKISON:  All right.  That's all I
2   have.
3          THE WITNESS:  Am I done?
4          MR. ADKISON:  He might have some.
5                    CROSS-EXAMINATION
6   BY MR. JOHN C. HARDY:
7       Q.   I have a couple of questions, Walker.  Did
8   anybody talk to you before your testimony before you
9   came in here?
10      A.   No, sir.
11      Q.   Did you talk to Joey?
12      A.   No, sir.
13      Q.   Did you ever hear Coach Alexander use
14  inappropriate language?
15      A.   Every now and then, but it wasn't nothing
16  that...
17      Q.   Just the way you talk every day?
18      A.   Just about.
19          MR. JOHN C. HARDY:  Nothing further of
20  this witness.
21          MR. ADKISON:  Okay.
22          INDEPENDENT HEARING EXAMINER:  You can be
23  excused.  Remember what I told you this morning.  You're
24  not to discuss your testimony with anyone.  Don't
25  discuss the -- the questions that you were asked or the

1 answers that you gave in response to those questions.

2 Okay?

3         THE WITNESS:  Yes, sir.

4         MR. ADKISON:  We rest.

5         INDEPENDENT HEARING EXAMINER:  Okay.  Do

6 you want to make a closing statement, Mr. Hardy?

7         MR. JOHN C. HARDY:  Sure.

8         INDEPENDENT HEARING EXAMINER:  Okay.

9        PETITIONER'S CLOSING STATEMENT

10         MR. JOHN C. HARDY:  Very briefly.  When

11 we started out this morning, Judge, we felt like that we

12 would be able to show that Coach Alexander, as the head

13 football coach and employed at Troup ISD, used

14 inappropriate means to communicate with the students.

15 That included inappropriate language as well as

16 inappropriate touching of the students.  We think that

17 the evidence is clear from credible witnesses that Coach

18 Alexander abused his students, that they testified what

19 had happened, that they were humiliated and it hurt, and

20 it was inappropriate contact.

21        There was some discussion about corporal

22 punishment, but I'm not going to get into that because

23 it's totally off base at this point.

24        We would submit from the school

25 district's standpoint that it's very clear that an

1   investigation was done.  The statements were taken.  As
2   the hearing officer knows from the school law, he's in
3   the middle of a two-year contract.  The Board had the
4   opportunity to wait until ten days before the last day
5   of instruction next year before they had a hearing.
6   This is a situation that was very clear, that the Coach
7   should not be working with the students here at Troup
8   ISD.
9               INDEPENDENT HEARING EXAMINER:  Thank you.
10  Mr. Adkison.
11              RESPONDENT'S CLOSING STATEMENT
12              MR. ADKISON:  The real issues that are
13  here are whether or not the proof adduced rises to the
14  level of terminating a contract for good cause however
15  that nebulous term comes to be defined.  Under the state
16  constitution, that is an extremely nebulous term, and
17  what you've seen is, is that on one hand in this
18  instance with a bad won-loss record for two years, if
19  it's conduct by Coach Alexander it's good cause, but if
20  it's conduct by another coach, absolutely nothing's
21  done.
22              What you've also seen is, is that an
23  investigation -- I don't see how it is that the
24  superintendent can come to you with a straight face and
25  ask you to base anything upon his investigation because

1  you've seen the document that is in evidence, Mr.

2  Hardy's assertions to me based upon meeting with the

3  superintendent that everybody he interviewed he took a

4  statement from except Colton and that all those

5  interviews support his decision.  And then comes in a

6  coach on that staff who was on that field that day and

7  one by one directly refutes every one of the allegations

8  that are made against Coach Alexander by this district.

9           The reason for the break was the trial

10  lawyer in me says this is done.  It's done.  The

11  superintendent has come in front of you, tried to tell

12  you that he conducted a thorough and impartial

13  investigation, but he absolutely failed to reveal, even

14  to the school's lawyers -- remember I told you earlier

15  this morning this stuff's not Mr. Hardy's fault.  He

16  chose to tell John Hardy just what he wanted John Hardy

17  to hear.  He chose to tell that Board just exactly what

18  he wanted that Board to hear, and they can't get around

19  -- I mean he comes when he starts and he says all the

20  coaching staff this, all the coaching staff that.

21           Well, I took the statements out of the

22  people that saw anything.  Well, the one he included

23  from a coach is John Eastman, and John says he didn't

24  see it.  At some form, somewhere, that's not going to be

25  right.  And then on top of that to have an undisclosed

1  coach come in and say no, I was there, I sat there and

2  watched. I can tell you in detail what happened. It

3  was not offensive. At one point he was laughing with

4  them and trying to get them to be quiet.

5           The language, not any language we hadn't

6  heard anywhere else. I mean, the superintendent really

7  believed that those athletes don't use any word that

8  they allege the coach has said themselves. It's in

9  their textbook and their curriculum. If they didn't

10 know them before, the Troup ISD's taught it to them.

11          The racial slur is absolutely outrageous.

12 So what does that tell you as an impartial hearing

13 officer about where we are? It's result oriented, and

14 it's not result oriented towards anything Dennis

15 Alexander's done except failed to put enough Ws in a

16 column.

17          I want to talk about the reputation of a

18 Hall of Fame coach, and this is -- it almost seems like

19 the superintendent set out to make every accusation he

20 could make that would blacken his name, racial slur,

21 language, striking a player. But the death nail to this

22 investigation is the way you now know that the

23 information was picked and chosen and how witnesses were

24 ignored, how exculpatory evidence and denials of

25 evidence, outright denials of the way this happened not

1  even included.  More importantly, not given to the
2  school board at the time they deliberated on this
3  resolution to proceed.
4          What's worse is, is that if you read the
5  Texas Penal Code, the failure to record that information
6  and the failure to present a document in a hearing such
7  as this and not include information that -- he's never
8  gotten up here and said he didn't talk to Coach Greer.
9  And this record establishes a criminal violation because
10  presenting the incomplete document is a violation of the
11  law, violation of the penal law.
12          So when you take this on balance -- you
13  remember the other thing that I told you this morning?
14  You're the last chance to save this school district from
15  the superintendent and the Whitsells, because even under
16  the Texas Constitution, to have -- I mean what does it
17  say to you that a Board member is sitting in the office,
18  by the superintendent's decision, when he initially
19  calls the coach in to ask him about the situation, and
20  that as soon as the Board member leaves, he tells the
21  coach he's suspended.  What kind of message does that
22  send?  What kind of signal is that?
23          Now, from that point on, he orally
24  suspended him, gave him no written notice of the reasons
25  or grounds for two months.  Now, this is not the forum

1   to talk about constitutionally in the United States
2   Constitution when you've got to have a hearing, but it
3   is the appropriate forum to talk about the notice
4   provisions under the Education Code of a suspension and
5   the adequacy of that.  Two months.  An oral suspension.
6   No written notice of it.
7               On sum and substance, the decision you've
8   got to make is do you -- do you blacken the reputation
9   of a literal Hall of Fame coach over accusations like
10  this when one member of the coaching staff says that
11  just didn't happen and no other member of the coaching
12  staff is called to say it did.  Not a single one of
13  them.
14              And my thought as a trial lawyer is we'd
15  put, you know, kids up here, you know, that he may have
16  called out for their performance and they got their
17  feelings hurt over being called out by name about what
18  they did or didn't do on the football field.  Then I'd
19  put kids up here that say, oh, yeah, I mean, he tapped
20  him on the back of the head.  We can do that all day.
21  But that doesn't reach the issue of what's right.
22              And simply because the superintendent set
23  out on -- you know, and I can understand, you know.  You
24  had two bad years.  You're in the middle of the second
25  bad year, and I mean, people are, you know, as the

1    school board president said, you know the knives come

2    out.  You get a school board member saying he

3    embarrassed my kid yesterday in practice.  I want

4    something done about it.  I suspect he thought he was

5    going to be a hero by day's end.  And so that's as plain

6    as I can tell you.  That's as blunt as I can be about

7    it, and I think that you know in your own heart that's

8    exactly what happened based on this record.  I

9    appreciate you listening to us.

10                   INDEPENDENT HEARING EXAMINER:  Okay.

11          PETITIONER'S REBUTTAL CLOSING STATEMENT

12                   MR. JOHN C. HARDY:  Thank you, Mr.

13   Adkison.  Great jury argument, and we appreciate that.

14   I would just come back on rebuttal, and if he wants to

15   talk about who was available or who didn't testify,

16   Coach Alexander sat here all day and didn't testify.

17   That's -- that's their prerogative, and they have a

18   right to call who they want.  But the won-loss record

19   really didn't come into play, just like the record that

20   Mr. Alexander had previously before he came to Troup.

21   That's -- that's not part of what we're here about.

22                   We're here about because it became

23   apparent after the investigation and confirmation that

24   students had been abused, both in the way that they were

25   addressed and the way that they were physically touched.

1    I think that it's clear we're all grown-ups in this

2    room.  Language, you can walk down the sidewalk every

3    day and hear things that you don't want to.  The book

4    language, I dare say that the witnesses that I saw

5    didn't read that book in Pre-AP.  They may know the

6    words, but they weren't the ones that were subjected to

7    that language that was approved in the literature from

8    the State.  And I'm not saying I agree with all the

9    literature or whatever's out here.  Whether you're in

10   Shakespeare or Tolstoy, there's language out there that

11   we may not approve and don't want in our living rooms or

12   houses or our dinner tables.  But the fact of the matter

13   is, the way the coaches and even their witnesses said

14   that language was inappropriate was addressed towards

15   the coaches and staff.  That's not the way that you

16   build comradery, and that's not the way that you

17   motivate kids.  That's not the way you motivate a staff.

18            The simple matter is for whatever reason,

19   Coach Alexander overstepped the bounds of a public

20   employee in the handling of the situation with the

21   students and that there's not a place for him at Troup

22   ISD.

23            INDEPENDENT HEARING EXAMINER:  Okay.

24   Thank you both.  Let's go off the record.

25            (Brief recess.)

1          INDEPENDENT HEARING EXAMINER:  Okay.
2    We're back on the record after a brief break.  In a
3    discussion, I've asked and counsel has agreed to the
4    following timeline.  The court reporter is going to get
5    us all a rough copy, working copy of the transcript by
6    Wednesday morning so that we can all begin our work.
7    Mr. Alexander's counsel and the district's counsel has
8    agreed to give me their proposed findings of fact and
9    conclusions of law by first thing Monday morning.  And
10   at the same time the court reporter will get us -- will
11   provide us with a final transcript at that time so that
12   I can then take that and formulate my recommendation to
13   the Board.
14          THE REPORTER:  Now, the names won't be
15   redacted.
16          INDEPENDENT HEARING EXAMINER:  Oh, yes.
17   Thank you.  The -- the thing that I forgot to -- forgot
18   to discuss earlier, obviously we had a, kind of a
19   laundry list of students that testified, and rather than
20   trying to come up with a cheat sheet ahead of time on
21   who those students are and y'all trying to keep them
22   straight, too, in your cross-examinations of other
23   witnesses, I just decided to let it go forward.  The
24   transcript itself will have those -- those students'
25   names in it.  I will create a cheat sheet that redacts

1  out any references, specific references to the students,

2  and they won't even be identified by -- by initials

3  because even that's not appropriate. So it will be

4  Student A, Student B, Student C, Student, D. The

5  coaches will be identified by name. They don't have the

6  same protection. But I will provide y'all with that

7  cheat sheet. The transcript will not be redacted out.

8  The transcript doesn't go down to Austin. The

9  transcript will be provided to the Board in their

10  recommendation, and they're entitled to have the

11  students' identity because they're already charged with

12  protecting that.

13             To the extent that -- to the extent that

14  you-all include student names in your proposed findings

15  of fact and conclusions of law, that's fine. Just do

16  them by name, and then I will -- in doing that I will

17  pull that out and substitute them by their identifiers

18  according to my cheat sheet. And then obviously, if

19  there's any -- if there's any reference to them or any

20  reference to the record that contains student names,

21  that will be redacted out in my recommendation when it

22  goes to Austin.

23             But for the recommendation that goes to

24  the Board, I will provide both of y'all with an

25  unredacted recommendation, too, so that it reads a

1    little bit cleaner.  So, in other words, you'll both get

2    two recommendations, and sometimes that's -- that's

3    confusing.  So I want to make sure we're clear on that

4    on the front end.  Okay?

5                    MR. ADKISON:  Yes, sir.

6                    INDEPENDENT HEARING EXAMINER:  Anything

7    else?

8                    MR. JOHN C. HARDY:  I do have one other

9    housekeeping matter.  I have -- I know we passed around,

10   but these are the original exhibits that were originally

11   marked, and I'll give those to the court reporter here

12   so she's got the ones there.  Mr. Adkison can certainly

13   look through them.  I have pulled the ones that we did

14   not admit.

15                   INDEPENDENT HEARING EXAMINER:  Okay.

16   Perfect.  And Mr. Adkison, refresh my memory.  Oh,

17   Exhibit 1 was the book.  Okay.

18                   All right.  If neither of y'all have

19   anything else, then we will adjourn.  I appreciate it.

20   I think you guys both did a great job shedding light on

21   the issues.  So now the -- the fun part starts.  Thank

22   you.

23                   MR. JOHN C. HARDY:  Thank you.

24                   MR. ADKISON:  Thank you.

25                   INDEPENDENT HEARING EXAMINER:  Off the

1    record.

2                     (Briefly off the record.)

3                     INDEPENDENT HEARING EXAMINER:  Back on

4    the record.  Back on the record real quick.  The -- the

5    Exhibit 1 that was marked by Mr. Alexander's attorney is

6    a book, "The Things They Carried" by Tim O'Brien, 2009

7    edition, and the ISPN is 978-0-618-70641-9.

8                     THE REPORTER:  Okay.

9                     INDEPENDENT HEARING EXAMINER:  Off the

10   record.

11                    (The proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS

2  COUNTY OF CHEROKEE

3        I, Terri Lynn Smith, Certified Shorthand

4  Reporter in and for the State of Texas, hereby certify

5  that the above and foregoing contains a true

6  and correct transcription of all portions of evidence

7  and other proceedings to be included in this volume of

8  the Reporter's Record, in the above-styled and numbered

9  cause, all of which occurred in open proceedings and

10  were reported by me.

11        I further certify that this Reporter's Record

12  of the proceedings truly and correctly reflects the

13  exhibits, if any, admitted into evidence.

14        I further certify that the total cost for the

15  preparation of this Reporter's Record is $_____ and

16  was paid/will be paid by _____.

17        Certified to this the 6th day of March, 2016.

18

19        _Terri Lynn Smith_

20  Terri Lynn Smith, CSR 6781
     Expiration Date:  12/31/16

21  DepoNet Solutions
     Firm Registration No. 732

22  206 South Main Street
     Henderson, Texas  75654-3560

23  Telephone:  (903) 657-2795
     Facsimile:  (903) 657-7002
     Glenda@DepoNetSolutions.com

24

25

**A**

**A's** 168:25 173:3
**A-t-t-a-w-a-y**
  85:3
**A&M** 159:12
  160:14
**ability** 29:5
  55:13 130:25
**able** 107:19
  164:23,24
  198:12
**abnormal** 168:1
  168:3
**above-styled**
  210:8
**absolutely** 13:4
  115:6 138:23
  199:20 200:13
  201:11
**abuse** 35:2 131:9
  131:10
**abused** 11:25
  198:18 204:24
**acceptable** 35:11
  173:11
**access** 122:6
**accident** 98:21
**accusation**
  201:19
**accusations**
  203:9
**accused** 142:16
**accusers** 17:11
**acknowledge**
  25:2,6,7
**acknowledged**
  25:4
**acquaintance**
  133:10
**acquaintances**
  133:5
**act** 130:22
**acting** 61:10
  108:3 118:3
**action** 31:11
  32:9 33:11

34:1 49:18
54:14 95:21
115:6 129:23
165:25 187:3
**actions** 13:21
  74:22 103:25
**actively** 50:9
**actual** 67:6
  163:10
**Adam** 5:6
**Adams** 4:17,20
  4:23 8:3,3,10
  8:10,11,11
  189:6,6,7,10
  189:13,17
  191:5,5,9,10
  191:13,17
  195:8,8,10,12
  195:15,20
**addition** 123:8
**address** 11:1
  113:12,19
  171:2
**addressed** 33:11
  37:14 172:5,11
  172:11 204:25
  205:14
**addresses** 172:7
**addressing**
  11:20 62:13
  112:24 113:2
**adduced** 199:13
**adequacy** 203:5
**adequate** 40:3
**adjourn** 140:18
  208:19
**adjourning**
  10:16
**Adkison** 2:17,18
  3:6,8,14,15,18
  3:19,22 4:2,6,9
  4:10,13,16,18
  4:21,24 7:10
  7:10,23 9:8
  10:8,11,21
  12:7,9,13,18

16:19,22 17:6
17:9,16,18
18:16 19:11
23:15 26:4
28:6,9 37:22
40:20,21,24
41:2,6,11,14
45:8,11 49:22
50:7,18 51:11
51:18,21 52:7
52:11,22 54:12
54:18,24 55:2
56:11 57:20
58:10,13 60:16
64:10,18,20,21
66:16 73:10
74:6,7 78:25
79:6 80:14
81:7,19,25
82:6,14,19,25
83:3,12 88:25
89:10,17 90:1
91:23 92:20,21
97:14,18
102:13,25
103:8 104:6
110:1,3,23
113:24,25
115:10 124:11
125:7 127:24
128:2,3 132:9
132:10 139:10
140:7,12 141:3
141:4,14 142:9
142:11 143:17
143:23 144:2,7
149:22 150:1
153:1,3 154:12
154:15,17,21
156:16,23
160:9,13
161:16,20
162:10 165:18
165:19 168:18
168:19 169:6
173:22 174:6

174:22 175:14
175:19 176:8
176:16,22
177:9 178:16
179:21 180:2,6
180:13,17,23
181:2 183:22
185:12,24
186:14 188:1
188:13,20
189:12,16
190:17 191:16
191:20 193:8
194:10,22,25
195:5,18 197:1
197:4,21 198:4
199:10,12
204:13 208:5
208:12,16,24
**administration**
  1:19 12:3 97:9
  173:13,15
**administrator**
  158:1 160:17
  173:17
**admiral** 187:15
**admissible** 19:12
  19:16
**admit** 89:1
  178:1 208:14
**admitted** 18:15
  18:17,18,19,21
  19:7 27:15
  51:10 58:2,3
  89:5,6,25
  109:16,17
  112:7 143:21
  143:25 144:1
  154:19,20
  210:13
**admonish** 8:24
  104:13 124:15
  139:16,18
**admonishment**
  9:16
**ADs** 117:19

**adult** 115:13
  159:20,21
**adults** 19:22
  20:1 21:22
  83:20
**adversarial**
  112:16
**advise** 95:21
**afraid** 64:2
  104:11
**African-Amer...**
  173:9
**afternoon** 39:1
  42:11 44:20
  97:2 110:8,9
  114:12 151:15
  151:19,20,21
  151:24 152:2
  152:12,14,24
  155:4 156:1
**age** 77:22
**Agency** 1:4 5:14
  30:20
**agenda** 5:12
  17:24 30:5
  31:6,11,24
  128:9,13
**Agnew** 74:2,6,8
  77:4,5,11,14
  77:15,16 79:22
**Agnew's** 73:25
**ago** 48:16 91:3
  115:16 148:22
  149:19
**agree** 118:3
  136:2,3 178:9
  179:7,8 205:8
**agreed** 10:18
  117:22 206:3,8
**agreement** 10:16
**agreements**
  131:6
**agrees** 179:8
**ahead** 7:19 9:21
  15:2,7 50:5
  54:17 58:17

59:6 60:22
81:13 85:5
90:18 106:9
125:22 139:16
141:10 162:6
178:15 180:23
186:10 189:12
191:7,8,16
206:20
**air** 59:1
**Alexander** 1:4
2:16 5:21,22
7:11,11 10:9
11:11,18,25
12:21 13:6,11
14:12 15:24
16:7,19 19:5
20:9,16 21:3
24:8 25:8 26:8
27:4,10 28:20
29:9,11,18,24
30:15,21 31:14
32:14 33:5,13
33:15 34:2
35:24 36:5,14
37:11,15,17
42:10,23 43:16
44:17,18,23
45:2,12,15
46:13 47:14
49:3 54:4
55:11 59:19
60:7,25 62:1
62:19 63:4,7
63:24 64:2,8
64:15,22 67:11
68:11,15,19,22
68:25 70:18,21
71:1,10 79:11
79:18 80:3,13
80:17,23 81:1
86:8,23 87:3
87:10 91:4,12
92:7 93:12
97:23 99:17
101:20 103:2

103:25 107:5,8
107:16 109:5,8
110:10,12
111:4,23,24
112:2,10,18,20
115:21 121:18
123:15 126:18
126:23 128:15
129:11,16
130:2,8 131:18
132:11,19,23
133:3,14,18
134:11,17
136:13 137:14
137:22 142:16
144:12 148:7
149:14 150:25
151:1,5,6
152:9 153:5
154:4,9 156:1
157:9 161:11
163:19 164:4
164:13 165:25
166:25 171:11
171:13 172:13
173:24 181:13
181:23 182:4
182:10,13,15
183:7,14
186:22 187:14
187:17 189:24
190:6 192:2,8
192:11,13,25
196:5,17
197:13 198:12
198:18 199:19
200:8 204:16
204:20 205:19
**Alexander's**
11:14 13:13
14:9 16:9
20:13 29:14
32:10 53:21
54:1 69:9
91:22 92:3,21
100:3 112:23

114:1 124:9
127:8 128:6
139:7 153:19
156:4 164:3
196:11 201:15
206:7 209:5
**alive** 24:16
**allegated** 163:11
**allegation** 13:1
14:15 30:20
38:17 52:15
53:20 114:21
142:15 157:9
163:8,10
**allegations**
47:14 77:18
168:14 200:7
**allege** 65:13
66:17 67:2
71:23,25 76:21
201:8
**alleged** 44:24
66:22 67:5
71:17 72:13
74:9 127:3
**allegedly** 21:20
**allow** 13:14
54:17
**allowed** 78:16
89:15 124:19
124:21 185:15
**allows** 78:20
81:21 82:20
122:10
**aloud** 89:12
**American**
165:23 169:15
**anatomy** 143:12
143:14
**Andy** 4:1 16:8
125:17,20
126:3
**Angelo** 135:21
**angry** 63:3
**answer** 23:16
40:18 41:1

53:11 57:12
81:9 82:15,17
83:9 103:9,18
103:18 117:8
139:4 146:13
154:7
**answered** 39:16
66:14
**answers** 83:25
104:18 124:21
139:21 176:1
185:18 188:8
190:24 194:15
198:1
**anticipated**
122:9
**anybody** 9:4,15
12:20 24:23
25:1,13 41:23
48:13 75:22
76:18 77:1
81:1 94:23
95:22 96:19
97:8 99:17
117:13 131:21
136:24 147:13
147:20 168:6
169:24 182:21
188:7 193:1,1
193:2 196:12
197:8
**anymore** 172:19
**Anyplace** 70:9
**anyway** 19:17
136:6
**AP** 160:22
**apart** 100:25
**apologize** 110:9
122:1
**apparent** 204:23
**appeal** 101:10
101:13
**appearances** 3:3
7:4
**appears** 18:4
**appointed**

161:10
**appreciate** 11:5
82:25 122:4
139:3 142:9
204:9,13
208:19
**approach** 16:13
87:24 97:14
108:8 111:13
188:14
**appropriate**
49:18 62:2,16
71:14 82:11
87:17,20 131:5
171:1 203:3
207:3
**appropriately**
64:5
**approve** 205:11
**approved**
160:24 205:7
**approximately**
31:8
**area** 34:17 133:8
**argue** 103:1
**argument** 179:1
204:13
**arguments**
40:17
**Armour** 69:21
**ARNOLD** 2:4
**arose** 11:15
**Arp** 100:22
101:4 107:17
114:8 174:17
174:22
**Article** 145:14
**asked** 21:18,23
21:25 22:11,19
24:18 25:20
26:5 44:19,25
45:3 48:17,21
56:20 66:11,13
76:7 79:7,13
83:25 100:2
102:25 104:17

116:12 124:20
139:21 144:15
161:12 163:19
164:8 165:16
167:22,22,23
167:24 168:11
169:4 170:23
176:1 185:17
188:8,21
190:23 194:14
197:25 206:3
**asking** 30:11,14
50:15 81:12
89:3 128:7
147:17 148:13
153:6 171:11
**asks** 104:24
124:23
**aspersion** 14:3
**ass** 171:20
**assault** 35:5
**assemble** 21:19
21:21
**assembled** 21:22
**asserted** 17:2
**assertions** 200:2
**assigned** 142:8
**assignments**
101:22
**assist** 72:21
**assistance**
115:18
**assistant** 117:6
117:19 162:20
**associate** 82:22
**ASSOCIATES**
2:4
**assuming** 50:19
50:23 178:20
**assumption**
180:4
**assurances**
168:22
**Astin** 4:8 8:14
162:7,12
**athletes** 119:15

119:20 131:25
175:16 201:7
**athletic** 11:11
12:1 16:11
31:11 32:14
36:15 54:2
77:20 106:18
106:21,23,24
112:19 117:5,6
117:7,14,17,20
117:25 118:7
119:14,23
128:15 131:19
150:2 161:9,10
174:23
**attached** 1:24
**Attaway** 3:20
5:5 80:6 84:21
84:25 85:11
90:11 104:9
165:9,24,25
169:20
**Attaway's**
152:16,17
157:15
**attempt** 72:20
**attempted** 42:7
**attempting**
49:10
**attend** 30:2,8
151:8,12
**attendance**
44:17
**attention** 23:10
66:24 114:14
114:16 148:17
148:19 187:14
192:22
**attorney** 7:6,8
16:19 28:11,14
28:14,16 114:1
209:5
**attorney's** 14:21
**attorney-client**
28:7
**attorneys** 7:14

8:19 10:14
**audience** 140:5
146:5 156:12
156:15
**Austin** 207:8,22
**authored** 18:6
**authority** 43:8
**automatically**
98:15
**Ava** 156:21
**available** 19:9
122:24 204:15
**aware** 45:4,18
56:17 149:9
158:11 181:12
186:21 189:23
196:4

---

## B

**B** 207:4
**B-i-r-d** 15:5
**back** 9:15 24:13
27:1 29:19
32:21 37:18
47:16 64:8
71:8 80:11
84:13 86:14
93:21,23 94:6
94:10 95:11
99:11,18,23
105:21 109:10
125:11 132:4
134:10,12
135:13 136:6
139:17 140:19
140:22 157:17
158:4 159:15
161:25 166:2,7
166:8,11 167:6
169:21 178:23
188:18 189:3
190:1 191:3
194:12 195:1
196:9 203:20
204:14 206:2
209:3,4

**backer** 95:17
**background**
130:11 157:25
**backs** 170:4
**backward** 93:19
**bad** 53:21 101:6
102:12 135:6
135:15,15
136:7,16 171:3
171:5 184:6
199:18 203:24
203:25
**balance** 202:12
**ball** 96:1
**band** 122:3
158:1,8,8,23
190:8
**barn** 67:18
121:19,20,25
122:1,11
**base** 198:23
199:25
**baseball** 78:3,14
96:4
**based** 11:14 26:1
35:18 131:16
132:2 137:14
200:2 204:8
**basically** 28:5
112:13 168:9
**basis** 34:8,9
48:21 52:15
99:16 113:1,5
113:10 133:20
**basketball** 54:6
54:8,19 78:3,5
96:4 162:19
171:18 174:7
174:25 175:3,6
**Bear** 159:2,7
**beat** 101:11
**Beaty** 16:4,5
**began** 70:21
**beginning** 14:2
74:16 126:21
**begins** 90:14

**backer** **behalf** 7:6 11:9
178:10
**behavior** 34:23
91:22 92:4
**behest** 13:10
**beliefs** 161:3,3
**believe** 11:17,24
29:17 34:5,16
34:19,23 35:2
35:5,13,16
36:13,17,20,23
37:7,10,13,17
52:11 57:7
71:16 73:6
74:21 75:17
81:4,15 91:17
97:25 100:19
104:4 109:20
109:22 115:21
116:10 117:8
117:11 119:1,7
126:19 130:21
131:5,16,23
132:2,25
138:21 155:5
157:4 159:21
160:16 163:7
163:11 166:14
169:15 171:22
174:14 177:8
**believed** 201:7
**Bench** 188:17
**best** 27:24 29:5
55:13 175:15
**bet** 158:10
**better** 140:13
**beyond** 104:25
124:24
**big** 101:2 165:12
196:25
**Bird** 3:12 4:5
5:14,23 7:7
9:25 14:25
15:1,4,5,9,15
15:17 19:3
20:5 27:14

28:18 32:5
63:13,16,18
88:12 96:17
103:24 109:1
116:4,13,16
126:22,24
127:6 130:1
131:24 132:3
136:13 141:7,8
141:11,15
160:12 163:16
**bit** 16:9 60:21
79:23 86:20
102:20,21
134:4 146:10
162:23 168:2
171:18 190:3
208:1
**blacken** 201:20
203:8
**blacks** 160:14
**Blake** 3:20 5:5
80:6 84:21,25
85:9,11 89:7
91:1 92:21
102:18 152:16
152:17 157:15
159:17,20,22
165:9,24,25
166:2,16
169:20 184:14
184:24
**blanket** 82:7
**blunt** 147:18
204:6
**board** 5:8,12,15
5:16,18,19
12:23 13:2,11
13:12 14:5,11
16:6 17:25
21:7 27:9
28:19 29:24
30:5 31:6,17
31:25 32:6,9
33:12,12 34:1
38:18,21 39:7

39:23 43:6,13
43:16,18 44:23
45:1,13 50:9
51:25 53:24
56:4 59:22
60:1 81:23
82:21 83:6,8
126:8,9,17
127:7,17 128:5
128:25 129:9
129:17,23,25
129:25 147:15
176:18,19
177:1,2,11,14
178:5 179:6,17
199:3 200:17
200:18 202:2
202:17,20
204:1,2 206:13
207:9,24
**board's** 179:9,12
**body** 91:20
146:19
**bomb** 62:9 113:7
143:4
**book** 6:6 93:4
142:4,8,12,23
142:25 143:3
205:3,5 208:17
209:6
**books** 160:22,23
160:24,25
**bore** 146:17
**bother** 171:17
**bottle** 123:4
**bottled** 123:8,11
**bottles** 120:12
120:16 124:3
**bottom** 131:11
**bounds** 205:19
**box** 93:16,17
**boys** 107:13
162:19 170:7
184:1
**break** 46:9 84:7
84:10 99:5,11

99:12,19,24
119:19 125:7
140:3 157:18
158:20,23
159:16 176:10
200:9 206:2
**breaks** 71:24
158:9,15
159:10
**brief** 44:20
205:25 206:2
**briefly** 141:4
144:15 198:10
209:2
**bring** 19:25
74:25 75:1,1
120:21 166:8
**bringing** 178:23
**broke** 119:22
**broken** 72:25
**brother** 96:9
**brought** 74:11
75:3,19 77:13
79:20 120:12
120:20 132:4
**Bryant** 159:3,7
**Bryce** 96:9,15
**build** 205:16
**building** 1:19
77:8,10
**burdened** 179:2
**bus** 67:18
121:19,20,25
122:1,11
**business** 19:13
19:14

───────
**C**

**C** 2:1,10 3:5,7,9
3:13,14,17,18
3:21,22,25 4:2
4:7,10,13,21
4:24 7:5,5,24
9:23 10:22,25
11:5,8 14:25
15:14 16:13,16

18:7,13 19:1
20:2,5 23:21
26:7 28:8,17
28:18 37:20
40:16 50:3
51:5 54:10
55:6,9 56:8
57:22 58:4,9
58:14 59:8,10
60:23 64:14,17
66:13 79:2,5
80:16 81:9,14
81:17 82:9
83:14 84:3,7
84:11,15,18
85:6,8 87:24
88:1,5,7 89:2,7
89:14 90:6
91:1 92:1,17
102:15,17
103:21 104:4
104:11 105:4
105:17 106:11
106:13 108:8
108:11 109:13
109:18,19
110:2,5 111:1
111:3,13,16
112:4,8,9
113:22 115:7
124:12 125:4
125:14,23,25
128:1,4 132:7
139:13 140:16
140:25 143:19
154:6 160:11
161:14 165:15
168:16 169:8
173:19 174:2
174:18 175:7
175:20 177:21
178:8,14
180:10 183:25
185:11 188:3
188:23 189:2
190:18 193:10

194:8 195:2
197:6,19 198:7
198:10 204:12
207:4 208:8,23
**C-a-b-e** 8:7
186:6
**C-o-l-t-o-n**
58:19
**Cabe** 4:15 8:7,7
142:1 185:24
186:3,3,6,9,11
**calendar** 97:15
**call** 7:3 10:1
14:24,25 67:11
95:22 122:18
122:21 124:5
140:23 164:6
172:24 176:7
189:1 196:19
204:18
**called** 7:16
19:10,12 39:9
41:22 44:22
54:23 72:16
74:13 75:17
93:5 100:9
109:24 124:23
126:24 172:23
203:12,16,17
**calling** 19:17
**calls** 60:17 75:5
115:8 202:19
**calm** 40:21
**campus** 29:19
**capacity** 117:4
**car** 61:23 75:1
**care** 37:24
**career** 130:14
**carefully** 50:25
**Carolina** 1:20
**carried** 6:6
22:12 142:25
209:6
**Carry** 93:5
**carrying** 122:11
144:11

case 7:16 8:23
    8:25 11:12,13
    13:17,22 83:4
    145:4
casual 133:10
catty-corner
    69:3 93:12
caught 140:6
    167:5
cause 1:16 23:21
    34:20,24 35:3
    35:6,13,18,21
    199:14,19
    210:9
caused 20:13
    108:24 169:23
    183:2
causes 23:23
center 121:23
    122:6
centered 142:4
Central 2:5
certain 53:12
    82:21
certainly 17:2
    19:23 26:20
    35:15 51:7
    56:13 127:23
    159:11 188:23
    208:12
Certificate 3:10
Certification 5:9
    28:19
Certified 1:3,17
    2:3 6:7 210:3
    210:17
certify 210:4,11
    210:14
cfreeman@aw...
    2:7
chain 45:16
chair 185:25
chance 202:14
change 137:24
    138:24 139:6
changed 50:1

changes 20:1
character 30:24
charge 20:23
    145:2
charged 19:3
    145:11 207:11
chase 93:8
cheat 206:20,25
    207:7,18
CHEROKEE
    210:2
chief 20:22
child 38:20
    44:24 45:13
    115:12 150:10
    165:19 172:6,6
    172:7 174:1
children 41:9,16
choose 144:23
chose 200:16,17
chosen 201:23
Christopher 1:2
    1:18 2:4
church 25:25
    63:5,6
circle 68:21
    93:11
Circuit 12:15
circumstances
    82:21 115:13
civil 1:23 17:12
    40:18
clarified 90:10
clarify 176:24
    176:24
class 74:16
    75:17 78:16
    104:9 118:13
    118:14,16,19
    118:20,23,24
    119:2 141:19
    141:22,23
    159:12 161:2
    189:3 191:3
    194:12 195:1
classes 118:10

118:11 119:10
    160:23
classification
    59:17 85:14
    186:19
classroom 73:23
    73:24,25 81:13
classrooms 74:1
    123:9
clean 172:18
    173:13
cleaner 208:1
clear 9:17 54:13
    139:23 144:6
    145:20 148:14
    179:6,11
    198:17,25
    199:6 205:1
    208:3
clearly 11:18,24
    174:19
client 18:6
clinics 133:23
close 79:16
    132:25 133:4
    148:19 151:4
    196:24
closed 10:7
closer 107:22
closest 23:6
    48:17 121:11
    121:12
closing 3:7,8,9
    198:6,9 199:11
    204:11
cloth 69:22
club 93:10
coach 7:11 11:12
    11:14,18,25
    12:1,21 13:6
    13:11,13,13
    14:10,12 16:12
    17:10 20:16
    22:8,24 32:15
    34:17 36:4,14
    36:15 37:1,8

37:11,17,18
    42:10,23 43:15
    44:17,18,22
    45:1,12,15
    46:13 47:14
    49:3 53:21
    54:1 60:7,7,25
    61:11,24 62:1
    62:4,19 63:2,2
    63:4,7,24 64:2
    64:7,15,22
    67:9,11 68:6,9
    68:9,10,10,10
    68:10,11,12,14
    68:15,19,22,25
    69:9 70:18,21
    71:1,10 72:16
    77:21,22 78:4
    79:11,18 80:3
    80:13,16,23
    81:1 86:7,23
    87:3,10 91:3
    91:12,21 92:3
    92:7,21 93:11
    97:23 99:11,17
    100:3 101:20
    102:22 103:2
    103:25 107:5,8
    107:16 109:5,7
    110:9,12 111:4
    111:23,24
    112:1,10,18,20
    113:25 115:21
    115:24 121:18
    123:15 124:8
    126:18,23
    128:6,16
    129:16 130:8
    130:15,19,20
    130:21 131:18
    131:19 132:11
    132:19,23
    133:3,14,17
    134:1,2,3,6,7
    134:11,17
    135:2,19

136:13 137:14
    137:22 139:6
    142:16 144:11
    145:21 148:1,2
    148:4,7,9,10
    149:11,13
    150:1,3,5,6,19
    150:21,21
    151:5,6,8
    152:9 153:4,19
    154:4,9 156:1
    156:4,8 157:9
    158:20,22
    161:8,11,12,21
    162:13,20,20
    162:21,22,23
    162:24 163:19
    164:3,4,13,13
    164:13 165:3,6
    165:24 166:25
    167:2 168:25
    169:9 170:7
    171:11,13
    172:10,13,19
    172:22 173:3
    173:12,14,18
    173:23 181:13
    181:23 182:4
    182:10,12,15
    183:6,10,14,16
    184:1,20
    186:22 187:11
    187:14,17
    189:24 190:6
    192:2,8,10,13
    192:22,25
    193:11,16
    196:5,11,17
    197:13 198:12
    198:13,17
    199:6,19,20
    200:6,8,23
    201:1,8,18
    202:8,19,21
    203:9 204:16
    205:19

**coach's** 34:20
  149:10 167:8
**coaches** 22:18
  22:18,21 41:9
  41:16 52:12,14
  68:8,9 69:4
  78:6 80:25
  81:6 100:13
  107:14 113:12
  117:19 131:7
  135:3 137:21
  149:9 151:3
  170:6,19
  174:17 194:6
  205:13,15
  207:5
**coaches'** 148:12
**coaching** 5:24
  6:1,2 18:4
  100:9 131:3
  133:14,17,23
  171:10 186:22
  200:20,20
  203:10,11
**code** 81:21
  145:15,18
  146:17,25
  202:5 203:4
**coin** 47:8
**Cole** 156:12
**color** 69:24
  157:24 159:23
**Colton** 3:16 22:8
  24:21 46:1,14
  46:18,18,25
  47:4,9,15
  55:18 58:9,23
  59:11,13 60:23
  64:21 79:6
  87:2,3 91:4,9
  91:13,18 94:2
  94:12,14,20
  107:8,12,18
  108:3 110:10
  114:11 165:8
  165:19 182:5,7

182:12,12
  183:3,19
  184:14,24
  187:6,7,8,9,12
  190:7 192:8,10
  192:11 193:4
  196:12,14,17
  200:4
**Colton's** 25:4
  182:15 187:17
**column** 201:16
**come** 20:14
  21:25 22:18
  24:8,17 37:17
  109:10 122:2,5
  135:13 167:18
  199:24 200:11
  201:1 204:1,14
  204:19 206:20
**comes** 98:12
  172:2 199:15
  200:5,19
**comfortable**
  11:3 109:2
  173:9
**coming** 170:8
  174:9,12
  178:17
**comment** 52:9
**comments** 37:6
  92:8 167:25
**commissioner**
  178:11
**communicate**
  198:14
**community**
  11:21 36:4
  101:13
**complaint** 38:20
  38:24,25 49:9
  49:13 142:4
**complete** 153:18
  153:23 177:5,5
  177:8
**completely**
  83:21 124:1

170:14
**completeness**
  17:23
**computerized**
  1:22
**comradery**
  205:16
**con** 25:17
**concern** 20:19
  20:20 23:22,23
  36:25
**concerned** 26:17
  65:21 188:24
  193:21
**concluded** 83:22
  124:22 139:19
  209:11
**conclusion**
  115:8 123:9
**conclusions**
  179:16 206:9
  207:15
**conditioning**
  59:1 158:12
**conduct** 5:8
  17:20 35:11,24
  35:25 50:2
  130:24 131:9
  137:6 199:19
  199:20
**conducted**
  200:12
**conference**
  188:17
**confirmation**
  204:23
**confirmed** 52:14
**conform** 54:15
**conforms** 54:14
**confront** 17:11
**confusing** 208:3
**confusion** 144:3
**consider** 176:19
**considered** 98:7
  98:17
**constituted**

35:18
**constitution**
  13:22,24,25
  18:2 54:13
  199:16 202:16
  203:2
**constitutional**
  13:23 17:11
  50:13
**constitutionally**
  50:8 203:1
**consulted** 43:16
**contact** 11:16
  21:24 22:12
  28:1,3 34:19
  56:25 57:5
  64:15 67:6
  94:6 115:3
  183:19 198:20
**contacted** 102:7
  108:25 109:3
  114:17
**contacting** 51:25
**contained**
  134:24 136:19
**contains** 207:20
  210:5
**contemporane...**
  19:5
**context** 71:14
**continue** 10:19
  28:16 71:18
  155:19 156:3
**continued** 157:6
**continuously**
  143:4
**contract** 5:4,10
  5:21 12:4 13:7
  13:13 17:18,20
  20:9 30:15
  31:11 32:10
  33:9 34:1,21
  35:14 40:6
  127:8 128:6
  134:19,23,24
  154:9 199:3,14

**Contracts** 5:10
**contradictory**
  38:7
**contrast** 138:2
**conversation**
  25:18,22 26:2
  26:8,12 39:22
  40:15 72:11,12
  73:15,22 77:14
  94:23 95:8
  116:3 151:5,6
  151:14,23
  152:1,6,9
  161:11
**conversations**
  25:15 26:15,24
  28:11,15 45:20
  74:8 83:24
  92:2,3
**COOK** 2:11
**Cooking** 74:3
**coolers** 122:18
**copied** 45:24
**copy** 12:10,14
  206:5,5
**corner** 14:12
  134:12
**cornerbacks**
  162:24
**corporal** 78:20
  81:21,25 82:4
  82:12 131:13
  198:21
**correct** 10:10,20
  10:22 29:16
  38:18,19,22,23
  40:9 42:8
  43:18 45:21,22
  47:25 48:15
  49:1,2,4,5 52:6
  52:15 53:23
  54:3 56:1,2
  57:2,14,15,19
  68:4 72:4
  76:14 77:8
  78:8,20 81:5

93:9 99:14
100:1,3,23
101:22,25
115:22 116:17
120:5,8 121:8
122:7,12,15
123:5,12,19
125:13,14
128:7 129:5,7
132:24 133:18
135:1 136:9
137:15,18
138:25 139:8,9
142:13,17,20
143:1 144:10
144:20,21,24
145:12,13
148:10,16
149:7 150:3,4
150:11,12,14
150:17 151:9
151:10 152:10
153:20 155:5,9
155:17 157:6,7
157:20 159:1,5
159:6 162:3
165:20 179:15
180:20 183:12
191:12 192:24
210:6
**correctly** 34:4
43:17 49:7
53:22 150:20
210:12
**cost** 210:14
**counsel** 2:9,16
7:19,22 206:3
206:7,7
**country** 93:10
**COUNTY** 210:2
**couple** 11:15
55:6 79:2 90:9
102:15 135:16
180:13 192:20
197:7
**course** 35:8

45:18 50:2
67:19,20,24
68:25 93:13,20
93:21 121:12
121:19,21
122:15 148:25
178:24
**court** 3:10 12:16
14:19 15:3
16:25 32:12
38:14 58:18
59:2 85:2
106:14 179:1
206:4,10
208:11
**courtroom** 65:1
92:25
**cover** 177:13
**cow** 122:19,21
124:5
**coworkers** 11:22
**CPS** 109:23,25
110:6 114:17
114:18,20,22
114:23 115:1,3
115:5,11
**create** 145:10
206:25
**credible** 36:21
198:17
**criminal** 202:9
**Crimson** 159:3
**cross-examina...**
3:14,18,22 4:2
4:7,10,13,21
4:24 14:1
37:21 57:25
64:19 92:19
113:23 132:8
160:10 169:7
183:24 193:9
97:5
**cross-examina...**
206:22
**CSR** 1:21
210:19

**culinary** 74:3
**culture** 158:11
**cumulative**
89:12,21
**current** 13:11,12
14:10 126:20
**currently** 77:20
154:22 162:18
**curriculum**
141:17 142:2,5
201:9
**curse** 92:8
**cuss** 131:2
167:24 171:9
184:1,3
**cussed** 171:18
**cussing** 167:23
167:24
**custodian**
144:19
**cut** 53:25 60:21
93:8

---

**D**

**D** 1:2,18 2:4
207:4
**dad** 25:21 76:22
95:20,21,24
96:1,7 151:6
151:15
**Daingerfield**
133:11
**Dallas** 2:5
**damn** 171:15
**danger** 34:24
**Darden** 9:12,12
9:13,13
**dare** 205:4
**date** 22:14 33:23
42:12 60:9
75:12 76:10
88:15 97:8,12
97:23 108:17
108:18 116:1
116:11 152:19
153:6 181:17

210:20
**dated** 33:23,24
97:7 116:11
129:16 152:18
**dates** 102:22
103:7
**David** 53:3
63:19 75:24
76:23 120:12
**Davis** 8:12,12
156:8
**day** 1:15 10:18
22:3,4 23:3
60:15,25 63:24
68:3 72:25
73:14 74:14
75:13,16 76:11
80:4,8 86:23
87:22 97:25
98:2,3 99:18
104:1 107:3
108:25 109:7
115:4 116:8,10
116:13 118:18
119:4,5,10,11
120:2,17
122:24 123:9
149:5 152:20
156:5 163:8,13
170:9,17 171:8
181:15 182:5
183:20 197:17
199:4 200:6
203:20 204:16
205:3 210:17
**day's** 204:5
**days** 99:12,24
108:22 119:13
119:18 157:18
159:15 199:4
**deal** 101:2
179:24
**dealing** 177:17
**deals** 127:16
128:13
**death** 201:21

**December** 5:18
5:20,21,22
31:25 32:6
33:24 128:11
129:16,16
154:25 155:8
155:16,22
156:2
**decide** 38:1
149:6 150:25
**decided** 151:1
152:4,5 159:14
206:23
**decides** 118:4
**decision** 43:2,3
43:15 44:9,18
46:13 48:18,19
48:20 50:24
55:19 56:13,16
98:7 147:6,7
148:14,18
152:6 159:17
159:18 200:5
202:18 203:7
**decision-maker**
56:15
**decision-maki...**
50:9,11
**decisions** 48:14
**deep** 26:14
**defensive** 70:7,7
70:15,16
**Defensively**
162:24
**defined** 199:15
**definition** 16:24
**degrading** 62:23
**delaying** 43:11
**deliberated**
202:2
**demeaning**
113:15
**demeanor** 26:9
26:11 167:8
**demonstrate**
14:8

Demontrae 111:6 165:10
denials 201:24 201:25
denied 47:23 56:23 57:3
Dennis 1:4 2:16 5:21,22 7:11 11:10 14:9 15:24 19:4 25:13 26:13 28:20 30:15,21 31:14 32:9,14 33:5 34:2 44:15,20 54:4 126:18 128:15 129:10 130:2 149:14 150:25 151:1 201:14
Dennis's 135:15
denominated 54:1
deny 72:10 123:24 134:15
depend 137:17
depending 158:22
depends 39:12 140:7 171:9
DepoNet 210:20
deprive 17:10
derogatory 92:8 99:22 143:6,11
describe 26:11 60:12 62:25 87:8 107:11 112:9 147:13 172:1
described 121:5 196:22
DESCRIPTION 5:3 6:5
descriptions 143:11,14
despite 10:19 24:15 175:11

detail 201:2
Details 127:22
determination 12:16 13:19
determine 54:14
determined 49:16
device 122:17,24 123:3,12
DFBA 28:25
DFBA(Legal)-P 5:11
DHB(Legal)-P 5:9
differ 25:17,19
difference 21:9 56:6 160:17,21 164:24
different 151:16
difficult 178:6
dinner 205:12
direct 3:13,17,21 3:25 4:2,6,9,13 4:16,18,21,24 15:13 27:4 59:9 85:7 106:12 130:1 141:13 162:9 181:1 186:13 189:15 191:19 195:17
directed 157:23 159:22 160:19
directing 33:12
direction 88:12 121:20
directive 27:7
directly 79:17 200:7
director 11:11 12:1 16:11 31:12 36:15 54:2 77:20 106:21 112:19 117:25 120:14 128:15 131:19

150:3 158:1,8 158:23 161:9 161:10
director/head 32:15
directors 117:17 117:20
directorship 112:1
disagree 40:12
disagreed 117:18
disagreement 117:15
disagreements 110:15,17 112:13 117:9 117:21,23
disciplinary 81:21 82:13 87:13 177:20
discipline 78:7 78:17 81:5,13
discretionary 43:8
discuss 8:25 9:3 65:25 70:18 83:19,23 102:2 104:14,17,18 104:20,23 105:8 124:17 124:20,21 126:24 139:18 139:20,21 175:13,24,25 185:16 188:7,7 190:22 194:13 194:14 197:24 197:25 206:18
discussed 61:23 74:10 77:17 101:25 131:24 164:6
discussing 26:19 72:4 127:2 143:1

discussion 12:22 30:10,15 62:18 65:24 80:3 127:6,8,10 128:7 141:25 164:3 198:21 206:3
discussions 33:4 66:6 92:3 129:5
dismiss 175:3
dismissal 175:5
dismissed 119:9
disrespectful 131:9
disruptive 78:16
dissatisfaction 12:24 98:20
district 1:2,19 2:9 5:24 6:1,2 7:6 11:9,21 13:19,20 14:18 19:7 20:23 29:3 33:21 40:8 43:8 78:19 82:13 83:5 106:18,19 118:7 134:1,2 134:3,6,7 139:8 142:6,12 144:8 177:12 191:22 200:8 202:14
district's 11:13 16:18 35:23 198:25 206:7
districts 131:14
Docket 1:1 7:3
document 108:13 154:23 200:1 202:6,10
documents 18:8 19:2,10 111:17 111:21 146:20 154:15
doing 24:16

50:17 51:14 52:2 58:11 86:10 91:9 167:10 182:12 182:20 187:12 192:11 207:16
donations 179:24
Donnie 156:10
door 81:12
doubt 80:21 173:23
downloaded 177:11
dressing 173:10
drills 66:21 67:6
drink 58:11
drinking 159:10
drop 71:5 113:7
dry 58:13
Dual-Assignm... 5:4
duly 15:10 58:24 84:22 106:8 125:21 141:12 162:8 180:25 186:12 189:14 191:18 195:16
duplicative 89:13
duties 35:9 40:2 117:14 118:6 120:5,8 153:15
duty 40:6 78:7

E

E 2:1,1
earlier 10:5 15:7 16:21 43:14 56:24 66:22 81:12 83:17 104:13 124:16 144:15 147:8 162:2 170:14 170:15 175:24 180:20 181:20

185:14 188:6
200:14 206:18
**early** 152:24
170:10,12,12
**easier** 11:3
76:20
**East** 126:5
**Eastern** 13:20
**Eastman** 54:2,5
54:18,23 68:10
77:21,22
138:17,17
148:10 149:11
149:13 150:1,5
161:8,12
173:18 200:23
**Eastman's** 78:4
**easy** 98:10 111:2
**edition** 6:7 209:7
**education** 1:4
5:13 23:24
28:19 30:19
203:4
**educational**
148:15
**educator** 5:8
30:20 160:16
**effective** 36:3
**effort** 178:17
**eight** 34:14,15
117:3 130:6
**either** 7:20 42:7
48:3 49:23
55:17 63:20
67:23 71:20,25
72:7 83:22
89:24 96:8,23
98:3,3 104:19
124:22 129:4
**ejected** 54:6,8,18
**elaborate** 172:4
**elastic** 69:22
**elective** 118:13
**eliminated** 161:7
**embarrassed**
61:15 204:3

**embarrassment**
86:21
**emotional** 26:16
131:12
**emotions** 172:2
**employed**
106:17 112:1
131:19 162:13
162:15,16
198:13
**employee** 5:8
112:14 205:20
**employee's**
27:19
**employees**
110:13,17
117:9,23
**employment**
15:18 20:14
35:9 126:23
**enactment** 17:22
17:24
**encompasses**
177:2
**encouraged**
168:21
**ends** 119:1
**engaged** 94:23
**English** 93:2
141:20 160:23
**enjoyed** 112:12
**enrolled** 174:13
174:14
**entered** 166:18
**entire** 17:23
40:11 136:11
176:19 177:14
**entirely** 38:6
50:11
**entirety** 176:20
**entitled** 207:10
**entrance** 123:10
**entry** 40:10
**envisioned**
178:18
**equipment**

69:14
**especially** 23:5
**establishes**
202:9
**evaluation** 5:24
6:1,3 18:5
26:23 111:17
**evaluations**
11:14 111:19
111:25
**event** 108:22
**events** 19:6 24:1
**everybody** 68:22
106:2 118:3
136:7 138:4
165:9 166:21
172:11 185:8
200:3
**everybody's**
93:11 135:7
**evidence** 11:17
11:24 13:3,22
17:10 27:15
42:8 51:13
89:11,13,19
110:3 154:22
176:20 198:17
200:1 201:24
201:25 210:6
210:13
**exacerbates**
17:13
**exact** 76:10
127:10,11
181:17
**exactly** 147:13
149:15 167:21
187:13 200:17
204:8
**Examination**
3:13,14,17,18
3:21,22,25 4:2
4:6,9,10,13,16
4:18,21,24
15:13 55:8
59:9 79:4 85:7

102:16 106:12
125:24 141:13
162:9 173:21
181:1 186:13
189:15 191:19
195:17
**examiner** 1:3,17
2:3 6:7 7:2,13
7:25 8:4,8,13
8:15,18 9:10
9:14,20,24
10:3,13,23
11:2 12:5,12
14:23 15:1,6
15:11 16:15
17:4,7,15
18:11,14,22
19:18 20:4
23:18 26:6
28:12 40:19,22
40:25 41:4,13
45:10 49:21
50:5,14 51:15
51:19 52:19
54:16 55:4,7
58:1,7,12,16
58:21,25 59:6
60:20 64:13
66:15 74:4
80:15 81:11
82:5,16 83:2
83:16 84:2,5,8
84:13,23 85:1
85:4 87:25
88:3,6,23 89:4
89:20 90:4,8
90:17,24 91:24
97:16 103:11
103:14,17
104:8,12,16,22
105:2,6,11,15
105:18,21,25
106:4,9 108:10
109:15 110:4
111:15 112:6
115:9 124:14

124:19 125:1,6
125:8,11,15,18
125:22 139:12
139:15,25
140:2,9,17,21
141:2,6,9
143:20,24
144:5 146:21
149:25 153:2
154:10,13,18
156:13,18
160:1 161:18
161:22,25
165:17 174:5
174:21 175:10
175:22 176:3,6
176:11,14,21
176:23 177:24
178:13,15
179:4,22 180:5
180:8,12,16,19
180:22 185:13
185:20,23
186:1,4,7,10
188:5,11,15,18
188:25 189:4,7
189:11 190:20
191:2,7,11,14
194:11,18,21
194:24 195:3,6
195:9,13
197:22 198:5,8
199:9 204:10
205:23 206:1
206:16 208:6
208:15,25
209:3,9
**example** 99:4,7
130:22
**exception** 52:16
**exculpatory**
201:24
**excuse** 19:8
40:13 45:6,8
54:24 57:8
59:19 88:21

103:8 110:23
136:8 149:22
160:7 162:14
169:1 174:11
**excused** 66:21
124:15 125:2
175:23 185:14
185:15 188:6
190:21 194:12
195:4 197:23
**executive** 30:11
30:12 128:8
**exemplar** 194:22
**exhibit** 5:1 18:15
18:16 28:24
51:4,6,20,22
57:24 58:3
88:8,11,22
89:4,6,11,24
108:12 109:14
109:15,17
127:16 128:12
129:18 142:22
143:17,18,21
143:22,25
144:1 153:18
153:22 154:8
155:1 157:8
177:11 208:17
209:5
**exhibits** 16:17
16:21,23 18:20
18:23 20:6
27:13 42:6
51:9 88:2
144:3 153:18
154:16,21
155:20 176:25
177:4 208:10
210:13
**exited** 10:2
**expect** 7:16,21
178:3
**expected** 183:11
**experience**
60:13 78:12,13

82:24 135:17
**Expiration**
210:20
**explain** 20:12
21:14 136:21
**explanation**
159:18
**expressed**
137:14
**expression** 94:9
**expressly** 13:18
13:23
**extent** 133:22
138:10 207:13
207:13
**extremely**
199:16
**eyes** 21:12 80:19
184:19
**eyewitness**
169:12

---

**F**

**F** 62:9 113:7
143:4 184:7
**F'n** 62:14 171:12
184:12
**face** 61:9 72:14
72:15,18 91:5
91:15 107:18
114:15,18
199:24
**facilities** 27:5
**facing** 68:25,25
69:1,2 93:12
93:15,20,20
121:18,21
**Facsimile** 2:6,13
2:20 210:23
**fact** 18:1 24:12
25:19 26:25
33:3 55:25
89:21 120:7
131:8 151:13
161:6 179:16
205:12 206:8

207:15
**factor** 98:7
**facts** 45:16
175:9
**factually** 45:12
**faculty** 80:25
**failed** 40:10
49:17 200:13
201:15
**failing** 11:22
**failure** 18:2
35:23 36:2
202:5,6
**failures** 101:21
**fair** 55:15 79:22
130:23 131:16
**fairly** 131:13
**fake** 173:7
**fall** 60:5 126:21
167:5 169:23
**falls** 98:15
**Fame** 201:18
203:9
**familiar** 100:12
131:13 141:19
145:14,17
146:16
**family** 63:4
**far** 35:18 60:19
107:21 134:9
138:4 188:23
193:21
**father** 55:18
59:19 61:21
66:6 72:9
73:19 74:22
75:4 79:21
**fault** 43:10,11
200:15
**fear** 26:25
**February** 1:11
1:15 42:19,25
**federal** 12:10,15
12:16 13:17,18
13:24 14:19
**feed** 56:14

**feel** 23:2 28:22
30:23 35:24
36:4 61:18
62:16 113:17
113:19 173:8
**feelings** 172:2
203:17
**fees** 14:22
**fell** 167:5
**felt** 36:7 62:19
173:10 198:11
**female** 143:11
**fetch** 120:17,19
**field** 20:17 21:22
23:3 24:16
68:6,8 73:7
93:17 94:24
95:11 107:14
120:22,24
121:2,3,11,22
121:22 122:7
123:11 137:21
182:1,4 200:6
203:18
**Fifth** 12:15
**figure** 71:13
179:3
**file** 39:18,19,24
41:7,8 42:2,3,6
48:11 52:4
153:19,23
**filed** 13:17
109:24
**filled** 111:24
**filling** 124:2
**final** 10:14
100:19 206:11
**finally** 24:20
**find** 21:21 48:17
49:1 62:22,23
87:15 92:15
113:15 114:16
157:13 179:13
**findings** 179:16
206:8 207:14
**fine** 18:12 58:8

89:23 140:16
195:4 207:15
**finger** 196:24
**fingerprint**
72:17
**finish** 10:16
40:23 41:1
66:19 78:4
103:18 174:25
179:15
**finished** 104:19
123:20 124:4
**Finishing** 85:16
**fire** 13:15 135:7
**Firm** 2:18
210:21
**firmly** 57:6
**first** 8:1 10:4
14:24 15:2,4
15:10 21:1
24:11 25:17,19
26:9,11 38:17
40:23 41:15
44:11 46:12,18
46:24 58:17,24
61:22,25 65:4
65:6,11,11,11
73:13 76:7
78:12,13 84:22
91:2 94:22
97:8 101:19
106:8 116:3
125:21 153:14
154:4 155:20
176:16 206:9
**five** 79:12 91:2
107:23
**five-** 84:9
**flag** 69:25
165:23 169:15
**focused** 192:22
**folks** 7:18 25:24
**follow** 9:25 27:7
27:23,25 29:5
149:6
**follow-up** 39:14

following 1:24
28:2 75:13
115:4 146:3
206:4
follows 15:10
58:24 84:22
106:8 125:21
141:12 162:8
180:25 186:12
189:14 191:18
195:16
football 11:12
12:1 16:11
20:17 22:3
24:19 32:15
60:3,5,13 61:3
61:5 70:1
78:13 85:20
91:21 95:5,24
96:3,4 100:10
128:15 130:15
130:19 150:3,6
158:11 159:7
162:20,22
172:10 181:9
186:17 189:21
191:24 196:2
198:13 203:18
foregoing 210:5
forget 168:24
forgot 206:17,17
form 5:24 6:1,3
200:24
former 13:13
135:2
formerly 49:7
forms 18:5
131:9
formulate
206:12
forth 23:11
88:14 130:3,5
forum 202:25
203:3
forward 130:2
206:23

foul 113:1
foulest 62:4
found 24:6
146:20 175:14
181:22
four 15:22 91:2
115:16 128:21
four-page 177:6
frame 93:22
framed 110:24
Frankie 9:12
Frankston 90:16
90:20
free 83:23
104:20
Freeman 1:2,18
2:4
frequent 92:10
freshman 78:14
93:2 96:2
189:19 195:23
195:24,25
Friday 31:7
103:3
friendly 196:21
196:22
friends 12:19,19
12:20 25:24
26:13 77:24,25
94:25 133:4
150:13
friendship 26:14
front 20:6 27:14
52:5 68:18,24
69:5 111:17
128:13 179:19
185:10 200:11
208:4
full 105:22
106:15 125:16
186:2 191:8
fullback 95:17
fun 172:21
208:21
funny 71:11
79:14,15

164:14
further 55:5
56:8 58:5
83:14 104:6
124:12 139:13
161:16 178:21
178:21 185:12
194:8,10
197:19 210:11
210:14

**G**

G-r-e-e-r 8:17
game 54:6,8,19
65:11,11
100:18,22,22
101:22 107:17
110:22 114:7,8
135:25 136:6
games 133:20,21
133:21
Garrison 101:2
gate 121:25
122:10
gathered 23:8
67:15 68:17
Gator 120:23
122:11 123:7
GD 62:6 113:2
143:9 171:14
184:9
gear 171:20
Gene 32:25 44:4
55:18 59:24
129:3
general 19:23
130:6 167:24
generally 19:20
51:12 171:8
gentlemen 63:20
getting 72:24
73:2 99:24
101:11 136:7
137:12 168:4
169:25
giggling 164:12

give 18:2 33:12
51:24 52:1
60:21 67:12
76:2 84:24
87:21 89:15
90:4 101:24
102:6 116:8,12
122:6 125:16
129:15 148:5
153:10 154:21
156:19 191:8
206:8 208:11
given 9:16 42:23
78:23,23 98:18
103:1 132:18
168:21 176:1
202:1
giving 61:13
63:21 83:25
115:12
Glenda@Dep...
210:23
go 7:19 9:21
15:2,7 17:15
25:25 46:20
48:22 50:5
54:17 58:6,11
58:17 59:6
60:22 67:10
69:7 76:19
81:13 84:9
85:5 90:17
99:23 105:18
106:3,9,16
114:11,13
121:23 125:8
125:22 130:10
131:7 134:18
136:12,24
139:16 140:10
140:18,21
141:9 161:20
161:22 162:5
170:7,9 171:21
173:17 176:11
177:18 178:14

178:15 179:5
179:12,19
180:22 186:10
186:15 188:16
188:16 189:3
189:12 191:3,7
191:8,16
194:12,25
195:1 205:24
206:23 207:8
goal 121:15
122:14
Goddamn
171:15
godmother 77:2
goes 14:7 81:2
118:20,24
172:9 178:10
207:22,23
going 8:20,21
9:15 13:3 14:7
14:8 18:8 26:4
28:9,10,10
39:13 40:16
43:19 48:25
49:19 50:3,14
51:8,15 54:10
54:16 60:20
79:24 81:24
82:2,9 88:7
89:10 99:11,23
101:3 108:11
121:2 122:9
123:10,21
133:22 135:13
135:14 140:13
154:14 157:17
159:15 161:21
163:24 167:4
168:25 172:19
173:5 174:2,3
174:18 175:8
175:11,13
177:18,18,19
177:22 178:6
178:20,23

179:15,20,23
190:1 196:8
198:22 200:24
204:5 206:4
**golf** 67:19,20,24
68:25 93:13,20
93:21 96:6
121:12,18,21
122:15
**good** 12:22 23:4
23:11 25:24
26:14 34:20,24
35:3,6,13,18
36:3,7 63:9
65:18 79:23
180:7 199:14
199:19
**goofing** 182:14
182:24
**Gotcha** 39:17
51:23 160:8
**gotten** 110:12
202:8
**governing** 17:22
50:9
**governmental**
144:8 146:19
**grabbed** 167:3
169:22
**grabs** 167:4
**grade** 59:16 78:1
85:14,15
118:12,13,22
119:2 186:19
186:20 195:22
**graduating**
159:11
**grandfather**
55:18 59:24
**grandparents**
56:3
**grandson** 13:2
38:21
**graphic** 143:14
**Gray** 4:12 8:5,5
180:17,19,21

180:24 181:4
**great** 150:16
204:13 208:20
**Greer** 4:8 8:14
8:14,17,17
68:11,12,14
145:21 148:1,2
161:21 162:2,4
162:7,12,13
169:9 175:23
202:8
**Griffin** 4:1 16:8
125:5,17,17,20
126:3 127:15
128:5 130:11
132:10 139:16
**ground** 167:5,7
**grounds** 202:25
**group** 185:7
**grown-ups**
205:1
**guardian** 172:9
172:18
**guess** 39:19 43:3
56:21,21 86:2
98:11 158:5
193:15
**gutless** 90:22
100:17
**guys** 7:18 26:2
140:3 192:21
208:20

---

**H**

**hair** 190:8
**half** 79:12
**halftime** 90:15
90:20
**halfway** 90:11
**hall** 188:21
201:18 203:9
**hallway** 73:23
74:13
**Hamilton** 3:24
5:7 6:1,3 73:9
73:11,22 74:12

76:22 77:7
105:17,23,24
106:1,3,7,14
106:16 108:11
109:19 113:25
124:15
**hand** 7:17 9:18
15:8 58:22
61:7 84:20
86:16 87:5
88:7 106:6
125:19 142:22
164:20,25
166:8,10 175:9
187:21,24
190:12 192:16
196:18,23
199:17
**handed** 16:17
**handle** 38:15
172:22
**handled** 173:25
**handling** 172:24
173:1,2,4
205:20
**hands** 20:21
**handwriting**
88:15
**handwritten** 5:5
5:6,7 19:21
**handy** 114:20
**hang** 103:14,15
103:15,15
170:6
**happen** 24:24
27:1 39:12,13
113:5,10 119:7
133:22 137:23
138:10,16
193:12 203:11
**happened** 14:8
20:13,15 22:3
22:16 24:11,25
25:14 26:7,21
56:20 60:23
66:22 67:13

73:14 87:22
88:2 98:2
108:18 109:3
115:14 137:23
147:21,21,22
163:25 166:16
167:21 193:21
198:19 201:2
201:25 204:8
**happening** 27:2
**happens** 119:7
150:2
**hard** 127:22
166:5
**Hardy** 2:10,11
2:11,11 3:5,7,9
3:13,14,17,18
3:21,22,25 4:2
4:7,10,13,21
4:24 7:5,5,8,24
9:21,23 10:22
10:24,25 11:5
11:8 14:3,4,23
14:25 15:14
16:13,16 18:7
18:13,23 19:1
19:19 20:2,5
23:21 26:7
28:8,16,17,18
37:20 40:16
43:7 45:19,24
47:13 49:19
50:3,19 51:5
54:10 55:6,9
56:8 57:22
58:4,9,14 59:7
59:8,10 60:22
60:23 64:14,17
66:13 76:8,14
76:24 79:2,5
80:16 81:9,14
81:17,24 82:2
82:9 83:14
84:3,7,11,15
84:18 85:5,6,8
87:24 88:1,5,7

89:2,7,14 90:5
90:6 91:1 92:1
92:17 102:2,15
102:17 103:21
104:4,11
105:13,17
106:10,11,13
108:8,11
109:13,18,19
110:2,5 111:1
111:3,13,16
112:4,8,9
113:22 115:7
117:8,23
124:12 125:4
125:12,14,23
125:25 128:1,4
132:7 134:18
139:13 140:16
140:23,25
143:19 154:6
160:11 161:14
165:15 168:16
169:8 173:19
174:2,18 175:7
175:20 177:21
178:8,14 179:8
180:9,10
183:25 185:11
188:3,23 189:2
190:18 193:10
194:8 195:2
197:6,19 198:6
198:7,10
200:16,16
204:12 208:8
208:23
**Hardy's** 43:11
200:2,15
**harm** 19:16
34:24
**harmful** 166:3
183:2
**Harris** 195:20
**hauling** 123:4,8
123:11

**head** 11:12,25
  16:11 25:5
  26:22 49:16,18
  71:3 80:11
  86:14 87:7
  91:4,15 93:24
  94:2,6 97:17
  106:18 117:6
  128:15 131:19
  136:1 150:3,6
  162:19,20
  164:5,6,16
  166:2,9,11,11
  169:21 170:7
  172:16 182:19
  190:11 198:12
  203:20
**headband** 25:4
  69:18,20,21
  71:1,5,8 79:6
  79:10 91:12,16
  164:5,6,7,8,10
  164:11,14
  165:20,22,23
  167:13,17
  169:9,14,16
  182:8,16 183:6
  183:17 187:9
  187:18 192:14
**headed** 14:19
**health** 131:12
**hear** 13:22 18:9
  46:7 59:3 62:9
  62:13 75:4
  92:2 107:19
  108:1 147:11
  170:1,5 171:12
  178:21 184:1
  197:13 200:17
  200:18 205:3
**heard** 14:16
  18:16 22:21
  51:16,20 62:5
  92:5 94:9
  98:20 107:24
  131:17 151:16

170:25 171:9
  171:13,14,15
  184:11 193:25
  201:6
**hearing** 1:3,9,17
  1:17 2:3 6:7
  7:2,13,25 8:4,8
  8:13,15,18,23
  9:1,10,14,20
  9:24 10:3,6,8,9
  10:13,19,23
  11:2 12:5,12
  14:7,23 15:1,6
  15:11 16:15
  17:4,7,12,15
  18:3,11,14,22
  19:9,18 20:4
  20:12 23:18
  26:6 28:12
  34:6 40:19,22
  40:25 41:4,13
  42:24 43:11
  45:10 49:21
  50:5,14 51:15
  51:19 52:19
  54:16 55:4,7
  58:1,7,12,16
  58:21,25 59:6
  60:20 64:12,13
  66:15 74:4
  80:15 81:11
  82:5,16 83:2
  83:16,21 84:2
  84:5,8,13,17
  84:19,23 85:1
  85:4 87:25
  88:3,6,23 89:4
  89:20 90:4,8
  90:17,24 91:24
  97:16 103:11
  103:14,17
  104:8,12,16,19
  104:22 105:2,6
  105:11,15,18
  105:21,25
  106:4,9 108:10

109:15 110:4
  111:15 112:6
  115:9 124:14
  124:19,22
  125:1,6,8,11
  125:15,18,22
  134:5 139:12
  139:15,19,25
  140:2,9,17,21
  141:2,6,9
  143:20,24
  144:5 146:21
  148:18,20,24
  149:25 153:2
  154:10,13,18
  155:11 156:13
  156:18 160:1
  161:18,22,25
  162:5 165:17
  172:17 174:5
  174:21 175:10
  175:22 176:3,6
  176:11,14,21
  176:23 177:23
  177:24 178:13
  178:15 179:4
  179:22 180:5,8
  180:12,16,19
  180:22 185:13
  185:20,23
  186:1,4,7,10
  188:5,11,15,18
  188:25 189:4,7
  189:11 190:20
  191:2,7,11,14
  194:11,18,21
  194:24 195:3,6
  195:9,13
  197:22 198:5,8
  199:2,5,9
  201:12 202:6
  203:2 204:10
  205:23 206:1
  206:16 208:6
  208:15,25
  209:3,9

**hearing's** 10:6
**hearsay** 16:23
  16:24 18:24
  80:14 91:23
  110:1 174:19
**heart** 204:7
**held** 15:21
  126:13
**helmet** 72:22
**help** 53:19
  162:25
**helped** 62:24
  123:6
**Henderson** 2:19
  210:22
**hereto** 1:24
**hero** 204:5
**Hess** 135:18,23
**high** 21:18 39:20
  75:25 118:14
  118:19 130:16
  130:18 146:9
  163:2
**hilarious** 14:15
**hired** 13:12
  14:13,14 15:24
  16:7 116:22,24
  126:18 132:19
  132:24 134:18
**hisself** 167:6
**historian** 160:12
**hit** 11:18 19:15
  61:8,9,14,24
  72:19 79:7,14
  79:25 80:8,10
  80:11,12,17
  82:20 83:6,7
  86:7,13,15
  87:3 91:15
  93:23 94:1
  107:18 164:25
  166:2,4 168:5
  169:25 171:22
  171:24 187:21
  190:12 193:2
  193:12 196:17

196:19
**hitting** 67:11
  136:13
**hold** 15:18 16:10
  17:5 126:11
  162:18
**holding** 9:22,25
**holiday** 10:17,19
**home** 69:2,3
  74:25 93:17
  95:11 121:20
  122:3
**Honor** 7:10
  10:11,21 12:9
  12:18 16:16
  18:7 28:6
  41:12 51:5
  52:7 54:10,25
  55:3 57:22
  58:10 81:24
  82:2,9 89:10
  102:14 103:9
  104:7 111:14
  112:5 139:11
  144:2 149:22
  153:1 154:6
  176:8 180:15
  180:18 185:24
**hope** 14:22
**hose** 123:2
**hour** 140:13,16
**hours** 99:19
  119:19 149:2
  158:24
**house** 24:16
  95:11,11,13
  120:22,24
  121:3,23
**housekeeping**
  180:14 208:9
**houses** 205:12
**huddle** 68:22
  107:15 170:18
**huge** 160:20
**Hughes** 133:8
**Huh** 102:9

**Huh-uh** 100:11
**humiliated**
198:19
**hurry** 192:21
**hurt** 61:16 86:19
182:21 198:19
203:17
**hydrated** 119:16
119:20,24

**I**

**idea** 64:1 101:6
150:23 174:24
**identified** 207:2
207:5
**identifiers**
207:17
**identify** 31:5
108:13 156:16
**identity** 165:5
207:11
**ignored** 201:24
**III** 2:4
**illegal** 81:16,20
81:23 82:8
**immaterial**
49:20 54:11
175:9
**immediately**
21:18 24:7
44:25 45:15
69:12 75:13
**immoral** 81:15
81:23 82:8
**impartial** 55:15
147:2,4,5
157:3,4 200:12
201:12
**importantly**
202:1
**improper** 49:10
**inadequate** 13:4
**inappropriate**
11:16 34:19
37:7,14 86:5
91:10 113:17

113:19 142:17
142:19 193:23
193:25 197:14
198:14,15,16
198:20 205:14
**inappropriately**
112:25
**incident** 22:2,9
39:4 44:2,5,24
47:23 50:10
52:15 65:13
66:17 67:4
71:17,23,25
72:1 73:11
74:9 75:13,19
76:18,21 79:6
79:10 81:3
91:16 94:15
107:21 110:19
119:4 121:5
129:2 138:5
163:4,9,11
169:10
**incidents** 49:17
**include** 179:23
202:7 207:14
**included** 142:7
179:25 198:15
200:22 202:1
210:7
**includes** 39:21
105:3 118:25
**Including**
134:24
**inclusive** 89:18
**incomplete**
202:10
**incorrect** 30:24
**Independence**
10:18
**Independent** 1:2
1:18 2:9 5:24
6:1,2 7:2,6,13
7:25 8:4,8,13
8:15,18 9:10
9:14,20,24

10:3,13,23
11:2,9 12:5,12
14:23 15:1,6
15:11 16:15
17:4,7,15
18:11,14,22
19:18 20:4
23:18 26:6
28:12 29:2
33:21 40:19,22
40:25 41:4,13
45:10 49:21
50:5,14 51:15
51:19 52:19
54:16 55:4,7
58:1,7,12,16
58:21,25 59:6
60:20 64:13
66:15 74:4
78:19 80:15
81:11 82:5,16
83:2,5,16 84:2
84:5,8,13,17
84:19,23 85:1
85:4 87:25
88:3,6,23 89:4
89:20 90:4,8
90:17,24 91:24
97:16 103:11
103:14,17
104:8,12,16,22
105:2,6,11,15
105:18,21,25
106:4,9,19
108:10 109:15
110:4 111:15
112:6 115:9
118:6 124:14
124:19 125:1,6
125:8,11,15,18
125:22 139:7
139:12,15,25
140:2,9,17,21
141:2,6,9
142:6,11
143:20,24

144:5,8 149:25
153:2 154:10
154:13,18
156:13,18
161:18,22,25
162:5 165:17
174:5,21
175:10,22
176:3,6,11,14
176:21,23
177:24 178:13
178:15 179:4
179:22 180:5,8
180:12,16,19
180:22 185:13
185:20,23
186:1,4,7,10
188:5,11,15,18
188:25 189:4,7
189:11 190:20
191:2,7,11,14
191:21 194:11
194:18,21,24
195:3,6,9,13
197:22 198:5,8
199:9 204:10
205:23 206:1
206:16 208:6
208:15,25
209:3,9
**independently**
136:18
**INDEX** 3:1,11
4:4 5:1
**indicated** 164:19
**indicates** 56:25
**indication** 50:16
**indications** 57:4
**individual**
101:21
**indulge** 176:9
**influence** 55:19
56:13,15 63:21
**influenced** 48:5
56:13
**information**

22:5,11 26:22
27:3 52:2
136:11 144:23
145:3 147:6,11
148:5 201:23
202:5,7
**initial** 57:16
127:6
**initially** 182:13
202:18
**initials** 207:2
**initiate** 54:21
73:15
**injury** 183:2
**inquiry** 163:5
**instance** 68:21
134:21 137:20
199:18
**instill** 78:7
**instruction**
51:12 199:5
**instructions**
51:24 168:22
**intend** 14:1
**intending** 28:7
**intent** 46:19
**intention** 46:5,7
**interaction**
166:24 190:6
192:7
**interactions**
196:11
**interest** 175:16
**interested** 23:7
131:11
**interfere** 55:10
**interjecting**
60:18
**interpret** 179:6
179:10
**interview** 46:6
48:9,13 49:1
52:23 53:7
57:17 136:24
145:21 146:1
146:14,14

156:3,5,7
163:17
**interviewed**
41:20,23,25
45:21,25 46:8
46:14,17,18,25
47:5,9,14,18
52:25 57:17
75:9 102:7
138:5,9 146:11
146:18 147:9
150:14 156:8
156:25 163:15
200:3
**interviewing**
49:24 157:6
**interviews** 53:9
200:5
**intimation** 98:6
**introduce**
177:22
**introduced**
138:24 146:20
**introduction**
17:9
**investig** 14:7
**investigate**
49:12
**investigating**
22:2
**investigation**
13:4 14:2 19:3
19:4 20:24
21:15 24:4,14
35:16,19 36:17
37:10,13,24
39:20 40:11
45:14 48:5
50:10,17,21
55:10,14 57:6
89:16 132:4
137:6,15,18
138:11 139:1,5
144:12,17
145:12 146:19
147:2,2,3,4,5

148:25 149:11
153:24 157:2
199:1,23,25
200:13 201:22
204:23
**investigator**
50:20,24
115:11 145:2
**invoked** 7:14
8:19
**involved** 13:1
44:24 56:1
89:16 129:1,1
**irrelevant** 49:20
54:11 175:8
**ISD** 5:8,10,12,15
5:16,18,19 7:8
15:20,23 16:10
17:25 22:16
27:16 29:18
31:17 33:18
35:11,25 36:15
37:8,18 59:14
60:3 64:8 81:1
82:20 85:12,18
106:20,25
110:13 112:1
112:19 119:9
126:7,17
131:20 132:5
141:19 173:16
174:12 177:22
178:10 189:19
198:13 199:8
205:22
**ISD's** 201:10
**isolated** 81:3
**ISPN** 6:7 209:7
**issue** 9:9 26:3
110:24 126:24
127:1 153:4
177:25 203:21
**issued** 47:22
**issues** 50:13
175:12 199:12
208:21

**it'd** 86:2 165:2
**it'll** 60:17 89:24
**item** 20:7 27:14
28:24 30:4,14
30:17 31:2,10
31:16,23 32:5
32:8 33:7
34:12 35:8
128:13
**items** 34:14,16
35:17

---
**J**
**Jacksonville**
116:20,21
117:1,3
**Jasper** 32:13
129:10
**Jennifer** 141:23
**jeopardy** 29:18
**Jim** 135:18
**jmh@hardyla...**
2:14
**job** 118:2,6
119:23 150:2
162:17 208:20
**Joey** 4:12 8:5
180:17,24
181:4,5 184:1
197:11
**John** 2:10,11 3:5
3:7,9,13,14,17
3:18,21,22,25
4:2,7,10,13,21
4:24 7:5,5,8,24
9:23 10:22,25
11:5,8 14:25
15:14 16:13,16
18:7,13 19:1
20:2,5 21:6
23:21 26:7
28:3,8,17,18
33:1 37:20
40:16 43:5,22
43:24 44:1,7
48:7 50:3 51:5

54:2,5,10 55:6
55:9,17 56:8
57:22 58:4,9
58:14 59:8,10
59:19,20 60:23
64:14,17 66:13
76:14 77:21
79:2,5 80:16
81:9,14,17
82:9 83:14
84:3,7,11,15
84:18 85:6,8
87:24 88:1,5,7
89:2,7,14 90:6
91:1 92:1,17
102:15,17
103:21 104:4
104:11 105:13
105:17 106:11
106:13 108:8
108:11 109:13
109:18,19
110:2,5 111:1
111:3,13,16
112:4,8,9
113:22 115:7
124:12 125:4
125:14,23,25
128:1,4 129:2
132:7 138:17
138:17 139:13
140:16,25
143:19 151:23
154:6 160:11
161:14 165:15
168:16 169:8
173:19 174:2
174:18 175:7
175:20 177:17
177:21 178:8
178:14 180:10
183:25 185:11
188:3,13,23
189:2 190:18
193:10 194:8
195:2 197:6,19

198:7,10
200:16,16,23
200:23 204:12
208:8,23
**john@hardyl...**
2:14
**Johnson** 156:21
156:21
**jokes** 71:11
**joking** 61:18
111:10 182:20
192:12
**Jr** 4:1 125:17,20
126:3
**judge** 11:6 58:5
58:14 60:12
79:3 90:6
102:15 109:13
111:2 175:8
188:20 198:11
**jump** 135:24
136:5 154:14
**Junior** 68:2
**jury** 89:21 90:2
133:25 204:13
**JV** 68:4

---
**K**
**keep** 39:18 40:3
40:7 52:4
83:20,20 92:6
106:2 206:21
**keeping** 39:19
41:7,8 147:14
**kept** 28:3 42:2,3
145:8
**kid** 164:11
172:20 173:6
173:13 204:3
**kids** 22:21 62:7
79:24 81:2
113:3,8 130:22
165:4 167:12
169:24 170:2,3
170:8 171:12
171:16,19

173:5 203:15
203:19 205:17
**kill** 172:21
**kind** 26:21 69:20
92:6 119:7
127:5 131:10
164:13 172:8
173:11 178:16
179:2 190:5
202:21,22
206:18
**kinds** 177:3,3
**Klan** 173:7
**knee** 61:11
107:14 166:20
166:21,23
167:4 169:22
**kneeled** 185:8
**kneeling** 111:8
121:11 185:8
**knew** 22:19 26:1
49:17 69:4
151:3
**knives** 135:6
136:8 204:1
**know** 7:15 19:19
22:6,10 24:19
24:25 25:6,14
25:23 26:13
27:9 33:3
37:25 38:6,6,8
39:3 42:17,18
46:4,4 48:3
56:23 57:13
63:24 75:7
77:16,17,18
78:21 80:6,10
80:25 82:19
83:4,8,10
86:11 88:1
94:19 97:23
103:10,19
114:22 119:8
119:12,15
121:12 122:1
122:18 127:10

127:11 130:20
131:6 133:9,18
133:19 134:1,6
134:8 135:18
138:1,4,19
140:4 150:15
157:11 159:21
159:25 160:4
160:13,15
165:8,9,10
166:3 167:17
167:25 168:11
168:23,25
169:2,14
170:24 174:20
177:25 178:2
201:10,22
203:15,15,23
203:23,25
204:1,7 205:5
208:9
**knowing** 134:9
159:25 179:20
**knowingly** 40:10
**knowledge**
27:10 47:18,19
53:16,18
147:10,12
**known** 14:14
63:4 133:2,14
133:14,17
147:8
**knows** 14:4,5
199:2
**Kyle** 8:6

## L

**l** 3:3
**labeled** 111:22
111:23
**lady** 77:7
**laid** 43:10
**Lakes** 2:12
**Lamotte** 120:12
**Lance** 95:3
**land** 93:10

**Lane** 95:2,4,5,5
95:18
**language** 11:19
14:9 37:14
53:21 54:5,19
62:1,2,20
113:1 142:16
142:19 143:6
160:18,19
170:21,23,24
171:1,5 172:8
193:23,25
197:14 198:15
201:5,5,21
205:2,4,7,10
205:14
**large** 117:22
**late** 152:23
**latitude** 60:21
**laugh** 70:24
**laughed** 14:13
164:13
**laughing** 70:22
71:15 79:13
91:9 108:6
134:12 164:4
164:15 165:4,6
166:1 167:2,10
167:11 192:12
201:3
**laundry** 206:19
**law** 2:18 40:7
145:11 179:17
199:2 202:11
202:11 206:9
207:15
**laws** 12:2
**Lawson** 68:10
156:12
**lawyer** 92:22
134:19 200:10
203:14
**lawyers** 200:14
**lay** 128:4
**Leach** 68:9
156:10

**lead** 35:16 36:17
37:13
**leadership**
112:23
**leading** 23:15
**leave** 27:4 44:19
46:20
**leaves** 18:23
45:14 202:20
**led** 37:7
**left** 7:8 45:3,4
46:22 69:10,11
117:2 180:3
**Legal** 28:25
**legendary** 159:2
**legs** 11:4
**length** 79:9
**Leonard** 4:15
8:7 185:24
186:3,11,15
**let's** 16:9 17:15
25:16 46:9
52:3 70:1
76:19 84:6,9
97:13 100:8
105:18 130:10
130:10 140:3
140:10,21
146:25 148:13
171:21 176:11
180:13 188:16
205:24
**letter** 5:13,22
18:3 28:19
30:19 33:18,20
33:25 34:4
45:24 110:25
130:2,5 155:22
155:23
**letterhead** 33:18
**level** 199:14
**liberties** 17:12
**licks** 78:23,23
**life** 130:20
**light** 67:10
208:20

**lightning** 110:20
110:20
**lily** 159:7
**line** 67:17,21,24
68:18 70:17
90:14 95:17
121:14,15
122:14 123:1
124:7 131:11
**lines** 91:2
**list** 16:17 20:6
34:12 36:2
160:24,25
206:19
**listed** 30:15
**listen** 8:23
183:18
**listened** 51:2
**listening** 17:8
204:9
**literal** 203:9
**literature**
160:18,18,24
205:7,9
**little** 16:9 25:19
60:21 69:2
86:20 102:20
102:21 117:1
135:5 146:10
162:23 168:2
171:18 190:3
208:1
**living** 205:11
**load** 123:6
**loaded** 120:22
123:4
**located** 1:19
**locker** 172:19,21
173:14
**long** 15:21 26:13
71:17 106:20
133:2 153:13
170:17
**longer** 170:16
**look** 13:16 19:21
20:6 27:14

28:24 30:4,17
31:2,23 32:21
33:7,17 45:11
51:4,20,21
90:11 97:13
98:25 154:3
155:19 165:2
179:19 183:11
208:13
looking 61:11
135:7 137:22
146:10 154:7
Lord's 62:6
lose 101:3
lot 40:1
loud 90:3
low 63:1
lunch 118:25
140:3,10,20
Lynn 1:20 210:3
210:19

**M**
M 2:11 4:1 7:8
125:17,20
126:3
ma'am 9:11
106:17 111:16
156:13
machine 1:22
mad 173:12
main 2:18 122:2
210:21
mains 119:6,22
181:19
maintain 36:2
40:3 145:11
157:2
majority 53:8
making 38:20
50:24
male 143:14
malicious 166:3
183:2
mandated
160:24

manner 61:19
111:10 113:20
March 210:17
mark 144:3
marked 88:8
108:12 208:11
209:5
marks 72:14
mask 173:7
material 149:3
Matt 4:17 8:11
8:11 189:6,6
189:10,13,17
189:17
matter 7:22 17:1
23:25 28:4
45:19 47:5
55:20 89:13,22
101:25 102:2
120:7 145:21
145:23 205:12
205:18 208:9
matters 136:19
177:19,20
180:14
McKay 126:5
McMullen 3:24
6:1 73:6,9
105:23 106:7
106:16
mean 22:8 40:17
41:18 57:13
82:6 89:12
99:21 112:11
119:20 120:19
135:18 136:21
136:24 148:13
159:2 165:1,14
166:4 167:9
168:15 171:3,7
171:9 172:4
177:25 183:10
183:11 189:1
192:21 193:12
200:19 201:6
202:16 203:19

203:25
means 8:20
57:16 123:3
198:14
medical 114:14
114:16
medicine 118:14
118:15
meet 11:20
35:23 128:14
meeting 5:12,15
5:16,18,19
30:5,8,14 31:6
31:20,24 32:6
44:16,19,23,25
45:7,12 67:5
70:17 71:7,10
71:18,23 75:20
75:23 93:9
101:19,20
107:13 121:6
123:22 124:9
127:17,19,19
128:11,18
129:9 132:14
132:15 167:19
190:4 200:2
meetings 17:25
29:25 30:2
127:7 128:6
131:7,7 133:21
148:23 192:20
member 13:3
27:9 38:18,21
39:7,23 44:23
45:1,13 49:9
50:8 51:25
64:7 140:5
156:12,15
202:17,20
203:10,11
204:2
members 12:23
32:22 43:17
64:4 80:25
memory 114:9

146:10 148:24
208:16
men 46:20
mentioned 71:20
71:21,25 72:1
72:7,8
message 202:21
met 19:13 35:25
44:15 76:8,14
116:6 123:17
133:20
methods 133:15
Mexico 135:24
middle 118:12
118:13 156:6
156:22 199:3
203:24
midfield 67:15
miles 100:25
mind 92:12
137:24 138:25
139:6 173:23
mine 97:18
mine's 154:22
Minnix 141:23
minute 8:20
41:21,22 46:10
47:16 48:16
90:5 130:10
149:19
minute-by-mi...
62:8
minutes 31:17
32:6,8,22
71:19 79:12
128:8 129:12
mischaracteri...
51:6 82:3,10
154:8
misconduct
27:19 30:20
missed 18:9
misspoke 106:23
mistaken 22:7
38:25 151:13
misunderstood

36:9
Mitch 8:10,10
191:6,21
193:11
Mitchell 4:20
191:9,17
model 130:21
131:25
moment 91:3
Monday 39:6
96:24 97:11,19
110:8,8,9
146:3 163:5,11
181:22 182:2
186:24 190:1
192:4 196:9
206:9
months 115:16
148:22 202:25
203:5
moral 161:3
morale 62:24,25
65:4,4,21,25
66:1,7 72:4
morning 11:8
14:16 21:17
41:18,19 84:10
97:2,3 110:8
116:6 120:7,7
152:21,23
153:17,23
189:8 190:21
191:12 194:13
195:10 197:23
198:11 200:15
202:13 206:6,9
mothers 142:1
motion 32:18,19
129:9,11
164:19
motivate 101:8
205:17,17
motivating
62:22 63:2
motivator 92:13
motives 137:7

mouths 62:4
move 178:17
  179:3
moved 32:13
**Moving** 97:16
  136:1 172:16
multiple 70:3
  122:20 193:6
multiyear 13:7

---

**N**

N 2:1
nail 201:21
name 7:4 8:16
  9:11 15:2,4,5
  15:15 21:5
  52:20 58:17
  59:11 62:6
  84:24 85:2,9
  105:22 106:15
  115:12,12
  125:16 126:1
  132:10 156:20
  162:11 181:3
  186:2,5 189:5
  191:4,8 195:7
  195:19 201:20
  203:17 207:5
  207:16
name's 64:21
  113:25 189:17
names 8:2 45:20
  48:8 206:14,25
  207:14,20
narrative 60:17
**Neanderthal**
  119:18
near 121:15,16
  165:10,10,14
nearest 67:24
nebulous 199:15
  199:16
necessarily
  77:25
necessary 28:22
  175:14

necessity 137:13
need 8:24 10:1
  10:15 11:3
  24:17 39:10
  60:16,22 90:10
  119:15,20
  139:3 140:10
  146:24 161:20
  177:14 179:25
  180:1
needed 23:2,12
  109:1 114:13
  114:16 158:20
  158:21 193:4
negative 100:13
neither 208:18
**Nelson** 9:13
nervous 102:20
never 22:22
  66:11 72:22
  83:7 109:12
  133:4 164:8
  171:13,14
  172:12,13
  183:16 184:11
  194:1,3 202:7
**New** 135:24
niggers 172:21
night 30:10
  74:20,21
**Ninth** 186:20
non 64:10
  142:10
nonresponsive
  26:5 41:3,3,12
  45:9 54:25
  83:1 142:10
  149:23 165:16
noon 119:10
normal 68:9
  170:14
normally 170:17
north 2:5 67:18
  121:12 122:1
  123:10
notes 39:22

48:11,12 53:10
  146:18
nothing's 199:20
notice 5:15,18
  5:21 12:10
  30:5 31:5,6,24
  32:3,15,16
  33:7,8,13 65:4
  110:25 129:15
  153:4,14 154:4
  155:7,11,13,17
  155:21 177:12
  177:14 179:14
  202:24 203:3,6
noticed 150:16
notification
  153:10
notified 43:18
notify 43:19
**November** 5:12
  5:15,17 30:5
  31:20 127:17
number 18:8
numbered 1:16
  210:8

---

**O**

**O'Brien** 6:6
  209:6
o'clock 31:8
  41:17
oath 38:2,7,9
  47:12 48:1
  64:25 72:10
  82:7 83:3
  92:25 102:18
  114:4 123:24
  133:25 134:5
  141:7 153:23
  189:8 191:15
  195:11
object 17:2 18:1
  18:3,6 23:15
  26:4 40:16
  41:2,5,11 45:9
  49:19 50:3

54:11,24 60:16
  66:13 80:14
  81:7 82:3,10
  83:1 89:11
  91:23 110:1,25
  115:7 142:10
  149:23 154:7
  165:15 168:16
  174:2,3,18
  175:8
objected 41:9
  51:6
objecting 178:1
objection 17:19
  17:21 18:16,17
  18:24 19:24
  45:8 60:18
  64:10 129:12
  143:19 175:11
  176:18 195:2
objections 16:21
  17:17 88:24
observe 91:9
  92:7 107:5,8
  108:6 112:23
  196:11
observed 91:3
  114:10,11
obtained 13:6
obviously 19:25
  23:7,9 102:11
  118:2 206:18
  207:18
occasion 11:19
  126:21
occasions 62:11
  102:4
occupy 150:5
occur 158:18,18
occurred 39:5
  65:14 67:2,5
  72:14 98:17
  121:10 158:19
  210:9
occurrence 62:8
  92:10

occurs 71:23
**October** 5:13
  24:1 29:14
  31:8 42:14,24
  60:9,13,24
  66:16 70:18
  74:21 85:24
  88:16 94:24
  98:16 103:1,3
  107:1 108:20
  155:3,4 156:1
  156:2 163:5
  181:15
offend 86:10
  177:21
offended 172:5
offensive 87:15
  92:15 193:1
  201:3
offensively
  162:25
offer 24:8 25:8
  42:7 88:22
  109:14 112:4
  115:18 143:17
  176:17 177:10
offered 17:1
  50:19 176:25
  177:2,4,16
offering 177:7
  178:1
office 7:9 20:14
  24:9,13 53:7
  96:18 116:7,9
  116:15 126:11
  151:7 163:18
  202:17
officer 19:9
  20:13,22 84:17
  84:19 126:9
  134:5 162:5
  172:17 177:23
  199:2 201:13
official 19:6
  31:16 32:3
  117:14 146:19

**oh** 95:5 108:18
  136:16 137:1
  154:12,17
  156:15 162:19
  194:4 203:19
  206:16 208:16
**okay** 7:13,18,25
  8:4,13,18,24
  9:6,10,14,17
  9:20 10:3,13
  12:5 16:1
  18:13,14,17
  30:17,18 31:4
  31:23 32:19,21
  39:7,16 46:9
  46:16,23 48:23
  52:17 55:7
  56:19 58:16
  59:4 65:8,21
  65:24 66:19
  67:8,23 68:4
  69:4,14,24
  70:4,9,13
  71:23 72:6,10
  72:20 74:7,14
  77:11 79:9
  83:16,25 84:19
  84:23 88:6
  90:24 91:9
  92:7 93:19,22
  94:9,12,16,22
  95:8 96:12,15
  97:7,13,13,20
  99:1 100:20
  102:6,11
  103:19,24
  104:2,4,8,16
  105:2,4,9
  106:5 109:10
  115:3,18 116:1
  116:8 117:4
  118:18,22
  119:4 120:1
  121:18,22
  124:5,8,14,24
  124:25 125:6

127:21 131:16
133:17 134:10
136:16 137:10
138:14,23
139:4,12,15
140:2 141:2,9
142:15 147:19
148:21 149:24
151:18,22,23
152:7,20
154:10 155:16
155:23 157:15
157:25 158:22
159:14 160:5,8
161:14,18
162:5 165:3,11
165:18 167:8
168:18 171:16
171:22,22,24
173:19 175:22
176:6,22 179:5
180:5,9,12,16
180:22 181:9
182:1 183:1
185:23 187:20
188:5,11 190:4
190:17,20
191:2,11
194:24 195:3
196:15 197:21
198:2,5,8
204:10 205:23
206:1 208:4,15
208:17 209:8
**old** 99:12,23
  136:8 157:18
  159:15
**once** 19:25 72:13
  83:21,21 95:11
  102:5 104:18
  133:12
**one-on-one**
  116:14
**ones** 17:16
  154:19,19
  205:6 208:12

208:13
**open** 10:7,9
  210:9
**opened** 81:12
**opening** 3:5,6
  11:7 12:8,17
  122:5
**operating** 20:22
**opinion** 26:18
  38:3 63:21
  64:7 65:3 86:5
  87:13 88:15
  92:12,13
**opinions** 137:13
**opportunity**
  12:25 22:25
  25:8 26:19,20
  42:23 87:21
  161:4 199:4
**opposed** 93:13
  164:22 178:23
**opposite** 122:14
**opt** 161:1
**option** 13:14
**optional** 17:23
**oral** 153:11
  203:5
**orally** 202:23
**orders** 105:8
**ordinary** 170:22
**oriented** 13:5
  147:3 201:13
  201:14
**original** 208:10
**originally**
  208:10
**ought** 51:9
  131:18
**outlets** 122:22
**outrageous**
  201:11
**outright** 201:25
**outside** 48:4
  64:11 73:23
  95:10,17
  107:15

**overhear** 169:24
**overnight** 39:11
**overrule** 51:16
**overruled** 18:17
  18:18 23:18
  110:4 174:21
**overseeing**
  123:18 141:17
**overstepped**
  205:19

---

**P**

**P** 2:1,1
**P.C** 2:4,11
**pads** 69:15
**page** 3:2,12 5:3
  6:5 34:9
**pages** 177:7
  178:11 179:23
**paid** 29:14
  148:19 210:16
**paid/will** 210:16
**paint** 25:23
**paper** 89:19
**paragraph**
  51:22
**parent** 39:8,23
**parent's** 21:5
**parents** 21:4
  56:3 105:4
**Parkway** 2:12
**part** 19:6 24:14
  29:8 30:10,14
  32:3 41:11
  47:3 53:24
  54:12 112:13
  124:3 141:16
  144:15 164:7
  167:13 180:3
  204:21 208:21
**participate** 92:1
  127:7 129:4
**participated**
  33:4
**participating**
  50:10

**particular** 70:18
  91:21 149:10
  185:1,4
**particularly**
  51:21 150:24
  158:12
**parties** 7:3 10:18
  12:14
**partly** 54:5
**parts** 17:22
**pass** 37:20 64:17
  81:17 113:22
  124:11 132:7
  160:9 169:6
  175:19 183:22
  185:11 193:8
**passed** 208:9
**pathetic** 90:22
  100:17
**Patrick** 8:12
**pay** 29:12,13
  148:17
**paying** 23:10
  178:12 187:13
**PE** 118:12
**penal** 145:15,18
  146:17,25
  202:5,11
**pendency** 45:19
**pending** 151:14
  151:23,25
  152:8
**people** 10:6
  20:21 22:13
  23:8,8 47:17
  48:22 49:1
  78:22 82:22
  129:1 138:9,12
  146:11 147:8,9
  149:18 156:6
  156:24 200:22
  203:25
**people's** 40:2
**perfect** 12:25
  106:5 208:16
**perfectly** 145:20

**perform** 55:14
**performance**
  49:3 70:19
  203:16
**performing** 35:9
**period** 74:16
  118:25 123:18
  126:13 158:13
**permitted** 8:22
  124:16 139:22
**person** 14:18
  20:22 21:1
  23:3 38:17
  45:14,25 46:18
  46:24 47:4,9
  47:13,22,22
  71:20,24 72:3
  72:7 95:18
  96:7 135:11,12
  144:22 145:1
  145:11 147:23
  150:2 157:23
  159:23 172:2
**personal** 133:19
**personality**
  133:18
**personally** 52:22
  92:2,5 112:21
  120:10 128:25
  133:19 134:9
**personnel**
  177:19,19
**persons** 34:5
  45:21 48:8
  146:18
**petitioner** 2:9
  3:11 5:2 57:23
  58:3 89:6
  109:17 141:1
**Petitioner's** 3:5
  3:7,9 11:7
  18:15,15,20
  88:8 108:12
  157:8 198:9
  204:11
**phone** 75:4

172:24
**photograph**
  114:18
**photographs**
  114:21
**physical** 34:24
  131:9 183:19
**physically**
  204:25
**pick** 178:7
**picked** 201:23
**picture** 25:24
**piece** 69:14
  89:18
**Pink** 8:8
**place** 17:24
  22:23 24:1
  27:11,21 31:7
  45:5 47:23
  53:7 56:17,22
  62:20 73:22
  86:4 88:14
  95:9 121:2
  137:11 163:17
  205:21
**plain** 185:10
  204:5
**plaintiff's**
  142:22 143:21
  143:22 144:4
**planning** 19:17
**play** 60:3 64:8
  78:3 85:18,20
  85:22 95:16
  96:1,4 135:25
  136:6 172:19
  173:5,14 174:7
  181:9 204:19
**played** 70:5,6,6
  70:7,7 78:5,10
  78:14 95:17
  96:3,6 119:18
  133:9,12
  189:21 196:2
**player** 65:22
  92:6 95:24

110:11 127:4
  136:13 149:14
  163:20 164:9
  164:18 165:20
  169:17,19
  174:25 183:10
  183:15,16
  187:23 191:24
  192:21 194:1,3
  201:21
**player's** 142:1
**players** 70:19
  101:21 107:16
  131:12 137:20
  152:21 164:3
  165:5 166:20
  166:23 167:2
  184:2 187:3
  190:15 196:12
**playful** 111:9
**playing** 101:10
  150:10 190:9
  194:6
**playoff** 110:22
**playoffs** 133:12
**plays** 172:10
**please** 7:3,17
  15:16 27:15
  31:2 32:12
  33:17 59:3,12
  84:20 85:10
  88:19 89:8
  105:22 126:2
  156:14 157:12
  162:11
**plenty** 120:16
**pocket** 71:6
**point** 16:18 17:6
  17:13 39:18
  51:16 53:12
  70:5,5 83:22
  83:23 88:22
  96:12 104:20
  105:3 112:13
  148:22 149:10
  150:24 153:3

158:15,17
  168:12 175:7
  177:10 178:22
  178:25 180:1
  181:12 186:21
  187:2 196:4
  198:23 201:3
  202:23
**pointing** 101:20
  178:4
**points** 13:21
**policies** 83:5
  131:14 177:1,3
  178:5,24
  179:13,14
**policy** 11:23
  27:16,21,23,25
  28:2,3,25 29:2
  29:6,8 53:24
  54:13 78:20
  81:23 82:3,13
  176:18,19,20
  177:2,5,5,6,11
  177:15 179:7,9
  179:12
**pop** 71:3 107:24
  190:11
**popped** 164:15
  182:19,23
**popping** 183:17
**pops** 164:5
**portions** 176:17
  177:15 210:6
**position** 11:25
  15:18,21 16:10
  16:10 36:15
  70:1 95:16
  111:8 112:18
  116:21,23
  126:6,13 150:6
  162:22 170:2
**positions** 70:4
  70:14
**positive** 126:16
  138:12,15
**possible** 31:11

32:17
**Possibly** 76:15
**potential** 156:3
**power** 170:10
**practicalities**
  147:1
**practice** 20:18
  22:3 24:19
  61:4,5,13
  66:17,18,19
  71:24 85:24
  86:4 94:25
  95:12,14 96:24
  99:18 108:25
  109:9,10 110:8
  110:9 115:22
  120:1,11 121:2
  123:19 151:9
  151:13,14,18
  170:10,12
  171:8 181:18
  186:24 190:1,2
  190:6 192:4
  193:17 196:8
  204:3
**practiced** 181:19
**practicing**
  120:24
**Pre-AP** 93:2
  141:20 142:12
  160:22 205:5
**precedent** 179:5
**predicate** 19:13
**prefer** 10:25
**preliminary**
  10:4
**premises** 27:5
**preparation**
  210:15
**prepare** 33:25
  130:1
**prepared** 88:11
  111:21
**prepractice**
  107:13 121:6
  123:22

prerogative 204:17
presence 35:9 48:4 76:23
present 32:22 33:1 45:14 52:25 53:6,8 75:22 96:19 126:17 127:18 182:1 202:6
presenting 202:10
presents 34:23
president 13:11 13:12 14:10 16:6 33:12 43:19 126:12 129:25 204:1
press 93:16,17
presume 19:22
pretty 23:4 48:14 63:1,9 170:17
prevent 60:17
previous 101:22
previously 16:18 49:6 57:3 72:4 114:25 116:16 141:12 150:5 162:8 180:25 186:8,12 189:14 191:18 195:16 204:20
pride 101:10,11
Primarily 28:1
principal 21:19 48:17,19,21,25 53:4 63:18,18 75:25 116:22 146:9 156:22 158:6 163:2,16 167:16 178:23
prior 16:5 66:17 67:5 107:17 123:19 148:23 157:25 174:9

174:11,12,12 174:15,16 186:25
privacy 175:12
privilege 28:7
pro 93:13
probably 19:14 39:9 41:17 78:7 93:3,13 94:25 95:10,10 95:20 96:9,11 102:12 107:22 118:25 120:3 139:20 152:23 168:1 170:18
problem 50:12 172:7,12,13 173:25 180:7
problems 65:4,5 172:15
Procedure 1:23
proceed 15:12 20:3 195:14 202:3
proceeding 54:21
proceedings 1:25 3:4 7:1 209:11 210:7,9 210:12
process 123:18 161:7 172:24 172:25
produced 138:24
profanity 35:8 54:9 62:3 134:13
professional 35:24,25 148:15
program 174:23 175:6,15,16,17
prompt 18:3
proof 199:13
proposal 128:14

130:7 177:9
propose 32:14 129:10,17 130:3
proposed 5:21 11:10 32:16 33:8,13 34:1 34:10 127:13 127:14 179:16 206:8 207:14
protected 134:22,23
protecting 135:3 207:12
protection 207:6
provide 32:15 37:6 46:1 206:11 207:6 207:24
provided 32:16 47:13 67:4 207:9
provision 134:24 179:17 179:19
provisions 1:23 178:5 203:4
proximity 21:19 23:6 48:18
psychology 100:6
public 35:10 205:19
pull 179:19 207:17
pulled 208:13
pulling 173:3,4
punishment 78:20 81:22 82:1,4,12 131:14 198:22
purchasing 179:24
purposes 106:1 177:13
pursuant 1:22

push 87:10 111:5,6 167:6 190:13,15
pushing 25:3
put 9:22,25 20:20 27:1 39:23 52:3 53:12 63:2 71:6 72:22 111:16 133:16 201:15 203:15 203:19
putting 145:2

## Q

Qualification 81:8
quarterback 70:6,16
quarterbacks 170:4
question 20:14 22:19 39:16 40:17 41:1 50:4 51:8,17 53:11 57:9 82:10,11,14,17 82:18 83:9 90:10 98:10,24 102:12 111:2 122:4 136:16 138:10 139:4 144:25 146:13 152:7 154:8 160:20 162:17 165:16 174:3,3 178:8 188:21
questioned 163:6 167:15
questions 9:4,16 12:11,15 13:17 13:18 19:24 24:19 51:13 79:3 90:9 104:17 124:20 139:20 175:20

175:25 185:17 188:2,8 190:23 194:14,16 197:7,25 198:1
quick 209:4
quickly 24:4
quiet 193:4 201:4
quite 146:11
quote 157:17

## R

R 2:1
racial 14:15 99:7 99:22 157:10 157:16 159:11 159:16 160:1 201:11,20
racially 159:23
raise 7:17 9:18 15:8 58:21 84:20 106:5 125:18
rank 168:17
rapport 36:3,7
reach 203:21
reaches 164:4
read 19:20 32:12 40:1 50:25 57:24 88:18,25 89:3,8,22,23 90:2,3,5,9,18 90:18 93:5 103:21 131:22 131:23 132:2 137:8 138:13 138:20 142:12 143:4 160:22 177:13 202:4 205:5
reading 89:11 89:18 90:19 136:15 138:22 142:5 148:18 148:20
reads 207:25

ready 20:3 84:3
140:18 149:3
real 199:12
209:4
realize 149:5
really 14:8 19:14
22:22 23:11
25:25 39:3
94:11 114:15
114:20 136:12
149:20 165:8
184:5 185:6
201:6 204:19
reason 13:7 17:2
34:25 46:21
60:10 81:5
107:3 112:17
135:7 149:17
175:5 185:1,4
200:9 205:18
reasonably
110:13
reasons 130:7
202:24
reassigned 13:14
134:25
rebut 26:19
rebuttal 3:9
204:11,14
recall 16:6 55:3
60:9,12 68:8
68:16 70:20
93:4 109:7
110:19 127:15
127:19 128:16
132:14,18
133:24 134:11
138:22 141:4
141:25 148:2
163:1 181:15
181:18 190:2
192:1,4,7
receive 38:24
received 12:10
38:25 153:14
receiver 70:6

receivers 162:25
reception 14:12
132:18 134:10
recess 84:12
105:20 125:10
140:20 161:24
176:13 205:25
recognize 27:16
38:5 88:9
111:18 142:23
recommendati...
12:3 34:9
130:3 149:7
178:4 206:12
207:10,21,23
207:25
recommendati...
208:2
recommended
161:9
recommending
130:7
reconciliation
45:7
reconvene
176:12
record 1:8,24
10:5,15 12:13
12:21 15:16
19:13,14 20:12
40:7,13,14,15
57:25 59:12
65:17 66:5
84:9,14 85:10
88:18 89:8
98:21 105:19
105:22 106:14
125:9,12 126:1
127:16 135:5
135:15 136:7
140:19,22
145:10 147:6
147:10 161:23
162:1 176:12
176:15 177:13
179:23 188:16

188:16,17,19
199:18 202:5,9
204:8,18,19
205:24 206:2
207:20 209:1,2
209:4,4,10
210:8,11,15
recorded 144:23
recordkeeping
144:17
records 19:7
31:17 40:4
42:9 111:25
144:19,24
145:3,7,11
Recross-Exam...
3:15,19 56:10
81:18
recusal 50:11
recused 129:2
red 72:15,18
redacted 206:15
207:7,21
redacts 206:25
Redirect 3:14,18
3:22 4:10 55:8
79:4 102:16
173:21
reference 22:9
22:20 99:23
207:19,20
references 207:1
207:1
referencing
13:24 28:15
referring 155:1
reflect 12:13
32:9 34:4
reflects 210:12
refresh 138:21
148:24 208:16
refutes 200:7
regarding 11:10
19:4 20:24
27:18 28:20
30:20,21 31:20

32:9 33:5,25
55:11,19
153:19
regards 81:25
136:12 144:11
144:16 156:3
187:3
Registration
210:21
regular 113:1,5
113:10
regularly 119:8
reinforcement
100:14
relates 60:13
relation 67:14
68:14
relationship
36:3 49:11
63:9,10 112:10
112:11,12
126:6 133:20
relationships
63:5
relative 23:1
47:20
relay 167:16,18
168:7
relayed 167:17
167:19 168:20
168:20
released 188:22
189:3
relevant 9:9
34:17 50:12
110:24
reliable 36:23
religious 161:3
rely 28:10,10
130:25
remain 37:8
remainder
100:16
remaining 13:8
remains 29:21
remediable 12:2

remember 39:3
45:5 48:10,13
48:15 52:2
53:2 69:13,23
71:12 72:12
76:10,12,17,17
96:25 101:23
103:7 107:3
134:16 145:22
146:11,15
149:19 150:20
153:8,16
156:10 165:5,9
181:17,21,22
184:8 185:14
186:8 188:6
190:4,21
191:12 194:12
195:10 197:23
200:14 202:13
REMEMBER...
1:15
remind 141:7
removal 79:10
remove 71:1
91:12 164:10
187:17
removed 112:18
removing 91:16
reoffer 57:24
repeated 159:19
rephrase 52:13
82:17 91:25
168:18
reply 163:22
report 21:22
38:17 39:15
41:15 44:8,12
49:17 109:22
109:24 110:5
114:23 115:1
115:11
reported 1:21
14:21 16:20
20:15 21:1,14
21:16,17 24:7

110:7 119:5
147:15 172:22
210:10
**reporter** 15:3
58:18 73:8
85:2 106:15
206:4,10,14
208:11 209:8
210:4
**reporter's** 1:8
3:10 59:2
210:8,11,15
**reporting** 27:18
**reports** 5:8
17:20 24:15
**represent** 7:11
64:21,23 92:22
114:2 132:11
132:12
**reputation** 134:2
134:6,12
201:17 203:8
**request** 24:8
127:11
**requested** 10:9
161:5
**requests** 10:7
**required** 11:23
93:4 117:14
142:5 143:3
**requirements**
27:18
**requires** 142:12
**reservation**
12:10 13:16,20
**reserve** 12:8
**reserved** 26:15
**reserving** 12:15
13:18
**reside** 126:4
**resign** 13:6
**resolution** 202:3
**resolve** 26:3
**respond** 50:6
**Respondent**
2:16 4:4 6:4

143:23 144:1
**Respondent's**
3:6,8 12:17
143:18,25
199:11
**response** 18:25
19:1 24:22
98:9 194:15
198:1
**responsibilities**
141:17
**responsibility**
119:14 130:21
144:16 145:10
**responsive** 41:5
**responsiveness**
60:18
**rest** 167:11
198:4
**rests** 141:1
**result** 13:5,5
139:5 147:3
201:13,14
**Retained** 6:7
**retired** 130:12
**return** 10:17
27:5 104:9
**reveal** 200:13
**review** 49:4
178:6 179:18
**reviewed** 131:24
**reviewing**
131:17 149:2
**rigged** 14:2
**right** 7:7,12 9:18
10:23 14:11
15:8,19 17:4
17:11 38:16
42:2,5 46:11
47:3 48:23
58:22 63:11
65:9 66:5 67:3
67:14,24 68:1
68:17 69:9,10
69:12 70:17
73:21 76:2

78:6 79:17
84:20 85:4
88:4,20 89:9
90:19 96:22
97:21 98:13
99:15,25
100:25 104:3
104:10 106:5
114:10 117:22
119:3 125:19
127:25 128:10
128:10 133:2
133:13 135:9
135:13,16,25
137:4,8,22
140:17,23
148:23 152:11
152:15,25
153:13 155:10
155:22 156:9
157:14 159:3
161:1 164:1,2
164:4 165:18
166:10,10,17
166:22 169:12
170:23 171:4
178:13 179:21
183:22 185:10
185:13,25
186:8 189:11
195:6,9 196:23
197:1 200:25
203:21 204:18
208:18
**rises** 199:13
**risk** 27:2
**rivalry** 100:22
101:14
**Robbie** 32:17
**role** 130:21
131:24 144:16
**roll** 118:3
**Ron** 2:17 7:10
16:19 64:21
92:21 113:25
132:10 147:16

ron@adkisonl...
2:20
**room** 7:15,20
9:1,22 10:1,2,6
22:12 46:20,21
46:22,25 53:13
53:14,16,17
58:6 63:17
132:21 172:21
173:10 205:2
**rooms** 205:11
**Ross** 52:18,21,23
53:1 68:10
147:25 148:4
150:21,22
**Ross's** 150:19
**rough** 206:5
**roughly** 124:10
**Rule** 7:14 8:20
**Rules** 1:23
**ruling** 176:24
**run** 27:1 135:24
136:3,5
**running** 170:4
175:15
**runs** 26:14

---
**S**

S 2:1
S-t-u-a-r-t 15:5
**safeties** 162:25
**safety** 29:17
**salary** 14:20
**Sam** 3:24 5:7,24
6:1,3 22:17,23
48:22,23 49:1
49:6 73:6,9,10
76:22 77:7
106:3,4,16
**Sam's** 49:3
**sampling** 23:5
23:12
**sat** 24:18 201:1
204:16
**satisfied** 168:13
**save** 14:18

202:14
**saw** 14:21 22:21
22:25 52:12
72:23 80:21
91:3 93:22
107:11 108:1,4
109:12 111:6,9
137:25 138:22
147:14,20
151:3 164:11
166:2 168:6,10
182:6 183:16
200:22 205:4
**saying** 24:20
43:7 81:22
90:2 136:6
137:23 152:12
171:4 204:2
205:8
**says** 32:13 45:25
90:14 91:5
99:11,23 148:5
157:16 179:20
179:20 200:10
200:19,23
203:10
**scenario** 163:24
**schedule** 10:12
**scheduled**
158:16,17,19
**school** 1:2,18 2:9
5:24 6:1,2 7:6
11:9 12:23
13:2,11,12
14:5,11,18
16:18 19:7
21:7,18 29:3
33:21 38:18,21
39:7,20,23
40:7 43:8,13
43:16 44:23,25
45:13 48:11
49:6 51:25
56:4 59:22
60:1 61:2 62:3
65:6,7,11

75:25 78:19
79:24 81:22
82:13 83:5
96:1 106:19
118:7,12,13,14
118:19 126:8,9
126:17,20
130:16,18
131:14 139:7
142:6,11 144:8
146:9 147:15
156:6,22 163:2
170:11,12,15
172:10 173:7
174:9 179:6,9
181:5 186:15
191:22 195:21
198:24 199:2
202:2,14 204:1
204:2
**school's** 134:18
200:14
**schools** 15:20
40:2 116:17
141:15
**scope** 64:11
**score** 90:22
100:19
**screaming** 167:9
**scrimmage** 65:8
**season** 171:18
174:25 181:10
196:2
**seasons** 111:20
**seated** 7:22
**second** 17:5 26:8
34:9 44:14
47:3 51:22
52:8 64:18
65:6 101:24
105:19 115:2
153:1 161:23
179:11 203:24
**secondary**
162:24
**seconded** 32:18

129:11
**seconds** 184:18
184:22
**section** 77:9
145:17 147:1
**sections** 146:17
**see** 7:20,20 20:7
22:23,23 23:10
30:6 47:20
53:19 70:1
76:19 79:18
80:16 86:23
87:10 90:13
91:12 100:8
111:4 112:18
114:13 120:10
134:18 137:6
138:17 146:24
147:11 148:9
149:14,18
155:20 163:25
164:10 165:24
166:24 167:20
167:22 168:5
169:18 173:6
178:21 180:13
182:4,15 183:1
183:14,19
184:14 187:2
187:17,20,23
190:10,12,15
193:11 194:7
196:16 199:23
200:24
**seeing** 52:14
133:24 163:19
192:25
**seek** 66:24
115:18
**seen** 23:9 78:22
83:7 131:18
132:3 138:4,15
163:23 167:23
199:17,22
200:1
**seized** 12:24

**select** 48:22,22
**selected** 48:21
176:17 177:15
**selective** 17:21
**self-esteem**
101:14
**semicircle** 68:23
68:24 93:11
**send** 202:22
**senior** 181:8
**sense** 101:13
**sensitive** 135:2
172:1
**sent** 18:4 45:24
151:14,18
**sentence** 90:12
90:18
**separate** 22:12
53:13 154:16
**serious** 28:4
109:20,22
**Seriously** 140:12
**serve** 21:7 59:22
60:1 126:8,9
128:24 155:7
**served** 11:11
**serves** 20:9
**serving** 12:14
**session** 30:11,12
66:19 120:11
128:8
**set** 88:14 123:1
123:23,25
124:1,6 130:5
130:22 167:6
178:18 201:19
203:22
**setting** 81:16
123:11 130:2
**settings** 142:20
**seven** 100:25
117:6
**seventh** 118:13
**Shakespeare**
205:10
**Shane** 32:13

66:2 72:2,6
129:9
**share** 36:25
**shared** 16:19
22:11 33:15
**she'd** 74:8
**shedding** 208:20
**sheet** 206:20,25
207:7,18
**shirt** 8:9
**shocked** 181:18
**Shoes** 69:16
**shop** 93:13
**short** 125:7
**shorten** 52:8
176:9
**shorter** 53:25
**Shorthand**
210:3
**shortly** 120:4
**shorts** 69:16
**shoulder** 69:15
**shoulders** 91:7
167:3 169:22
**shove** 190:12,15
192:18 193:1
**shoved** 110:10
**show** 11:18,25
13:3 14:1,9
17:1 18:2
45:23 97:15
108:12 114:18
128:9 129:12
154:3 157:12
196:8 198:12
**shown** 174:19
**shows** 31:7
32:22,25 97:18
127:18 128:19
**shut** 170:11
175:11
**sic** 66:16 147:1
**side** 25:9 47:8
68:18 69:6
72:18,19 122:3
122:11 123:10

140:7,14
172:16,16
**sideline** 135:23
**sidewalk** 205:2
**sight** 185:10
**sign** 22:14
**signal** 202:22
**signature** 129:20
**signed** 33:20
111:24
**simple** 11:13
83:9 122:4
205:18
**simply** 148:6
203:22
**single** 23:3 99:21
185:6 203:12
**singled** 185:1,4
**sir** 10:11 15:16
16:8 20:8,25
21:13 24:3,6
25:6,10 27:8
27:12,15,20,24
28:17,21,23
29:1,10,22
30:1,3,7,9,16
30:22 31:1,3,9
31:13,15,19
32:4,7,11,13
32:24 33:2,6
33:10,14,16,18
33:19 34:3,7
34:11,13,15,18
34:22 35:1,4,7
35:12,20 36:1
36:6,16,19,24
37:2,12,16,25
40:5 42:20,22
43:1 44:13
47:2 48:2,6
49:8,15,25
50:22 51:2,23
52:24 53:5
55:12,16,24
56:5 57:4,11
59:5,15,21,23

59:25 60:2,4,6
60:8,11 61:3
61:11,15,17,20
61:22,25 62:5
62:8,10,12,15
62:17,21,23
63:6,8,12,15
63:23 64:1,3,6
64:16,18,24
65:2,10,12,15
65:23 66:4,8
66:10,12,18,20
66:23 67:1,7
67:25 68:5,7
68:13,20 69:17
69:19 70:10,12
70:23,25 71:2
71:4,6,9,16
72:5,15,18,22
73:1,4,12,17
73:20 74:10,24
75:6,8,11,15
76:1,4,6,17,25
77:6,19,23
78:9,18,24
79:15,17,19
80:1,5,7,9,18
80:20,22,24
81:3,15 82:22
83:7,11 84:1
84:18 85:13,17
85:19,21,23
86:1,3,6,9,12
86:18,22,25
87:9,11,14,16
87:19,23 88:10
88:13,17 91:6
91:8,11,14,17
91:19 92:5,9
92:11,14 93:3
93:6,18,25
94:5,8,14,18
94:21 95:7,15
95:23,25 96:14
96:21 97:1,6
97:10,22 98:14

98:23 99:9,20
100:4,7,15,24
101:1,5,7,9,12
101:15,17
102:1,3,8,10
102:19,24
103:4,6,16
104:15,21
105:1,5,10
106:11 107:4,7
107:10,20,25
108:2,5,7,14
108:18,21,23
109:6,12,21,24
110:14,16,18
110:21 111:11
111:19 112:3
112:21 113:4,6
113:9,11,14,16
113:18,21
114:3,6,9,19
114:24 115:15
115:17,20,23
115:25 116:18
117:10,12,21
117:24 118:1,5
118:8,17
119:17,21,25
120:6,9 121:1
121:4,7,17
122:8,13,16,23
123:1,6,13,20
123:23 124:4
124:10,18
129:21 130:17
132:17 134:14
134:20,22
135:17,20,22
137:16,19
138:7,12
139:24 141:8
141:18,21
142:7,18,21
143:2,5 144:14
144:18 145:16
145:19 147:23

149:1,8,12
150:15,18,20
152:14 153:7
153:21,25
155:13,18,24
157:13 158:2
158:14 159:9
159:13 160:25
161:4,6 162:11
164:18 165:21
166:12,14,21
169:11,13,15
171:24 175:2
175:18 176:2,5
180:11,21
181:6,11,14,21
182:3,6,9,11
182:17 183:4,8
183:13,16,21
184:15,23,25
185:3,19,22
186:3,9,16,18
186:23 187:1,4
187:8,10,13,16
187:19,22,25
188:10 189:10
189:18,20,22
189:25 190:14
190:16 191:1
191:13,23,25
192:6,9,17,19
192:23 193:5
193:22 194:17
194:20 195:12
196:1,3,6,10
197:10,12
198:3 208:5
**sit** 8:22 22:1
25:21 139:17
185:25
**site** 110:22
**sitting** 7:7,12,15
93:19 196:23
202:17
**situation** 11:15
12:2 20:24

23:6 24:9
46:19 47:19,20
50:7 63:14
79:21 82:8,23
91:18,20 109:3
109:20 110:7
110:21 161:5
173:2,8 199:6
202:19 205:20
**situations**
112:16 130:24
**six** 65:14 128:21
**sixth** 106:22
118:12 119:2
**slap** 24:21,22
25:1,5,13 81:6
82:12 87:8
91:15 94:4,7
94:10 107:19
130:19 164:1,9
168:5 183:14
183:16 196:18
**slapped** 20:17
21:20 22:8
107:18 110:10
114:15
**slapping** 81:2
127:3
**slept** 39:10
**slow** 134:4
**slur** 14:15
157:16 160:1
201:11,20
**slurs** 157:10
**Smith** 1:20 22:1
53:3,6,8 63:19
75:24 76:23
95:2,3,4,5,5,18
96:17 103:25
163:16 210:3
210:19
**Smith's** 96:18
163:18
**snatched** 164:14
**softball** 110:21
**sole** 50:20,23

**solicit** 49:10
**Solutions** 210:20
**solve** 50:12
**somebody** 94:10
96:16 99:10
146:5 149:6
167:4 172:5,7
193:12
**son** 13:2 77:22
78:4
**soon** 24:6,7
32:17 44:16
102:6 202:20
**sophomore**
59:18 195:23
**sorry** 36:9 40:24
52:19 73:8
74:4 108:19
118:24 119:12
136:16 143:21
154:12,17
156:15 162:19
188:20
**sort** 68:22 98:7
107:17 114:14
180:3
**sound** 97:21
**source** 136:11
**sources** 20:16
**south** 67:18,21
67:22 121:13
122:1 210:21
**Spanish** 75:17
**speak** 22:25 59:3
70:21 109:2
156:14 163:1
**speaker** 156:17
**special** 5:12,15
5:16,18,19
17:24 30:5
31:5,6,24
**specific** 51:17
53:24 115:12
115:12,13
139:4 177:1
178:5,24

179:17 207:1
**specifically**
11:17 52:1,2
115:11 117:17
119:8,12
184:21
**speculate** 50:16
**speculation** 50:4
64:11 81:7
168:17 174:4
**speech** 61:13
90:16,20
170:16,17
**speed** 180:3
**spell** 8:15 15:2
58:17 85:1
186:5
**spend** 149:2
**split** 170:1
**spoke** 116:5,13
116:14
**spoken** 10:14
156:19
**sports** 78:2
85:18 118:14
118:15
**Springs** 133:8
**staff** 5:24 6:1,3
11:20 18:5
22:15 35:10
36:4,11 37:3,4
37:6,14 49:6
49:10 66:25
81:1 122:6
171:10 200:6
200:20,20
203:10,12
205:15,17
**stand** 7:19 11:1
11:4 19:15
139:17
**standards** 5:8
11:21,21 17:19
35:23,25
**standing** 7:21
8:1,19 9:6

68:14 69:5,8
107:15 164:22
164:23 165:1
170:16,18,20
185:7
**standpoint**
11:13 198:25
**stands** 69:3
121:20,23
122:2,3,6
**start** 39:18 41:6
41:15 67:6
70:13,15 71:24
120:1 123:19
134:4 136:17
148:24
**started** 12:23
24:4,7 39:19
39:20 40:11
41:8,8 51:8
57:6 67:8
101:20 120:4
123:22 187:11
198:11
**starter** 70:11
**starting** 170:13
170:14
**starts** 90:13
118:20 136:7
138:10 200:19
208:21
**state** 1:21 5:8
7:3 13:21,24
15:15 28:19
40:7 50:12
54:13 59:11
85:9 91:4
106:15 126:1
135:24 142:8
144:13 160:24
160:24 162:11
181:3 195:19
199:15 205:8
210:1,4
**stated** 1:23 91:3
138:13 147:8

**statement** 3:5,6
3:7,8,9 5:5,6,7
11:7 12:8,17
22:13 43:14
46:1,3,6,8,21
46:22 47:5,10
47:11,12,13,21
47:24 52:10
57:10,14 63:22
76:2,5,7,11,13
79:23 82:7
87:22 88:18
89:3,8,15,17
89:18 90:12
91:1,5 96:13
97:5 98:16,24
99:8,10,14,16
99:21 100:16
102:6,25
103:20 108:14
108:24 109:4
116:1,8,12
117:9 137:2
148:9 149:10
150:19,22,23
152:16,17
157:14,15,16
157:17 159:14
169:4 179:1
198:6,9 199:11
200:4 204:11
**statement's** 97:7
**statements**
16:24,25 19:21
38:5 50:18,25
51:3 53:13
56:24 127:4
131:17,22
136:15,19
137:8,25
138:20 148:12
150:17 151:2
152:21 154:24
156:24 166:18
199:1 200:21
**States** 13:19

203:1
**station** 170:3
**stations** 69:8
170:8,9
**status** 20:14
26:16 139:7
**statute** 10:6
17:22,23
**stay** 131:8
**stayed** 28:1
**stenotype** 1:22
**step** 8:22 45:1,3
83:17 161:12
161:19
**Stephanie** 3:24
105:23 106:7
106:16
**steps** 21:15 48:3
**sticker** 177:11
**stipulate** 51:7
**stood** 14:11
**stop** 182:24,25
**stories** 159:2
**story** 25:9 46:7
106:2
199:24 206:22
**Street** 1:20 2:18
210:21
**stretch** 11:4
**stretched** 170:2
**strike** 23:23 61:5
63:11 79:18
80:23 81:20
86:23 87:6
91:4 107:5,8
111:4 130:19
149:14 163:20
184:14 187:20
187:23 192:16
**strikes** 87:12
110:20
**striking** 25:2
201:21
**struck** 21:2
23:14,20 37:11
60:25 63:25

64:15 79:11
80:3 86:7
91:10 107:11
108:4
**Stuart** 3:12 4:5
5:14,23 7:7
14:25 15:4,9
15:17 19:3
63:13 88:12
126:22 130:1
136:13 141:11
**student** 11:19
13:1 20:17
21:20 23:13,17
23:19 25:2
35:2,5 37:11
49:11 55:22,23
59:14 78:15,17
80:4,8 81:20
82:12 83:6
85:12 86:24
91:20 111:4,5
123:6 124:2
130:19 160:19
161:1 171:25
172:9,18
173:10 175:12
191:21 207:4,4
207:4,4,14,20
**student's** 21:4
25:21
**students** 11:16
11:20 19:22,25
20:17 21:2,11
21:19,23,25
23:19,24 29:18
34:20,24 35:10
36:4,8,20
37:15 47:1
49:24 53:13
55:25 62:13
75:5 82:20
83:20 107:6
112:24 113:20
131:2 142:12
143:3 150:13

171:2,23
184:11 188:21
198:14,16,18
199:7 204:24
205:21 206:19
206:21 207:1
**students'** 206:24
207:11
**stuff** 40:1 149:17
**stuff's** 200:15
**styled** 1:16
**subdivision**
144:9,12
**subject** 45:13
55:3 74:11
75:19 77:13
163:4
**subjected** 205:6
**submission**
178:21,22
**submit** 179:16
198:24
**subsequently**
156:24
**substance**
167:16,18
203:7
**substitute**
207:17
**successful** 37:18
**successor** 54:2
**sudden** 135:6
**sufficient** 119:24
120:11
**suggest** 48:7
**suggesting** 48:13
**Suite** 2:5
**sum** 203:7
**summoned**
45:12 163:1
**superintendent**
5:14,23 7:7
14:5,6 15:20
15:23 16:1,2,5
18:4 33:21
40:3 49:14

75:10,21,23
88:12 109:1
116:23 117:1,2
119:5 126:22
130:1 132:24
141:5,15 163:2
167:15 168:13
199:24 200:3
200:11 201:6
201:19 202:15
203:22
**superintenden...**
202:18
**supervision**
118:4
**supervisor**
117:25
**supervisor's**
118:2
**support** 147:7
200:5
**supported** 147:6
**suppose** 37:25
46:4 54:5
145:4 150:15
**supposed** 39:4
99:7 163:25
**sure** 28:1,2
30:13 37:23
45:23 51:18
90:1 93:3
97:12 100:21
119:23 120:16
132:25 133:11
134:16,20,22
135:4,18 136:4
137:12 138:3
147:16 150:9
160:15 165:13
169:9 170:13
180:2 187:13
189:7 208:3
**surprise** 61:14
115:5
**surprising** 86:17
**suspect** 204:4

**suspend** 42:10
43:15 44:9,18
44:21 46:13
98:8 148:14
150:25 151:1
152:4,5 153:11
175:17
**suspended** 26:24
29:9,11,21
43:20 45:1,15
97:24 98:2,5
100:3 102:23
103:2,13,19
109:5,8 148:6
152:12 153:9
153:12 155:3
155:25 157:5
172:23 173:24
174:22 181:13
181:24 186:22
189:24 192:2
196:5 202:21
202:24
**suspending**
43:24
**suspension** 27:9
27:10 29:23,24
50:20 54:4
98:17 152:3
153:4,15,19,24
154:5 155:8,14
155:17,21
156:4 186:25
203:4,5
**Suspension/Te...**
5:10
**sustain** 50:15
**sustained** 19:25
26:6 41:13
45:10 49:21
64:13 66:15
80:15 82:5
83:2 91:24
115:9 149:25
154:11 165:17
174:5

**swear** 8:21 15:7
**sweatband**
190:11 192:13
**swing** 166:5
**Switzer** 32:17
129:11
**swore** 162:2
180:20 186:8
189:8 191:12
195:10
**sworn** 9:19
15:10 58:15,24
84:16,22 106:8
125:13,21
141:12 162:8
180:25 186:12
189:14 191:18
195:16

---

## T

**table** 7:22
**tables** 205:12
**tackle** 70:8,16
**take** 24:1 45:5
47:21 48:12
53:10 68:18
73:22 74:22
84:7,9 86:4
89:23 93:2
95:8,21 99:10
99:24 121:2
125:7 140:3
152:20 156:23
158:8,23,24,24
163:17 164:11
165:25 177:12
177:14 178:18
179:13 182:15
187:2 192:13
202:12 206:12
**taken** 47:23
78:22 84:12
115:5 120:8
161:24 199:1
**takes** 164:5
**talk** 16:9 22:15

23:2 25:16
31:10 37:3
43:24 44:4,7
61:21 63:13
67:9,12 73:13
76:18 77:11
78:1 79:23
89:15 91:18
94:12,16 99:17
128:7 130:10
130:23 165:4,7
182:10,13
183:11 185:16
187:12 192:11
197:8,11,17
201:17 202:8
203:1,3 204:15
**talked** 22:17,18
25:20 36:21
43:22 44:1,3
49:22 63:16
73:10,18 74:23
76:22,22,23,24
77:1,2 94:14
94:18,19 95:19
96:8,8,15,17
97:8 102:22
103:24 104:3
116:9 131:21
133:21
**talking** 22:22
41:9,15 91:21
93:23 96:19
107:16 127:24
128:12 131:10
153:21,22
157:17 161:8
164:12,12
165:4,6 166:1
168:7 169:24
170:7 171:3
182:14,25
184:20 193:20
**talks** 91:2
100:16 194:4
**tap** 196:21,21,22

tapped 166:8
169:21 203:19
tapping 166:7
taps 166:11
taught 100:13
161:2 201:10
taunting 131:10
teach 118:10,11
118:12,14,15
118:18,22
teacher 10:7
78:16 81:13
83:6,7
teachers 77:8,9
81:6 117:19
teaches 74:2
141:22,23
team 60:5 62:25
64:4,7 65:3,5
65:22 66:1,7
67:5,15 68:18
70:1 78:8
91:21 93:9
95:6 112:24
120:10 121:9
121:20 124:9
131:7 150:11
159:7 165:12
173:5 174:7
175:3 186:17
187:3,12 190:4
teammates
62:19 65:25
teams 158:12
tee 93:14
telephone 2:6,13
2:19 116:5
210:22
tell 9:6,11 22:10
24:24 25:9,11
25:13 26:7,21
39:8,10,12
46:16 47:17
49:23 52:18,21
52:23 53:1
67:8,8 73:18

83:18 105:7,7
133:25 134:5
140:3 146:5
147:20,25
149:16 157:21
164:23,24
166:24 171:12
171:20 172:17
178:16 182:7
189:2,4 190:23
190:24 191:4
193:4 194:25
195:5,7 200:11
200:16,17
201:2,12 204:6
telling 46:12
71:10 101:3
115:10 148:2
149:19 159:25
169:2 183:18
184:11
tells 202:20
ten 107:22,23
199:4
ten-minute 84:9
176:10
term 5:4,10,21
33:8 94:4
199:15,16
terminate
129:10
terminated
36:14
terminating
199:14
termination 1:9
5:21 11:10
12:4 17:12,20
32:14,17 33:8
33:13 34:1,10
34:17,20,25
35:3,6,14,21
54:21 99:17
127:11,13
128:14 129:10
129:17 130:3,7

Terri 1:20 210:3
210:19
terry 69:22
test 19:8
testified 9:2
15:10 38:2
58:24 83:3
84:22 104:24
105:7 106:8
125:21 141:12
153:23 162:8
180:25 186:12
188:22 189:14
191:18 195:16
198:18 206:19
testify 102:18
124:24 139:23
204:15,16
testifying 36:13
38:12 65:1
92:24 114:4
testimony 8:23
9:3,3 48:1
52:12 56:14
79:20 83:19
93:7 104:14
124:17 130:6
139:18 154:1
172:25 175:24
178:19 185:16
188:7 190:22
194:13 197:8
197:24
Texas 1:4,20,21
1:22 2:5,12,19
5:13 10:18
12:2 13:20
30:19 69:25
145:14,17
159:12 202:5
202:16 210:1,4
210:22
text 24:14
textbook 201:9
Thank 9:21 12:6
18:13 20:2

28:17 52:9
54:3 58:4 59:8
79:3 81:14
83:12 84:2,11
85:6 90:6,7,25
105:11,12
106:11,17
109:18 111:2
112:8 125:3,23
128:1 139:14
139:25 140:1
161:8 171:22
180:10 188:12
194:21 199:9
204:12 205:24
206:17 208:21
208:23,24
Theory 100:9
they'd 23:20
thing 10:14
36:12 51:20
57:23 61:22
101:18 114:20
119:15 127:5
131:10 135:10
135:12 139:22
140:14 154:14
175:23 179:2
179:11 202:13
206:9,17
things 6:6 10:4
24:20 39:14
40:2 67:4
90:22 134:8
142:25 177:20
178:9 205:3
209:6
think 19:19,23
22:25 28:13,13
39:1 41:21,22
41:22 50:15
51:9 53:25
62:24 64:4
69:8 81:9,11
83:18 87:17,19
88:3 89:14

90:2 93:15
94:1 96:2,3
98:19 126:15
138:21 141:24
144:6 145:22
145:23,25
148:11 154:22
158:4 160:2,2
160:6 163:7,14
165:1 168:15
170:10,13
171:1 176:25
177:3 198:16
204:7 205:1
208:20
thinks 81:10
Thomas 5:6 66:2
68:10 72:2,6
thorough 139:1
200:12
thoroughness
137:18
thought 18:11
23:4,11 25:25
48:16 51:7
55:14 63:8,10
101:6 138:20
158:20,21
203:14 204:4
thoughts 67:12
three 2:12 71:19
108:22 111:17
111:20 126:15
184:18,22
Thursday 97:19
98:12 196:8
tight 70:7,16
Tim 6:6 209:6
time 15:24 16:1
16:3,7 19:6,11
19:20 20:10
21:16,23,24
22:4,4 23:24
24:13 25:5,10
26:14 28:4
29:23 34:5

39:2,3 42:24
43:15 44:8,9
44:11 46:13
49:23 51:2
53:15 55:3
56:9 57:21,23
61:25 63:3
65:8,16 67:15
70:21,24 74:14
75:16 76:3,5
79:1,10,10
89:23 92:18
93:22 94:22
96:12 97:4
98:18 101:19
104:7 109:4,13
112:5,22
117:16 118:18
118:22 120:1,5
121:9 123:21
124:3,13,22
126:7,11,14
127:3,22
130:18 132:23
134:17 135:10
135:12,23
137:21 139:11
139:14 140:10
140:25 148:4
150:24 152:11
152:20 153:3,9
153:14 154:4
155:20,25
158:13,15,17
158:25 161:15
161:17 167:2,9
171:5,7 173:24
175:21 177:10
178:22 181:12
182:8 183:5,6
183:9 184:16
186:21 187:2
187:20 189:23
190:10,12
192:1 193:14
193:24 196:4

202:2 206:10
206:11,20
**timeline** 206:4
**times** 44:7 57:18
100:13 113:13
114:25 171:6
184:10 193:6
**Timpson** 101:2
**TISD** 81:22
177:12
**today** 10:16
22:25 29:15
36:14 42:16,17
42:17,18 83:19
83:22 104:19
104:23 124:17
124:22 139:19
149:3,3,5
167:17,19
168:9 175:24
178:3,19
185:16 194:14
**told** 14:4,6 25:12
28:14,14 43:22
44:20 50:1
54:23 57:18
101:24 103:2
109:1 135:23
138:6 147:21
148:6 149:20
159:22,22
163:23,24,25
167:20,21
168:5,6,9,10
168:10,13,23
168:23,24,24
169:1,3,20
170:24 185:14
188:6 194:12
197:23 200:14
202:13
**Tolstoy** 205:10
**top** 32:21 200:25
**topic** 80:3
**total** 210:14
**totally** 198:23

**touched** 204:25
**touches** 87:12
**touching** 198:16
**track** 140:8,13
162:20
**trailer** 120:23
**train** 140:6,8,12
49:16,18
106:18,23,24
112:22 117:5,6
117:7,14 118:7
119:14,23
**trainers** 72:20
73:2 123:6
124:2
**training** 49:10
55:14 66:24
100:5,8 122:6
**trajectory**
116:25
**transcript** 206:5
206:11,24
207:7,8,9
**transcription**
210:6
**transitioned**
116:23
**transpired** 30:25
**transportation**
120:14
**trash** 131:10
**Tray** 72:11
79:16 87:10
**treat** 130:23
**treated** 21:11
55:22
**treats** 64:4
**Trey** 94:16,18
94:19 115:19
166:18,25
167:3,5 169:22
174:7,9,10,13
196:12
**Trey's** 196:16
**trial** 89:21 90:2

200:9 203:14
**tried** 63:2
200:11
**Troup** 1:2,18,20
2:9 5:8,10,12
5:15,16,18,19
5:24 6:1,2 7:6
7:8 11:9,12
15:20,23 16:10
17:25 22:16
27:5,16,21
29:2,18 31:17
33:18,20 35:11
35:25 36:15
37:8,18 59:14
60:3,14 64:8
78:19 81:1
82:20 83:5
85:12,18 98:21
106:19,20,25
110:13 111:25
112:19 116:17
118:6 119:6,9
119:22 126:5,7
126:17 131:20
131:25 132:4
132:24 139:7
140:4 141:19
142:5,11 144:7
173:16 174:12
174:14 177:22
178:10 181:5
186:15 189:19
191:21 195:21
198:13 199:7
201:10 204:20
205:21
**true** 16:22 43:21
46:3 47:11
119:9 148:6
151:12 154:1
210:5
**truly** 149:21
210:12
**Trustees** 5:12,15
5:16,18,19

31:7,18
**truth** 12:20,20
17:1 137:17
**try** 14:7 63:20
82:22 93:8
**trying** 71:13
106:2 128:4
133:25 156:10
157:13 165:3,6
179:3 180:3
182:10,13
183:11 187:11
192:11 201:4
206:20,21
**Tuesday** 39:1,1
41:15,18,20,23
41:25 74:20
96:23 98:3,5
98:12 115:24
116:6,7 146:1
146:3 163:7,12
**turn** 27:13
**turns** 138:8
**twice** 44:10
102:5,5 164:15
166:2,9,13
169:21
**two** 9:8 10:4
12:21 23:19,19
25:14 38:5
53:17 71:19
74:1 77:8,9
79:12 99:19
119:19 128:23
151:16 158:24
160:21 170:19
176:25 177:4,4
177:7 184:10
184:18,22
199:18 202:25
203:5,24 208:2
**two-year** 199:3
**Tyler** 2:12
**type** 62:2 150:22
**typed** 150:19,23

**U**

**Uh-huh** 31:22
42:4,15 46:2
94:3 99:6,13
120:13,15
159:4 164:21
166:19 167:14
**uncalled** 90:21
**uncomfortable**
174:1
**understand**
13:10 38:9,11
43:17 44:22
53:20,21 64:22
64:25 67:3
71:22 74:7
89:2 92:22,24
99:4 101:19
114:1,4 132:11
139:2 142:15
145:9 147:16
176:4 185:21
188:9 189:9
190:25 194:19
203:23
**understanding**
10:8 16:20
141:16 174:16
176:17 180:6
**understood**
51:11 153:17
**undertake** 20:23
**undisclosed**
200:25
**unethical** 81:15
81:23 82:8
**UNIDENTIFI...**
140:5
**unique** 50:7
**United** 13:19
203:1
**unredacted**
207:25
**untrue** 30:24
**unusual** 22:6
80:2 86:5

**upset** 111:12
112:15,15
**use** 35:8 54:9
62:6,9 82:12
100:13 113:2
157:9 171:14
184:7,9 193:23
193:25 197:13
201:7

**V**

**vaguely** 127:20
132:20 181:25
**vain** 62:6
**variety** 20:16
**various** 24:19
154:15
**varsity** 68:1,2,4
78:10,12,13,14
**veracity** 137:17
**verbal** 51:3 98:9
131:9
**verbally** 153:11
153:12 155:3
155:25 157:5
**verification**
136:19
**verify** 19:10
**view** 16:18
**violate** 13:21
**violating** 28:3
**violation** 18:2
202:9,10,11
**violations** 13:23
17:12
**visible** 72:14
**visit** 24:9,11,17
126:21
**visited** 24:12,18
132:3
**Vividly** 99:3
**volume** 1:10
210:7
**vote** 32:19 33:4
128:18 129:5
**voted** 129:17

**votes** 128:21
**Vs** 1:3

**W**

**W-h-i-t-s-e-l-l**
58:20
**Wade** 72:11
79:16 111:6
165:10 174:10
174:13
**wait** 188:1 199:4
**waive** 28:7
178:10
**waiving** 28:11
**walk** 205:2
**walked** 69:7
**Walker** 4:23 8:3
195:8,8,12,15
195:20 197:7
**want** 39:11
45:23 89:22
112:17 118:4
131:25 173:14
178:6,9,11,20
179:25 188:16
198:6 201:17
204:3,18 205:3
205:11 208:3
**wanted** 21:24
152:5 200:16
200:18
**wants** 99:10
204:14
**warm-ups** 67:10
190:5
**wasn't** 14:14
25:5 57:1,10
63:8 72:25
74:10 77:17
80:2 109:2,9
112:16 116:6
123:4 138:6
148:6 159:11
168:1 170:24
171:3,4,4
172:19 177:6

184:19 197:15
**watch** 183:6
184:16 185:2,5
**watched** 193:16
201:2
**watching** 184:21
193:14
**water** 58:11
72:24 73:3
90:14 99:5,11
99:12,19,24
119:6,19,22,24
120:11,12,17
122:11,22,25
123:2,8,11,12
123:25 157:19
158:8,15,23
159:3,10,16
170:11 181:19
**watering** 122:17
**waterline** 72:25
**way** 52:3 61:10
63:7,21,22
67:23 68:24
76:19 87:13,18
89:24 108:3
113:13 133:16
134:23 138:25
140:11 151:16
151:17 171:2
179:3,5 194:5
197:17 201:22
201:25 204:24
204:25 205:13
205:15,16,17
**ways** 151:17
**we'll** 7:2 10:1
60:21,21 76:19
89:23 125:8
140:18
**we're** 11:8 38:1
51:7,8 77:25
78:1 99:11,23
128:12 131:11
143:1 144:6
157:17 159:15

175:13 178:2
179:1 188:24
204:21,22
205:1 206:2
208:3
**we've** 9:6 10:12
18:24 35:17
57:24 93:7
**wearing** 169:14
**Wednesday**
10:17,17 41:18
41:24 42:11
74:18 75:14
83:22 96:24
98:4,5,12
104:19,23
105:9 109:9
115:22,24
116:6 124:23
139:20 151:8
151:13,21
152:14 155:6
178:3,19 196:8
206:6
**week** 65:6,6,11
65:13,14 70:6
70:19 77:12
107:17 109:7
114:7 146:2
181:23
**welcome** 18:1
128:3
**well-being**
131:12
**went** 21:18 22:6
23:5,9,10 63:6
66:5 90:21
94:23 147:10
167:3 173:18
**weren't** 28:2
83:17 104:13
116:12 124:16
158:19 170:22
205:6
**West** 2:18
**whatever's**

205:9
**whatsoever** 66:9
138:25
**when's** 153:13
**Whichever** 11:2
**white** 159:7
**Whitehouse**
110:22
**Whitsell** 3:16
21:6 24:21
32:25 33:1
43:22,24 44:1
44:4,7,16,19
46:1,14 47:4
47:10,15 48:7
48:7 49:23
50:17 55:17,17
55:18 56:25
58:9,17,19,23
59:1,13,20,24
87:2,4 91:13
94:2 107:9
108:3 110:10
114:11 129:3,3
152:1,9 165:8
165:19 182:5
187:7,8,9
190:7 196:12
196:18
**Whitsells** 14:19
48:4 202:15
**wide** 70:2,6
**William** 2:4 4:20
191:5,5,9,9,13
191:17
**Williams** 8:6,6
**willing** 40:18
51:7
**wind** 100:18
**wingback** 70:5
**wit** 1:25
**withdraw** 111:1
**witness** 3:11 4:4
7:16 14:24
16:14,17,25
19:15 37:20

40:18 41:1
57:1,17 58:5,6
58:8,14 59:5
64:17 81:17
83:15 84:1,4
84:25 85:3
89:3 90:15,19
92:18 104:15
104:21 105:1,5
105:10,12,14
105:16 108:9
113:22 124:11
124:13,18,25
125:3,4,12
132:7 139:14
139:24 140:1
140:24 154:7
160:9 161:15
161:21 169:6
173:20 174:19
175:19,21
176:2,5,7
180:14 183:23
185:11,19,22
188:4,10
190:19 191:1
193:8 194:9,17
194:20 196:23
197:3,20 198:3
**witnesses** 7:21
8:21 9:19 10:2
18:5 19:9,15
34:5 51:25
56:14,15 58:5
130:5 145:7,9
151:4 156:3
157:6 198:17
201:23 205:4
205:13 206:23
**women** 143:6
**won-loss** 65:17
98:21 135:5,15
136:7 199:18
204:18
**won/loss** 12:21
**word** 99:2,22

143:9 184:7
201:7
**wording** 127:10
127:12
**words** 92:8
171:10 177:6
205:6 208:1
**work** 114:22
206:6
**worked** 106:20
116:16 117:13
117:20
**working** 36:3
106:25 112:11
112:12,23
130:11,14
199:7 206:5
**worry** 168:25
**worse** 14:9
202:4
**wouldn't** 41:23
77:25 83:8
102:11 133:16
137:24 147:7
196:19
**wrap** 26:21
**write** 22:13
28:18 46:21,22
53:13 76:5,7
76:11,13,16
108:16,24
109:4 149:17
169:4 178:3
**writes** 49:3
**writing** 129:15
**written** 46:1
87:21 116:14
150:17 153:4
153:10,14
154:4 155:7,13
155:17,21
156:23 178:25
179:1 202:24
203:6
**wrong** 93:9
114:9 135:10

135:10,11,12
135:12,12
138:8 152:19
**wrongdoings**
19:4
**wrote** 103:20,22
103:23 104:1
108:14,19
116:10
**Ws** 201:15

---
**X**
---

---
**Y**
---

**y'all** 7:20 9:17
9:24,25 77:24
101:3,3,16
122:17 179:15
182:24 206:21
207:6,24
208:18
**y'all's** 189:1
**yard** 67:17,21,24
68:17 70:17
93:10 121:14
123:1 124:7
**yards** 107:22
121:3 124:8
164:22 165:2
170:19
**yeah** 19:18
40:19 58:12
84:5,8 103:11
122:20 136:5
136:11,22
144:5 146:7
156:18 176:23
188:25 193:7
203:19
**year** 13:8,9
15:22 85:16,22
85:25 96:2
98:22 106:22
117:7 126:20
142:14 181:7
181:16 189:21
192:1 195:21

195:22 199:5
203:25
**year's** 14:20
**years** 11:15
12:22 15:22
78:10 117:3,6
126:15 133:5
135:16 158:3
199:18 203:24
**yelling** 62:7
113:7
**yesterday** 204:3
**you-all** 207:14
**young** 46:20
173:9
**youngsters**
151:2

---
**Z**
---

**zone** 67:14

---
**0**
---

**0-6** 65:19
**034-LH-01-2016**
1:1 7:3

---
**1**
---

**1** 1:10,10 5:4 6:6
17:18 18:15,20
20:7 35:17
93:14 142:22
143:18,21,22
143:25 144:1
153:18,22
154:8 208:17
209:5
**1-5** 65:19,20
66:5,11 101:16
**1,000** 178:11
179:23
**1:10** 140:18
**1:11** 118:21
**1:30** 170:13
**10** 5:8 17:19
18:16,17 27:14
**10-22** 18:20
**10/19/2015** 5:7

**10/22** 152:18
**10/22/15** 5:5
  97:7
**10:00** 118:24
**10:45** 118:25
**100** 121:3
**102** 3:22
**106** 3:25
**109** 5:7
**11** 3:5 5:10
  17:20 18:17,18
  28:24
**11:27** 75:18
**11:42** 119:1
**12** 3:6 5:12
  17:25 18:18
  30:4
**12/31/16** 210:20
**12:00** 120:3
**12:19** 75:18
  118:20
**12:23** 74:17
**125** 4:2
**12th** 85:15
**13** 5:13 17:25
  18:18 30:17
**132** 4:2
**14** 5:15 17:25
  18:18 31:2
  127:16
**14-10** 90:23
  100:17
**141** 4:6
**144** 6:7
**15** 3:13 5:16
  17:25 18:18
  31:16 170:19
  196:2
**16** 5:18 17:25
  18:18 31:23
**160** 4:7
**162** 4:9
**169** 4:10
**17** 5:19 17:25
  18:18 32:5
  128:12

**173** 4:10
**18** 5:4,9,11,12,14
  5:15,17,18,18
  5:20,20,21,21
  5:21,22,23,24
  6:1,3 18:1,10
  18:12,18 33:7
  129:18 155:1
**181** 4:13
**183** 4:13
**186** 4:16
**189** 4:18
**18th** 31:25 32:6
  33:24 128:11
  129:16 154:25
  155:8,16,22
  156:2
**19** 5:22 18:3,19
  33:17 66:16
  157:8
**191** 4:21
**193** 4:21
**195** 4:24
**1957** 159:12
  160:13
**1968** 158:5
**1969** 133:7,13
**197** 4:24
**1970** 133:13
**198** 3:7
**199** 3:8
**19th** 24:2 29:15
  60:9,13,24
  70:18 74:22
  85:24 88:16
  94:24 97:11,19
  106:25 108:15
  108:16 111:4
  163:5 181:15

**2**
**2** 3:3 5:5 16:23
  18:23 88:8
  89:4,6
**2:15** 176:12
**20** 5:24 18:4,19

**111:22** 112:5
  170:19
**2009** 6:7 209:6
**201** 1:19
**2015** 5:12,13,15
  5:17,18,20,21
  5:22 30:6 32:2
  33:24 86:2
  107:1 127:17
  154:25 181:9
  186:17
**2016** 1:11,16
  42:21 66:16
  181:8 210:17
**204** 3:9
**206** 210:21
**2080** 2:12
**20th** 98:1 155:4
  156:1
**21** 6:1 18:19
  111:22 112:5
**210** 3:10
**214** 2:6,6
**21st** 42:13,14,24
  151:11 152:13
  152:22,24
  155:4 156:2
**22** 6:2 16:17
  18:19 111:23
  112:5
**22nd** 97:19 98:6
  98:16 103:1
  108:19 116:2
  116:11
**23rd** 103:3
**27** 5:13
**29** 1:11 42:19
**29th** 1:15 42:25

**3**
**3** 5:12,15,17
  16:23 30:5
**300** 2:18
**30th** 31:8
**35-17** 100:19
**350,000** 14:22

**36** 145:17
**37** 3:14 145:14
**393-3840** 2:6
**3rd** 31:21
  127:17

**4**
**4** 16:23 157:13
**4-0** 32:20 128:19
**40** 67:17,21,23
  68:17 70:17
  93:10 121:16

**5**
**5** 5:6 16:23 35:8
  35:17 51:4,6
  51:20,22 57:24
  58:1,3
**5:00** 151:24
**5:30** 151:24
**50** 123:1 124:7,8
  164:22 165:2
**55** 3:14
**56** 3:15
**561-8228** 2:13
**561-8400** 2:13
**58** 5:6
**59** 3:17

**6**
**6** 5:7 16:23
  31:10 35:23
  108:13 109:14
  109:15,17
**605** 2:5 126:5
**64** 3:18
**657-2795** 210:22
**657-6108** 2:20
**657-7002** 210:23
**657-8545** 2:19
**6781** 210:19
**692-6474** 2:6
**6th** 210:17

**7**
**7** 3:4 16:23 32:8
  36:2 128:13

**70** 133:7
**732** 210:21
**75** 165:2
**75231** 2:5
**75652** 2:19
**75654-3560**
  210:22
**75703** 2:12
**79** 3:18
**7th** 118:22

**8**
**8** 16:23
**81** 3:19
**85** 3:21
**89** 5:5

**9**
**9** 16:23 18:23
**9:00** 31:8 41:17
**90** 158:6,7
**903** 2:13,13,19
  2:20 210:22,23
**92** 3:22
**9400** 2:5
**978-0-618-706...**
  6:7 209:7

Date given Employee _2/10/15_
Date returned by Employee _2/19/15_

1. **Position.** The District agrees to employ **Dennis Alexander** (you) as Athletic Director / Head Football Coach.

2. **Term.** You will be employed on a 12-month basis for the 2015-2017 school year(s), according to the hours and dates set by the District as they exist or may hereafter be amended.

   2.1 **Term for Dual-Assignment.** Your dual assignment may require you to begin work before the start date specified in paragraph 2 and to continue to work after the end date specified in paragraph 2. Your compensation under paragraph 6.1 includes pay for this additional work.

3. **Credentials and Criminal History Review.**

   3.1 **Certification.** You agree to provide, before your start date of each school year, the certification, service records, documentation of highly-qualified status, licenses, and other records and information required by law, the Texas Education Agency (TEA), the State Board for Educator Certification (SBEC), or the District. You agree to maintain any required certification or license throughout the term of this Contract. If you fail to fulfill the requirements necessary to extend a temporary or emergency certificate or permit, or if your certification expires, is canceled, or is revoked, the District may provide you with notice that this Contract is void pursuant to Texas Education Code section 21.0031.

   3.2 **Highly Qualified Status.** If you are employed as a classroom teacher, you agree to become and remain "highly qualified," as that term is defined under the No Child Left Behind Act, 20 U.S.C. § 7801(23), and by TEA, to the extent required by law.

   3.3 **Criminal History Review.** If required by the District, TEA, or SBEC, you agree to submit to a review of your state or national criminal history record information.

4. **Representations.**

   4.1 **Beginning of Contract.** You understand that a criminal history record acceptable to the District, at its sole discretion, is a condition of this Contract. You represent that you have disclosed to the District, in writing, any conviction, no contest or guilty plea, deferred adjudication, or other adjudication for any felony or any offense listed at 19 Texas Administrative Code § 249.16(b).

   4.2 **During Contract.** You agree that, during the term of this Contract, you will notify the Superintendent in writing of any arrest, indictment, conviction, no contest or guilty plea, deferred adjudication, or other adjudication for any felony or any offense listed at 19 Texas Administrative Code § 249.16(b). You agree to provide the notification within seven calendar days or any shorter period specified in Board policy.



PETITIONER'S EXHIBIT
1



TASB HR Services

Copyright 1/31/2012 Texas Association of School Boards. All rights reserved.

4.3 **False Statements and Misrepresentations.** You represent that any required records or information in your employment application are true and correct. Any false statements, misrepresentations, omissions of requested information, or fraud by you concerning any required records or in the employment application may be grounds for termination or nonrenewal, as applicable.

## 5. Duties.

5.1 **General Standard.** You agree to perform the duties of your assigned position, as prescribed by state law and regulations and by the District, with reasonable care, skill, and diligence.

5.2 **Rules.** You agree to comply with all Board and District directives, state and federal laws and rules, and District policy and regulations, as they exist or may hereafter be amended. In addition, you agree to comply with all applicable rules of the University Interscholastic League.

5.3 **Assignment/Reassignment.** You understand that the District has the right to assign or reassign you to positions, duties, or additional duties and to make changes in responsibilities, work, or transfers, at any time during this Contract.

5.4 **Supplemental Duty.** You understand that this Contract does not apply to assignments of or payments for supplemental duties. This Contract does not create a property right to continued employment in any supplemental duty. If you are assigned to a supplemental duty, the start and end dates for the supplemental duty may be different from the start and end dates under this Contract.

5.5 **Dual Assignment.** The term "supplemental duty" does not include your dual assignment under this Contract. This Contract constitutes a unified agreement for both your primary assignment and your dual assignment. District action under this Contract concerning either assignment shall constitute the same action for the other assignment. You may not continue employment in one assignment without continuing employment in both assignments and you may not resign one assignment without resigning both.

## 6. Compensation.

6.1 **Salary.** The District shall pay you according to the compensation plan adopted by the Board each school year. Your salary includes consideration for all assigned duties, responsibilities, and tasks, including your dual assignment, regardless of the actual number of hours or days (including days not designated on the school calendar) that you work during this Contract. Your salary shall be reduced for absences in excess of authorized, paid leave.

6.2 **Furloughs.** If the District implements a furlough under Texas Education Code section 21.4021, your salary will be reduced in proportion to the number of furlough days. The reduction will be equally distributed over the remainder of the applicable school year.

6.3 **Annualized Salary.** Your salary will be paid out over 12 months, regardless of the work schedule specified in paragraph 2.


TASB HR Services

Copyright 1/31/2012 Texas Association of School Boards. All rights reserved.

6.4 **Incentive and Performance Pay.** If you qualify, you may receive incentive pay or pay for performance under the District's compensation plan, federal law, or state law, including Texas Education Code chapter 21, subchapter O. An incentive payment is not an entitlement as part of your salary.

6.5 **Overpayments.** You agree that the District may deduct any overpayments under this Contract from one or more of your paychecks.

6.6 **Benefits.** The District shall provide you with benefits as provided by state law and Board policy. The District reserves the right to amend its policies at any time during the term of this Contract to reduce or increase these benefits, at the Board's sole discretion.

7. **Other Provisions.**

   7.1 **Equipment and Reports.** You agree to satisfactorily submit or account for all grades, reports, school equipment, or other required items upon request from the District.

   7.2 **Special Funding.** If your position is funded by grants, federal funding, or other special funding, you understand that your employment is expressly conditioned on the availability of full funding for the position. If full funding becomes unavailable, your employment is subject to termination or nonrenewal, as applicable.

   7.3 **Addenda.** This Contract **does**/does not (circle one) include one or more Addenda, as follows:

   (1) Addendum A: Retire/Rehire Addendum

8. **Suspension.** In accordance with Texas Education Code chapter 21, the District may suspend you without pay during the term of this Contract for good cause as determined by the Board.

9. **Termination and Nonrenewal of Contract.**

   9.1 **Termination of Contract.** This Contract will terminate, in accordance with the procedures at Texas Education Code chapter 21, if the Board determines that any of the following exists: good cause, financial exigency, or a program change. This Contract will also terminate if you provide written notice of resignation before the penalty-free resignation date (see Tex. Educ. Code § 21.210).

   9.2 **Nonrenewal.** The District may nonrenew this Contract in accordance with Texas Education Code chapter 21, as applicable, and Board policy.

10. **General Provisions.**

    10.1 **Amendment.** This Contract may not be amended unless you and the District agree, in writing, to an amendment.

    10.2 **Severability.** If any provision in this Contract is held to be invalid, illegal, or unenforceable, the other provisions of the Contract will remain in full force and effect.



HR Services

Copyright 1/31/2012 Texas Association of School Boards. All rights reserved.

If you are receiving or have received retirement benefits through the Teacher Retirement System of Texas (TRS) or any other retirement program (Retirement Benefits), you acknowledge the following:

1. The District cannot and does not make any guarantees regarding your continued right to receive the Retirement Benefits.

2. You are relying on your own investigation and understanding of the law and upon the guidelines, rules, and regulations regarding employment after retirement of the program(s) under which you retired. You are not relying on any statements made by the District regarding the effect of District employment on your Retirement Benefits.

3. You agree not to sue or otherwise bring any claim against the District, its Board of Trustees, its Superintendent, or any other employee or agent of the District for any loss or reduction in the value of your Retirement Benefits.

4. If you retired under the TRS, the District must report your employment to the TRS. You agree not to sue or otherwise bring any claim against the District, its Board of Trustees, its Superintendent, or any other employee or agent of the District based on such reports.

Please sign below and return this document to the Superintendent.

Employee: _____

Date signed: _____2-19-15_____

TASB HR Services          Copyright 1/31/2012 Texas Association of School Boards. All rights reserved.

Blake Attaway
10-22-15

On Monday Coach A was going on his normal Monday Tyrant when he slapped me in the back of the head for no apparent reason. Then about 30 seconds later he slapped Colton Whistel across the face. Coach A has used many racial slurs. The one I remember most vivridly was when Nich Buchner wanted to take a break and get water like the rest of the lineman who were getting subbed out to get water and coach A said "We're going back to the old days were you don't get a break or any water." Then there was also a halftime speech at Frankston that was very uncalled for he went on to say we were gutless and pathetic and other things when the score was only 14-10. He has cussed at the trainers for not even giving them a chance to bring the water out. He even went on to tell us on the thursday before the A G that we were gonna lose. No coach should ever say that to a team. He has also been verbally abusive to multiple players on the team. He does not motivate like a coach should instead he brings the team down.

Blake Attaway

PETITIONER'S
EXHIBIT
2
PENGAD 800-631-6989

10-21-15

As per conversation with Mr. Bird and Mr. Smith. I was asked to explain a situation about Colton Whitsell getting slapped by Coach Alexander.

I did not witness a slap by Coach Alexander - I did know it happened because another player. Trey Wade, came to my drill talking about Colton getting slapped. Later that evening Colton's dad contacted me about it by phone.

I do not believe that anything was malicious or even by being mad. I believe that Coach was playing around and joking.

When asked about language on the field I said yes there is bad language - excessive at times.

Adam Thomas
10/21/15



PETITIONER'S EXHIBIT
5

PENGAD 800-631-6989

10/19/2015

Monday afternoon at football practice while Coach Alexander had the team up on a knee to talk before practice began, I watched him (open handed) slap an athlete, Colton Whitsell on the face in front of the rest of the football team. The hit was enough to cause a noise from the distance I was standing - about 10 yards away. ~~The team~~ I was not the only adult who was present at the time. A majority of the varsity coaches were gathered as well.

He also shoved a player over who was kneeling close to him, Demontrae Wade.

Sam Hamilton
10/22/15

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
6

EMPLOYEE STANDARDS OF CONDUCT                                        DHB
REPORTS TO STATE BOARD FOR EDUCATOR CERTIFICATION        (LEGAL)

| | |
|---|---|
| **REPORT REQUIRED** | In addition to the reporting requirement under Family Code 261.101 [see FFG], a superintendent shall notify the State Board for Educator Certification (SBEC) if: |
| **CRIMINAL HISTORY** | 1. An educator employed by or seeking employment with the district has a reported criminal history and the district obtained information about the educator's criminal record by a means other than the criminal history clearinghouse established by the Texas Department of Public Safety; |
| **TERMINATION** | 2. An educator's employment at the district was terminated based on evidence that the educator engaged in an act of misconduct listed below; |
| **RESIGNATION** | 3. An educator resigned and there is evidence that the educator engaged in an act of misconduct listed below; or |
| **ASSESSMENT INSTRUMENT** | 4. The educator engaged in conduct that violated the assessment instrument security procedures established under Education Code 39.0301. |
| **"REPORTED CRIMINAL HISTORY"** | "Reported criminal history" means information concerning any formal criminal justice system charges and dispositions. The term includes arrests, detentions, indictments, criminal informations, convictions, deferred adjudications, and probations in any state or federal jurisdiction. |
| | *Education Code 21.006, 22.087; 19 TAC 249.3(43), .14(d)* |
| **REPORTABLE MISCONDUCT** | A superintendent shall make a report to SBEC under Education Code 21.006 if there is evidence that the educator: |
| | 1. Sexually or physically abused or otherwise committed an unlawful act with a student or minor; |
| | 2. Was involved in a romantic relationship with or solicited or engaged in sexual contact with a student or minor; |
| | 3. Possessed, transferred, sold, or distributed a controlled substance, as defined by Health and Safety Code Chapter 481 or by 21 U.S.C. Section 801 et seq.; |
| | 4. Illegally transferred, appropriated, or expended funds or other property of the district; |
| | 5. Attempted by fraudulent or unauthorized means to obtain or alter a professional certificate or permit for the purpose of promotion or additional compensation; or |
| | 6. Committed a criminal offense or any part of a criminal offense on school property or at a school-sponsored event. |



PETITIONER'S
EXHIBIT
_10_
PENGAD 800-631-6989

Troup ISD
212904

EMPLOYEE STANDARDS OF CONDUCT
REPORTS TO STATE BOARD FOR EDUCATOR CERTIFICATION

DHB
(LEGAL)

"ABUSE"

"Abuse" includes the following acts or omissions:

1. Mental or emotional injury to a student or minor that results in an observable and material impairment in the student's or minor's development, learning, or psychological functioning;

2. Causing or permitting a student or minor to be in a situation in which the student or minor sustains a mental or emotional injury that results in an observable and material impairment in the student's or minor's development, learning, or psychological functioning;

3. Physical injury that results in substantial harm to a student or minor, or the genuine threat of substantial harm from physical injury to the student or minor, including an injury that is at variance with the history or explanation given and excluding an accident or reasonable discipline; or

4. Sexual conduct harmful to a student's or minor's mental, emotional, or physical welfare.

*19 TAC 249.3(1)*

"SOLICITATION OF A ROMANTIC RELATIONSHIP"

"Solicitation of a romantic relationship" means deliberate or repeated acts that can be reasonably interpreted as the solicitation by an educator of a relationship with a student that is romantic in nature. A romantic relationship is often characterized by a strong emotional or sexual attachment and/or patterns of exclusivity, but does not include appropriate educator-student relationships that arise out of legitimate contexts such as familial connections or longtime acquaintance. The following acts, considered in context, may constitute prima facie evidence of the solicitation by an educator of a romantic relationship with a student:

1. Behavior, gestures, expressions, or communications with a student that are unrelated to the educator's job duties and evidence a romantic intent or interest in the student, including statements of love, affection, or attraction. Factors that may be considered in determining the romantic intent of such communications or behavior include:

    a. The nature of the communications;

    b. The timing of the communications;

    c. The extent of the communications;

    d. Whether the communications were made openly or secretly;

    e.    The extent that the educator attempts to conceal the communications;

    f.    If the educator claims to be counseling a student, SBEC may consider whether the educator's job duties included counseling, whether the educator reported the subject of the counseling to the student's guardians or to the appropriate school personnel, or, in the case of alleged abuse or neglect, whether the educator reported the abuse or neglect to the appropriate authorities; and

    g.    Any other evidence tending to show the context of the communications between educator and student.

2.    Making inappropriate comments about a student's body, creating or transmitting sexually suggestive photographs or images, or encouraging the student to transmit sexually suggestive photographs or images.

3.    Making sexually demeaning comments to a student.

4.    Making comments about a student's potential sexual performance.

5.    Requesting details of a student's sexual history.

6.    Requesting a date, sexual contact, or any activity intended for the sexual gratification of the educator.

7.    Engaging in conversations regarding the sexual problems, preferences, or fantasies of either party.

8.    Inappropriate hugging, kissing, or excessive touching.

9.    Providing the student with drugs or alcohol.

10.    Suggestions that a romantic relationship is desired after the student graduates, including post-graduation plans for dating or marriage.

11.    Any other acts tending to show that the educator solicited a romantic relationship with the student.

*19 TAC 249.3(50)*

A superintendent may notify SBEC of any educator misconduct that the superintendent believes in good faith may be subject to sanctions by SBEC. *19 TAC 249.14(d)*

DEADLINE TO REPORT    The superintendent must notify SBEC in writing not later than the seventh day after the date the superintendent knew about an

Troup ISD
212904

EMPLOYEE STANDARDS OF CONDUCT
REPORTS TO STATE BOARD FOR EDUCATOR CERTIFICATION

DHB
(LEGAL)

employee's termination of employment following an alleged incident of misconduct. *Education Code 21.006(c)*

CONTENTS OF REPORT

The report shall include the name or names of any student or minor who is the victim of abuse or unlawful conduct by an educator. The report shall, at a minimum, describe in detail the factual circumstances requiring the report and identify the subject of the report by providing the following available information:

1. Name and any aliases;

2. Certificate number, if any, or social security number;

3. Last known mailing address and home and daytime phone numbers;

4. All available contact information for any alleged victim or victims; and

5. Name or names and any available contact information of any relevant witnesses to the circumstances requiring the report.

*Education Code 21.006(c); 19 TAC 249.14(e)*

A superintendent shall include the name of a student or minor who is the victim of abuse or unlawful conduct by an educator, but the name of the student or minor is not public information under Government Code Chapter 552. [See GBAA] *Education Code 21.006(h)*

NOTICE

A superintendent shall notify the board and the educator of the filing of a written report with SBEC. *Education Code 21.006(d)*

SANCTIONS FOR FAILURE TO REPORT

A superintendent who fails to timely make a required report is subject to sanctions by SBEC. *Education Code 21.006(f); 19 TAC 249.14(e)*

IMMUNITY

A superintendent who, in good faith and while acting in an official capacity, files a report with SBEC is immune from civil or criminal liability that might otherwise be incurred or imposed. *Education Code 21.006(e)*

| | |
|---|---|
| **SUSPENSION WITHOUT PAY** | The Board may, for good cause as determined by the Board, suspend an employee without pay: |

1.  Pending discharge, or

2.  In lieu of termination.

The suspension may not extend beyond the end of the school year. *Education Code 21.211(b)*

| | |
|---|---|
| **BACK PAY** | If an employee is not discharged after being suspended without pay pending discharge, the employee is entitled to back pay for the period of suspension. *Education Code 21.211(c)* |

| | |
|---|---|
| **GROUNDS FOR DISMISSAL** | The Board may terminate a term contract and discharge a term contract employee at any time for: |

1.  Good cause as determined by the Board; or

2.  A financial exigency that requires a reduction in personnel.

*Education Code 21.211(a)*

| | |
|---|---|
| **NOTICE** | Before any term contract employee is dismissed for good cause, the employee shall be given reasonable notice in writing of the charges against him or her and an explanation of the District's evidence, set out in sufficient detail to fairly enable the employee to show any error that may exist. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) [See DF(EXHIBIT)] |

| | |
|---|---|
| **HEARING** | If a term contract employee desires a hearing before an independent hearing examiner, the employee must file a written request with the Commissioner not later than the 15th day after the date the employee receives notice of the proposed termination or suspension without pay. The employee must provide the District with a copy of the request and must provide the Commissioner with a copy of the notice. |

The parties may agree in writing to extend by not more than ten days the deadline for requesting a hearing.

*Education Code 21.251(a), 21.253* [See DFD]

| | |
|---|---|
| **FINANCIAL EXIGENCY** | An employee who is protesting proposed action to terminate a term contract at any time on the basis of a financial exigency declared under Education Code 44.011 [see CEA] that requires a reduction in personnel must notify the Board in writing not later than the tenth day after the date the employee receives notice of the proposed action. The employee is entitled to a hearing in the manner provided under Education Code 21.207 for nonrenewal of a term contract [see DFBB] or a hearing under Education Code Chapter 21, Subchapter F, as determined by the Board. *Education Code 21.159* |


PETITIONER'S EXHIBIT
//

TERM CONTRACTS                                                    DFBA
SUSPENSION/TERMINATION DURING CONTRACT                          (LEGAL)

SUSPENSION WITH     The employee may be suspended with pay pending the outcome of
PAY                 the dismissal hearing. _Moore v. Knowles_, 482 F.2d 1069 (5th Cir.
                    1973)

                    **Note:**   See DF regarding circumstances in which a certified
                                employee's dismissal must be reported to the State
                                Board for Educator Certification (SBEC).

# Agenda of Special Meeting

## The Board of Trustees
## Troup ISD

A Special Meeting of the Board of Trustees of Troup ISD will be held November 3, 2015, beginning at 6:00 PM in the Board Room, 201 N. Carolina, Troup.

If, during the course of the meeting, discussion of any item on the agenda should be held in a closed meeting, the Board will conduct a closed meeting in accordance with the Texas Open Meetings Act, Government Code, Chapter 551, Subchapters D and E. Before any closed meeting is convened, the presiding officer will publicly identify the section or sections of the Act authorizing the closed meeting. All final votes, actions, or decisions will be taken in open meeting.

The subjects to be discussed or considered or upon which any formal action may be taken are as listed below. Items do not have to be taken in the order shown on this meeting notice.

Unless removed from the consent agenda, items identified within the consent agenda will be acted on at one time.

1. Call the meeting to order
2. Pledge of Allegiance
3. Prayer
4. Members Present
5. Executive Session
   Consultation with Board's Attorney, 551.071; Discussion of Real Property, 551.072; Personnel Matters, 551.074

   A. Discussion of Contract of Athletic Director Dennis Alexander
      551.071; 551.074
6. Results of Executive Session

   A. Possible Action on Contract of Athletic Director Dennis Alexander
7. Adjourn



PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
12

# *Troup Independent School District*

Fax: 903-842-4563       P.O. Box 578       Troup, Texas 75789       Phone 903-842-3067

Stuart Bird, Superintendent
Troup Independent School District
P.O. Box 578
Troup, TX 75789

October 27, 2015

Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

RE: Allegation of Educator Misconduct

This letter is to notify the State Board for Educator Certification that Mr. Dennis D. Alexander (Educator Certificate #10752) has been suspended indefinitely by the Troup Independent School District for striking a student. Mr. Alexander has been placed on administrative leave due to actions currently being investigated and of which the District has been advised are inappropriate. Mr. Alexander has not been terminated at this time and there has been no formal action by the Troup Board of Trustees.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Stuart Bird
Superintendent of Schools
Troup Independent School District

PETITIONER'S EXHIBIT
13
PENGAD 800-631-6989

High School
903-842-3065

Middle School
903-842-3081

Elementary School
903-842-3071

# Notice of Special Meeting

## The Board of Trustees
## Troup ISD

A Special Meeting of the Board of Trustees of Troup ISD will be held November 3, 2015, beginning at 6:00 PM in the Board Room, 201 N. Carolina, Troup.

If, during the course of the meeting, discussion of any item on the agenda should be held in a closed meeting, the Board will conduct a closed meeting in accordance with the Texas Open Meetings Act, Government Code, Chapter 551, Subchapters D and E. Before any closed meeting is convened, the presiding officer will publicly identify the section or sections of the Act authorizing the closed meeting. All final votes, actions, or decisions will be taken in open meeting.

The subjects to be discussed or considered or upon which any formal action may be taken are listed below. Items do not have to be taken in the same order as shown on this meeting notice.

1. Call the meeting to order
2. Pledge of Allegiance
3. Prayer
4. Members Present
5. Executive Session
   Consultation with Board's Attorney, 551.071; Discussion of Real Property, 551.072; Personnel Matters, 551.074
   A. Discussion of Contract of Athletic Director Dennis Alexander
      551.071; 551.074
6. Results of Executive Session
   A. Possible Action on Contract of Athletic Director Dennis Alexander
7. Adjourn

If, during the course of the meeting, discussion of any item on the agenda should be held in a closed meeting, the board will conduct a closed meeting in accordance with the Texas Open Meetings Act, Government Code, Chapter 551, Subchapters D and E or Texas Government Code section 418.183(f). Before any closed meeting is convened, the presiding officer will publicly identify the section or sections of the Act authorizing the closed meeting. All final votes, actions, or decisions will be taken in open meeting. [*See* BEC(LEGAL)]

The notice for this meeting was posted in compliance with the Texas Open Meeting Act on:

Friday, October 30, 2015
at 9:08 a.m.

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
14

For the Board of Trustees

**Troup ISD**
**Board of Trustees**
**Special Meeting**
**November 3, 2015**

The Troup Independent School District Board of Trustees met in Special Session on Tuesday, November 3, 2015 at 6:00 p.m. in the Board Room of the Administration Building, 201 N. Carolina Street, Troup, TX. The meeting was called to order at 6:00 p.m. and presided over by President Andy M. Griffin, Jr.

Following the Pledge of Allegiance, Andy M. Griffin, Jr. opened the meeting with prayer.

**Members Present:** President Andy M. Griffin, Jr.; Secretary Melissa Young; Members Shane Jasper and Robbie Switzer. Vice President Gene Whitsell and Member John Whitsell were not present.

**At 6:19 p.m. the board convened in Closed/Executive Session.**

**At 7:39 p.m. the board reconvened in Open Session.**

**Under Agenda Item #6:**
There was no action on the contract of Athletic Director Dennis Alexander.

**Under Agenda Item #7:**
At 7:40 p.m. Shane Jasper made a motion to adjourn the meeting. Robbie Switzer seconded the motion.
*Motion carried 4-0.*

_____          _____
Board President                                        Board Secretary

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT

15

# Notice of Special Meeting

## The Board of Trustees
## Troup ISD

A Special Meeting of the Board of Trustees of Troup ISD will be held December 18, 2015, beginning at 11:30 AM in the Board Room, 201 N. Carolina, Troup.

If, during the course of the meeting, discussion of any item on the agenda should be held in a closed meeting, the Board will conduct a closed meeting in accordance with the Texas Open Meetings Act, Government Code, Chapter 551, Subchapters D and E. Before any closed meeting is convened, the presiding officer will publicly identify the section or sections of the Act authorizing the closed meeting. All final votes, actions, or decisions will be taken in open meeting.

The subjects to be discussed or considered or upon which any formal action may be taken are listed below. Items do not have to be taken in the same order as shown on this meeting notice.

1. Call the meeting to order
2. Pledge of Allegiance
3. Prayer
4. Members Present
5. Discussion and Possible Action on Contract of Dennis Alexander, Athletic Director
6. Executive Session
   Consultation with Board's Attorney, 551.071; Discussion of Real Property, 551.072; Personnel Matters, 551.074
7. Results of Executive Session
   A. Possible Action on Executive Session Items
8. Adjourn

If, during the course of the meeting, discussion of any item on the agenda should be held in a closed meeting, the board will conduct a closed meeting in accordance with the Texas Open Meetings Act, Government Code, Chapter 551, Subchapters D and E or Texas Government Code section 418.183(f). Before any closed meeting is convened, the presiding officer will publicly identify the section or sections of the Act authorizing the closed meeting. All final votes, actions, or decisions will be taken in open meeting. [*See* BEC(LEGAL)]

The notice for this meeting was posted in compliance with the Texas Open Meeting Act on:

Tuesday, December 15, 2015 @ 10:21 a.m.

_____
For the Board of Trustees



PETITIONER'S EXHIBIT
16

PENGAD 800-631-6989

**Troup ISD**
**Board of Trustees**
**Special Meeting**
**December 18, 2015**

The Troup Independent School District Board of Trustees met in Special Session on Friday, December 18, 2015 at 11:30 a.m. in the Board Room of the Administration Building, 201 N. Carolina Street, Troup, TX. The meeting was called to order at 11:35 a.m. and presided over by President Andy M. Griffin, Jr.

Following the Pledge of Allegiance, Melissa Young opened the meeting with prayer.

**Members Present:** President Andy M. Griffin, Jr.; Secretary Melissa Young; Members Shane Jasper and Robbie Switzer. Vice President Gene Whitsell and Member John Whitsell were not present.

**At 11:36 a.m. the board convened in Closed/Executive Session.**

**At 12:09 p.m. the board reconvened in Open Session.**

**Under Agenda Item #7:**
Shane Jasper moved to propose the termination of Dennis Alexander as Athletic Director/Head Football Coach and that he be provided notice of this proposed termination as soon as possible. Robbie Switzer seconded the motion.
*Motion carried 4-0.*

**Under Agenda Item #8:**
At 12:10 p.m. Melissa Young made a motion to adjourn the meeting. Shane Jasper seconded the motion.
*Motion carried 4-0.*


_____                          _____
Board President                                              Board Secretary

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
17

## NOTICE OF PROPOSED TERMINATION OF TERM CONTRACT

Date of Notice:      December 18, 2015

Employee Name:    Dennis Alexander

On December 18, 2015, the Board voted to propose termination of your employment contract with the Troup Independent School District. A letter addressed to you from Mr. Stuart Bird, Superintendent is attached to this notice setting forth the information required under the Texas Education Code as well as the Troup ISD Board Policies. The letter specifically sets forth the reasons constituting good cause for termination of your contract.

Please take note of the requirements for you to request a hearing on this proposed action. All board policies are available to you both online or by request to the district who will make a copy of any policies you request. All direct questions regarding the proposed termination of your contract should be directed to your Superintendent and to the district's legal counsel.

Signed and dated this 18th day of December, 2015.

TROUP INDEPENDENT SCHOOL DISTRICT
BOARD PRESIDENT

ANDY GRIFFIN


PETITIONER'S EXHIBIT
18
PENGAD 800-631-6989

# *Troup Independent School District*

Fax: 903-842-4563     P.O. Box 578     Troup, Texas 75789     Phone 903-842-3067

December 18, 2015

Mr. Dennis Alexander
c/o Ron Adkison, Attorney at Law
300 W. Main Street
Henderson, Texas 75652



PETITIONER'S
EXHIBIT
19
PENGAD 800-631-6989

        Re:     Proposed Termination of Contract
                Dennis Alexander - Athletic Director/Head Football Coach

Dear Mr. Alexander:

        This letter is written pursuant to the Texas Education Code and Troup ISD Board Policies. Our board policies state that before any contract employees can be dismissed for good cause, the employee shall be given reasonable notice in writing of the charges against him or her and an explanation of the district's evidence regarding the charges.

        Presently you are on administrative leave/suspension from your duties at Troup Independent School District. Accordingly, this letter will serve as notice that you will remain on administrative leave/suspension, with pay, pending a hearing on your proposed termination per your discussions with Superintendent Stuart Bird. This letter will also serve as official notice that you are to turn over all school property in your possession at this time.

        The basis for my recommendation that your contract be immediately terminated is a result of the investigation indicating inappropriate contact with a student as well as inappropriate language directed toward students, including racial slurs. I am making the recommendation to the Board of Trustees that your contract be terminated after a full and complete hearing held pursuant to board policy.

        You have been given copies of the statements that have been gathered during the investigation through your attorney, Mr. Ron Adkison. The purpose of this letter is to set forth those specific items and the evidence that will be considered during any hearing.

        It is anticipated that evidence will come from six witnesses. The witnesses will include:

1.      Mr. Stuart Bird. Mr. Bird will testify concerning your inappropriate language during the football season together with your inappropriate contact with students. Mr. Bird will also testify concerning your contract with the district, expectations of you as an employee of the district as well as policies of the district. Further, Mr. Bird will testify that your conduct as an employee of the district was unacceptable and failed to meet the standards of Troup ISD.

2.      Sam McMullen Hamilton, Athletic Trainer. Ms. Hamilton will testify regarding your use of inappropriate language directed to the students, your use of racial slurs directed at players, your inappropriate contact with both players and students, and particularly your physical striking of students.

3.      Colton Whitsell, student.  Mr. Whitsell will testify that you struck him in the face on or about October 19, 2015.  He will also testify that the slap to his face was offensive, embarrassing, and caused him physical pain as well as humiliation.  Further, he will testify regarding your use of inappropriate language directed toward him and other players as well as employees of the district.

4.      Blake Attaway, student.  Mr. Attaway will testify that you struck him in the head which caused him physical pain as well embarrassment and humiliation.  He will further testify regarding your use of racial slurs and verbal abuse toward him and other players.

5.      Mr. John Eastman, employee.  Mr. Eastman will testify regarding your use of inappropriate language used toward students and staff.

The basis of my recommendation for proposed termination will be:

1.      Inappropriate contact with students;
2.      Behavior that presents a danger of physical harm to students;
3.      Assault of a student;
4.      Abuse of a student;
5.      Use of profanity in the course of performing your duties of employment in the presence of students and staff as well as the public;
6.      Failure to meet the district's standards of professional conduct;
7.      Failure to maintain an effective working relationship and good rapport with the students, staff and community; and
8.      Each of the above items standing alone and in conjunction with each other constitute good cause for the immediate termination of your contract.

If after receipt of this notification you desire to be heard and contest the recommended proposed action, you shall provide written notice within ten (10) days after receipt of this notice. You are also required to submit a written request to the administrator of education for the appointment of an independent hearing examiner and provide the board with a copy of the request not later than the 15th day after you receive this notice.  If the Board is not notified of a hearing request within ten (10) days of receipt of this notice or if you fail to timely request an appointment of an independent hearing examiner, the Board will vote to terminate your contract.

Please direct any questions regarding the proposed termination of your contract to the Superintendent with a copy to the district's legal counsel, Mr. John C. Hardy, 2080 Three Lakes Parkway, Tyler, Texas 75703.

Sincerely,

Stuart Bird, Superintendent
Troup Independent School District

# Troup Independent School District
## Coaching Staff Evaluation Form

Name: _Sam_ + _OUTSTANDING_

Rating:
- **S**   **Satisfactory Performance in this area**
  Meets or Exceeds expectations
- **I**   **In Need of Improvement**
  Performance in this area raises a level of concern and improvement is needed
- **U**   **Unsatisfactory**
  Performance in this area is not acceptable and improvement is needed

## Professional and Personal Relationships

1. ___+___   Unselfishly supports and promotes the TOTAL ATHLETIC program of the school
2. ___+___   Establishes rapport with all players without compromising team
3. ___+___   Establishes good rapport and a spirit of cooperation with administration, faculty and staff
4. ___+___   Establishes good rapport and spirit of cooperation with other members of the coaching staff
5. ___+___   Is candid, sincere, courteous, positive and cooperative in dealing with parents and patrons

## Coaching Performance

1. ___+___   Is an expert in all areas pertaining to their responsibilities in their sport
2. ___+___   Possesses the ability to relate knowledge of expertise in their sport
3. ___+___   Has the ability to perform under game conditions with class and poise at all times
4. ___+___   Develops and utilizes a well organized practice schedule that maximizes individual and team instruction opportunity (~~1000 reps~~)
5. ___+___   Develops game plans and strategies which are fundamentally sound, proactively planned, and imaginative

## Coaching Related Responsibilities

1. ___+___   Dresses appropriately for practices and games
2. ___+___   Consistently exhibits suitable sideline conduct toward players
3. ___+___   Develops respect by example in matters of appearance, manners, behaviors, language, and conduct during competition
4. ___+___   Displays enthusiasm and exhibits an intensity for coaching
5. ___+___   Is willing to work and spend the necessary time needed to produce quality
6. ___—___

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
20

## Equipment, Supplies and Facilities

1. _S_  Takes care of supplies and equipment and ensures that they are used properly

2. _S_  Issues and collects equipment in an orderly and business-like manner while keeping accurate records.

3. _S_  Regularly inspects equipment to ensure that it is in good repair and safe for use

4. _S_  Takes good care of facilities

5. _S_  Complies with established procedures related to the purchase of materials and services.

## Organizational and Administrative Responsibilities

1. _NA_  As a priority, the coach is a role model in their teaching field at school. This includes planning, organization, motivating students to learn, and striving to improve instructional delivery in order to prepare our students for success.

2. _S_  Willing to assist in planning contests, special events, banquets, award ceremonies, etc.

3. _+_  Is dependable and punctual in performing assigned responsibilities

4. _S_  Prepares necessary forms and paperwork completely, accurately, neatly, and on time.

5. _S_  Follows policies and procedures outlined in the athletic and school handbooks

6. _S_  Understands and follows all district and UIL guidelines, rules and regulations pertaining to the athletic eligibility and ethical conduct of coaches

*★ LIMIT cell phone USE DURING PRACTICE. Business only please. At FB TRAINING Room during athletics unless on school business. Keep me informed.*

Assignments 2013-14

Salary Adjustments for Assignments 2013-14

Goals for Coaching Career

Goals for Programs at Troup Independent School District

Needs for Your Program at Troup Independent School District (Head Coach only)

*QUESTIONS:*
*Student Asst. —2013*
*Help sanitizing Bands*
*Purchases 2013*
*Clinics*

_Dennis Alexander_

Dennis Alexander, Athletic Director

_4-10-13_
Date

Printed Name

*Jam, U are very talented & do great job.*

Signature

Date

# Troup Independent School District
## Coaching Staff Evaluation Form

Name: _Sam Mc Mullen Hamilton_

Rating:

**+**    *OUTSTANDING*

**S**    **Satisfactory Performance in this area**
Meets or Exceeds expectations

**I**    **In Need of Improvement**
Performance in this area raises a level of concern and improvement is needed

**U**    **Unsatisfactory**
Performance in this area is not acceptable and improvement is needed

## Professional and Personal Relationships

1. _S_    Unselfishly supports and promotes the TOTAL ATHLETIC program of the school
2. _S_    Establishes rapport with all players without compromising team
3. _S_    Establishes good rapport and a spirit of cooperation with administration, faculty and staff
4. _S_    Establishes good rapport and spirit of cooperation with other members of the coaching staff
5. _+_    Is candid, sincere, courteous, positive and cooperative in dealing with parents and patrons

## Coaching Performance

1. _S_    Is an expert in all areas pertaining to their responsibilities in their sport
2. _S_    Possesses the ability to relate knowledge of expertise in their sport
3. _I_    Has the ability to perform under game conditions with class and poise at all times
4. _S_    Develops and utilizes a well organized practice schedule that maximizes individual and team instruction opportunity (1000 reps)
5. _S_    Develops game plans and strategies which are fundamentally sound, proactively planned, and imaginative

## Coaching Related Responsibilities

1. _S_    Dresses appropriately for practices and games
2. _S_    Consistently exhibits suitable sideline conduct toward players
3. _S_ _But TRACK MEETS, FB PRACTICE, MORE PROFESSIONAL, INVOLVES NOT PARTY_    Develops respect by example in matters of appearance, manners, behaviors, language, and conduct during competition
4. _S_    Displays enthusiasm and exhibits an intensity for coaching
5. _S_    Is willing to work and spend the necessary time needed to produce quality

PENGAD 800-631-6989

PETITIONER'S
EXHIBIT
21

**Equipment, Supplies and Facilities**

1. _____S_____ Takes care of supplies and equipment and ensures that they are used properly
2. _____S_____ *Be Sure Insurance, Injuries, Parents* Issues and collects equipment in an orderly and business-like manner while keeping accurate records.
3. _____S_____ Regularly inspects equipment to ensure that it is in good repair and safe for use
4. _____S_____ *Clean Bandda, vinyl, if need cordls to do this let me know.* Takes good care of facilities
5. _____S_____ Complies with established procedures related to the purchase of materials and services.

**Organizational and Administrative Responsibilities**

1. _____S_____ As a priority, the coach is a role model in their teaching field at school. This includes planning, organization, motivating students to learn, and striving to improve instructional delivery in order to prepare our students for success.
2. _____S_____ Willing to assist in planning contests, special events, banquets, award ceremonies, etc.
3. _____S_____ Is dependable and punctual in performing assigned responsibilities
4. _____S_____ Prepares necessary forms and paperwork completely, accurately, neatly, and on time.
5. _____S_____ Follows policies and procedures outlined in the athletic and school handbooks
6. _____S_____ Understands and follows all district and UIL guidelines, rules and regulations pertaining to the athletic eligibility and ethical conduct of coaches

(1) More professionalism FB practice, track, No party end zone.
(2) Student Assts. (HS) need to be more focused.
(3) FB practice water — give it out but please have girls be not visiting during practice time.
(4) Please keep cell phone for important issues during athletic times.
(5) Have all paper work as discussed with Mr. Bird.
(6) Gatorade - each day summer workout. Where & cups

Assignments 2014-15

Salary Adjustments for Assignments 2014-15

Goals for Coaching Career

Goals for Programs at Troup Independent School District

Needs for Your Program at Troup Independent School District (Head Coach only)

_____DA_____     ___5-30-14___
Dennis Alexander, Athletic Director          Date

_____
Printed Name

_____     _____
Signature          Date

# Troup Independent School District
## Coaching Staff Evaluation Form

Name: _Sam Hamilton_

Rating:

 **+** OUTSTANDING
 S **Satisfactory Performance in this area**
 Meets or Exceeds expectations
 I **In Need of Improvement**
 Performance in this area raises a level of concern and improvement is needed
 U **Unsatisfactory**
 Performance in this area is not acceptable and improvement is needed

## Professional and Personal Relationships

1. **+** Unselfishly supports and promotes the TOTAL ATHLETIC program of the school
2. **+** Establishes rapport with all players without compromising team
3. **+** Establishes good rapport and a spirit of cooperation with administration, faculty and staff
4. **+** Establishes good rapport and spirit of cooperation with other members of the coaching staff
5. **S** Is candid, sincere, courteous, positive and cooperative in dealing with parents and patrons

## Coaching Performance

1. **+** Is an expert in all areas pertaining to their responsibilities in their sport
2. **+** Possesses the ability to relate knowledge of expertise in their sport
3. **+** Has the ability to perform under game conditions with class and poise at all times
4. **S** Develops and utilizes a well organized practice schedule that maximizes individual and team instruction opportunity (1000 reps)
5. **S** Develops game plans and strategies which are fundamentally sound, proactively planned, and imaginative

## Coaching Related Responsibilities

1. **+** Dresses appropriately for practices and games
2. **+** Consistently exhibits suitable sideline conduct toward players
3. **+** Develops respect by example in matters of appearance, manners, behaviors, language, and conduct during competition
4. **+** Displays enthusiasm and exhibits an intensity for coaching
5. **+** Is willing to work and spend the necessary time needed to produce quality



PETITIONER'S EXHIBIT
22

PENGAD 800-631-6989

## Equipment, Supplies and Facilities

1. _____S_____ Takes care of supplies and equipment and ensures that they are used properly
2. _____+_____ Issues and collects equipment in an orderly and business-like manner while keeping accurate records.
3. _____+_____ Regularly inspects equipment to ensure that it is in good repair and safe for use
4. _____S_____ Takes good care of facilities
5. _____+_____ Complies with established procedures related to the purchase of materials and services.

## Organizational and Administrative Responsibilities

1. _____S_____ As a priority, the coach is a role model in their teaching field at school.  This includes planning, organization, motivating students to learn, and striving to improve instructional delivery in order to prepare our students for success.
2. _____S_____ Willing to assist in planning contests, special events, banquets, award ceremonies, etc.
3. _____S_____ Is dependable and punctual in performing assigned responsibilities
4. _____+_____ Prepares necessary forms and paperwork completely, accurately, neatly, and on time.
5. _____+_____ Follows policies and procedures outlined in the athletic and school handbooks
6. _____+_____ Understands and follows all district and UIL guidelines, rules and regulations pertaining to the athletic eligibility and ethical conduct of coaches

Assignments 2013-14

Salary Adjustments for Assignments 2014-15

Goals for Coaching Career

Goals for Programs at Troup Independent School District

Needs for Your Program at Troup Independent School District (Head Coach only)

_Keep up Good Work.
Sorry for your pain+loss-
Love Y'all._

_____ Dennis Alexander, Athletic Director

6-3-15
Date

Sam Hamilton
Printed Name

Sam Hamilton
Signature

26May2015
Date